**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **STEVENS TRUCKING CO.,<br>WESTERN FLYER EXPRESS, LLC,<br>D & M CARRIERS, LLC, d/b/a<br>FREYMILLER TRUCKING,<br>IWX MOTOR FREIGHT, LLC,<br>CHRISTENSON TRANSPORTATION, INC.,<br>and E.O.S. INC.,<br><br>Plaintiffs,<br><br>v.<br><br>C.H. ROBINSON COMPANY, INC., d/b/a<br>C.H. ROBINSON WORLDWIDE,<br>C.H. ROBINSON INTERNATIONAL, INC.,<br>C.H. ROBINSON COMPANY, LLC, d/b/a<br>C.H. ROBINSON WORLDWIDE,<br>C.H. ROBINSON WORLDWIDE, INC., and<br>TOTAL QUALITY LOGISTICS, LLC,<br><br>Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br><br><br><br><br>**CIVIL ACTION NO.<br>2:26-cv-00869-JRG** |

**DEFENDANT TOTAL QUALITY LOGISTICS, LLC'S MOTION TO DISMISS THE CLAIMS OF PLAINTIFF IWX MOTOR FREIGHT, LLC UNDER RULE 12(b)(6)**

Defendant Total Quality Logistics, LLC ("TQL") moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts I through V of the Complaint (ECF No. 1) to the extent asserted by Plaintiff IWX Motor Freight, LLC ("IWX")[1] against TQL, and respectfully shows the Court as follows.

## I. SUMMARY OF THE MOTION

Stripped of its rhetoric, this is a dispute about IWX losing a price-competitive bidding war, the likely result of its own poor business practices. IWX dresses an ordinary commercial setback

[1] TQL submits this motion despite the fact TQL never used IWX as a motor carrier, it appears IWX is owned in whole, or in part, by Western Flyer Express, LLC, who as TQL's separate Motion to Dismiss lays out, executed a Broker-Carrier Agreement establishing Clermont County, Ohio as the exclusive venue for any claim.

that it is solely responsible for in the language of racketeering and false advertising because it cannot plead a single TQL act that caused a single IWX loss. The Complaint's most serious allegations — unsafe carriers, falsified logs, and coerced drivers — describe the conduct of those carriers, not Total Quality Logistics, LLC — a freight broker that buys hauling services from third-party motor carriers. The attempt fails at the threshold as a matter of law. .

The Complaint's own structure makes the gap plain. The business IWX says it lost — its PepsiCo, Ryder, Conagra, Associated Wholesale Grocers, and Danone accounts — it attributes to CH Robinson, not TQL. Compl. ¶ 217. The section of the Complaint addressed to TQL does not mention IWX at all. Id. ¶¶ 220–229. And the only IWX-specific bid losses the Complaint identifies — bids to Driscoll's and Graphic Packaging — failed on price: IWX's bids came in 20% or more above the shippers' own target rates, and no paragraph identifies TQL as the competing bidder or the winner on a single one of those lanes. Id. ¶¶ 336–337.

That missing connection is fatal because every count IWX asserts requires it. A civil RICO plaintiff must be injured "by reason of" the violation — a direct relation between the injury and the conduct alleged. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–61 (2006), and *Varela v. Gonzales*, 773 F.3d 704, 708–10 (5th Cir. 2014). The Lanham Act likewise requires injury flowing directly from the alleged deception. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133–34 (2014). IWX pleads neither. On its own allegations, the direct victims of the conduct it describes are the regulators allegedly deceived in carrier filings and the drivers allegedly coerced by motor carriers — not IWX, a competing bidder several steps downstream. And to the extent IWX's theory is that unlawful practices let others charge lower prices, the Supreme Court rejected exactly that cost-advantage theory of RICO causation in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–61 (2006).

IWX cannot close that gap by promising to supplement after discovery. Compl. ¶ 345. The pleading standard requires facts making the causal connection plausible now; it does not unlock discovery for a plaintiff armed with conclusions. *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009). Each count also fails on its own statutory elements, as set out below. For these reasons, Counts I through V should be dismissed as asserted by IWX against TQL.

TQL has separately moved to dismiss under the doctrine of forum non conveniens. to enforce the contracting plaintiffs' agreements selecting the state courts located in Clermont County, Ohio. TQL requests that the Court resolve the forum motion before the merits motions. This motion seeks a merits ruling only if the Court retains IWX's claims against TQL. It is self-contained and does not depend on TQL's separate motion concerning the other plaintiffs.

## II. STATEMENT OF ISSUES

1. Whether IWX's civil RICO claims (Counts I through IV) fail for lack of proximate cause, where IWX attributes its lost bids to price — bids exceeding the shippers' own target rates by 20% or more — and connects no TQL predicate act, bid, or representation to any lane or account it claims to have lost.
2. Whether Count I (18 U.S.C. § 1962(a)) fails because IWX pleads no injury flowing from TQL's use or investment of racketeering income, as distinct from the alleged predicate acts themselves.
3. Whether Count II (18 U.S.C. § 1962(b)) fails because IWX pleads no injury flowing from TQL's acquisition or maintenance of an interest in or control of an enterprise, as distinct from the alleged predicate acts themselves.
4. Whether Count III (18 U.S.C. § 1962(c)) independently fails because the Complaint pleads (a) no TQL predicate act of wire fraud with the particularity Rule 9(b) requires, (b) no facts establishing TQL's knowing participation in a forced-labor venture under 18 U.S.C. § 1589(b), and (c) no facts showing TQL operated or managed any RICO enterprise.
5. Whether alleged FMCSA violations, electronic-logging violations, and violations of 18 U.S.C. § 1001 can constitute RICO predicate acts under 18 U.S.C. § 1961(1).
6. Whether Count IV (RICO conspiracy, 18 U.S.C. § 1962(d)) fails because IWX pleads no RICO injury traceable to TQL and no facts plausibly showing that TQL agreed to the conspiracy's unlawful objective, as opposed to engaging in lawful parallel price competition.
7. Whether Count V (Lanham Act, 15 U.S.C. § 1125(a)(1)(B)) fails because IWX identifies no actionable TQL commercial advertisement, relies on non-actionable puffery and regulatory nondisclosure, and pleads no injury traceable to deception rather than price.

8. Whether dismissal of Counts I through V should be with prejudice where amendment would be futile.

## III. THE COMPLAINT'S ALLEGATIONS CONCERNING IWX

IWX is an Oklahoma limited liability company with its principal place of business in Missouri. Compl. ¶ 43. The Complaint organizes its allegations of customer interference by defendant. In the section addressing CH Robinson, it alleges that IWX suffered losses from 2022 through 2024 on its PepsiCo, Ryder, Conagra, Associated Wholesale Grocers, and Danone accounts, "on information and belief traceable to CH Robinson." Id. ¶ 217.

The section addressing TQL identifies Johnson Controls business allegedly lost by Stevens and Western Flyer and Bridgestone business allegedly lost by Christenson. Id. ¶¶ 220–227. It does not mention IWX. It closes with two collective sentences: that "Plaintiffs all lost significant business to TQL in a similar manner," and that TQL's conduct "precluded the Plaintiffs from participating meaningfully on bids." Id. ¶¶ 228–229.

The damages section adds two IWX-specific bid results. In Driscoll's Winter 2024 request for proposals, Driscoll's flagged 187 of the 235 lanes IWX bid as 20% or more above its target rate. Compl. ¶ 336. In Graphic Packaging International's third- and fourth-quarter 2024 requests for proposals, every IWX bid was graded 20% or more above target, and IWX alleges, on information and belief, that it lost significant lanes to Defendants' continued underbidding. Id. ¶ 337; see also id. ¶¶ 30–31. Neither paragraph identifies TQL as a competing bidder or winner on those lanes. Driscoll's is also included in the collective customer allegations. Id. ¶¶ 322–324. Paragraph 345 states that records identifying lane winners and rates are held by defendants and shippers and that plaintiffs will supplement their allegations. It does not identify a TQL transaction causing an IWX loss.

The Complaint also describes forces affecting freight rates apart from any alleged racketeering, including the industry-wide growth of the brokerage model and a record expansion

in the supply of licensed drivers. Compl. ¶¶ 62–65, 76–79. It further describes the relevant period as one Defendants characterized as a historic freight recession. *Id.* ¶ 4. TQL does not ask the Court to weigh evidence on these points. Their relevance is legal: as in *Anza*, a theory that requires the Court to separate the effect of alleged racketeering from other market forces the Complaint itself describes does not plead the direct relationship RICO requires. *See* 547 U.S. at 459–60.

## IV. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must plead facts allowing a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The Court accepts well-pleaded facts and draws reasonable inferences in the plaintiff's favor, but need not accept conclusions reciting statutory elements. *Id.* Allegations merely consistent with liability do not establish plausibility. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). When RICO predicates sound in fraud, Rule 9(b) requires particularity concerning the time, place, contents, speaker, and benefit obtained from the alleged misrepresentation. *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). Knowledge and intent may be alleged generally, but the allegations remain subject to Rule 8's plausibility requirement. Fed. R. Civ. P. 9(b); *Iqbal*, 556 U.S. at 686–87. The Complaint here is long on anecdotes cloaked as facts — generalized allegations about the industry, other brokers' practices, and injuries suffered by third-party drivers — but none of those is an element of the causes of action IWX asserts against TQL. They are rhetoric designed to distract from the absence of factual support.

A civil RICO plaintiff must plead that it was "injured in [its] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "By reason of" requires proximate cause—"some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). The directness requirement the Court expressed

in *Holmes* serves three practical concerns: (1) the less direct the injury, the harder it becomes to separate damages caused by the violation from damages caused by independent factors; (2) recognizing remote injuries forces courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels, raising the risk of multiple recoveries; and (3) directly injured victims can generally be counted on to vindicate the law, so there is no need to allow suits by the indirectly injured. *See Holmes* at 269-70. To succeed, RICO proximate cause requires a direct relationship between the statutory violation and the plaintiff's injury. *Anza*, 547 U.S. at 461. A remote or contingent chain does not satisfy that requirement merely because commercial harm was foreseeable or allegedly intended. *See Varela*, 773 F.3d at 708–10.

IWX's allegations must be evaluated under that directness requirement, separately for each asserted violation. The directness requirement applies to each subsection according to the particular violation it targets: for Counts III and IV (§ 1962(c) and (d)), the relevant conduct is the pattern of predicate acts; for Count I (§ 1962(a)), it is the use or investment of racketeering income; and for Count II (§ 1962(b)), it is the acquisition or maintenance of an interest in or control of the enterprise. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011); *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007)). IWX's injury is remote from the violation in each instance, as Sections IV.A through IV.C explain. The subsection-specific analysis in Sections IV.B and IV.C is therefore in addition to, not in substitution for, the directness analysis set out here.

## V. ARGUMENT

### A. Counts I-IV Fail for Lack of Proximate Cause Because IWX Does Not Connect Any TQL Act to an IWX Loss.

IWX's allegations describe what a competitive freight market looks like; naming coercion or regulatory evasion by motor carriers at step one of the supply chain does not supply the missing direct link to an IWX bid loss at step five. IWX's allegations are based solely on theories of remote or contingent causes that fail to state a plausible claim for relief. First, IWX's "cost advantage theory" for a RICO claim has been rejected by the U.S. Supreme Court in *Anza*. Second, IWX has no factual support for the asserted market effects, which is required under the Fifth Circuit's precedent in *Varela.* Third, it is readily apparent from IWX's allegations that the direct victims of the alleged bad acts (which acts are attributable to motor carriers, not TQL) are the government and the drivers of motor carriers, not IWX, thereby defeating the directness requirement for a RICO claim. Fourth, IWX cannot establish the direct causal connection by vague target-rate comparisons and collective allegations. As such, IWX's RICO claim against TQL must be dismissed for failure to state a plausible claim.

1. *IWX's real complaint is that others charged less—a cost-advantage theory that Anza rejects.*

*Anza* is closely analogous to IWX's claims. A steel supplier alleged that its principal competitor defrauded the New York tax authority, used the savings to charge lower prices, and thereby took the plaintiff's customers. 547 U.S. at 454–55. The Court held that the claim failed because the direct victim of the fraud was the State, not the competitor, *id*. at 458, and because the cause of the plaintiff's harm—the defendant's lower prices—was a set of actions distinct from the alleged RICO violation. *Id*. The plaintiff's lost sales "could have resulted from factors other than" the fraud, and assessing how much of the loss the fraud caused would require speculation. *Id*. at 459–60. The Court also rejected the argument that a defendant's aim to increase market share at a competitor's expense satisfies proximate cause. *Id*. at 460.

IWX's cost-advantage theory has the same structure, with even more intervening decisions than in *Anza*. In each category of alleged wrongdoing, the direct victim is someone other than IWX. The direct victims of the alleged regulatory fraud—carriers' filings with the FMCSA concerning their authority and compliance—are the regulator and the public, just as the State was the direct victim of the tax fraud in *Anza*. Compl. ¶¶ 257–263. The direct victims of the alleged forced labor are the coerced drivers. *Id.* ¶¶ 267–278. IWX's claimed injury depends on what happens after that conduct: carrier costs, broker prices, shipper benchmarks, and shippers' purchasing decisions among many bidders. *Id.* ¶¶ 150–156, 336–337. The Complaint does not explain how a particular TQL act produced the loss of an IWX bid for freight. It principally alleges that unlawful practices made lower market prices possible. Under *Anza*, that asserted economic advantage does not establish the required direct injury.

IWX's reliance on alleged shipper-directed fraud also fails but for a number of other reasons. Fraudulent communications to a third party can directly injure a competing bidder, but only where the deception itself is what diverts the business. In *Bridge*, the false attestations themselves determined the allocation of liens that the competing bidders otherwise would have received. 553 U.S. at 643–44, 658. And although the plaintiff need not at this stage demonstrate reliance on the misrepresentation, the Court cautioned that a plaintiff ordinarily cannot establish causation unless someone relied on it. *Id.* at 658. The Complaint fails to note what was relied upon, but nevertheless concludes IWX was somehow harmed. Compl. ¶¶ 210, 212, 223. Further, IWX's Complaint does not allege that Driscoll's or Graphic Packaging received a TQL representation, relied on one, or awarded any lane to TQL because of one. Instead, IWX attributes its rejected bids to price—bids that exceeded the shippers' own targets by 20% or more. *Id.* ¶¶ 336–337. A loss caused by price returns IWX to the cost-advantage theory that *Anza* forecloses.

2. *IWX Pleads No Facts Linking the Alleged Market Effects to Its Own Rates or Its Losses to TQL, as Fifth Circuit Precedent Requires*

IWX's allegations that the overall scheme had a market effect of lowering carrier prices fails for lack of any factual support directly linking the alleged market effects to TQL. Under Fifth Circuit precedent, such vague allegations are insufficient. In *Varela*, employees alleged that unlawful hiring practices expanded the labor supply and depressed their wages. 773 F.3d at 708–10. The Fifth Circuit declined to decide whether a wage-depression theory could ever proceed but held that the particular allegations did not plausibly establish proximate cause. *Id*. General economic assertions did not explain the relevant market or adequately connect the challenged practices to the plaintiffs' compensation. IWX similarly alleges that exploitation lowered carrier costs, which lowered brokerage prices and contributed to the rejection of its bids. That chain adds downstream pricing and purchasing decisions, without facts connecting TQL's alleged violation to a specific IWX loss. *Varela* supports dismissal of this insufficiently pleaded causal theory, without requiring a categorical rule against every competitive market injury.

*Molina-Aranda v. Black Magic Enterprises, L.L.C.*, 983 F.3d 779, 784–85 (5th Cir. 2020), provides a further analogy. The workers alleged fraudulent visa submissions followed by underpayment. The Fifth Circuit held that the reduced wages were several causal steps removed from the forms; the forms did not require the subsequent underpayment. *Id*. Likewise, alleging that carrier filings enabled hauling does not explain how those filings directly caused IWX's rejected bids.

3. *The Direct Victims, if any, of Motor Carriers' Acts Are Regulators and Drivers, Not IWX — and Bridge Does Not Supply A Substitute Link*

The presence of more directly injured victims underscores the lack of directness between the alleged RICO violation and IWX's claimed injury. *Holmes*, 503 U.S. at 269–70; *Anza*, 547 U.S. at 460. Drivers allegedly subjected to coercion are directly injured by the forced-labor conduct of the motor carriers that hired them, not the brokers, and the Complaint cites actions

those drivers have brought against those motor carriers. Compl. ¶¶ 99 n.10, 128 n.13. The regulator, not IWX, is the direct victim of the alleged filing fraud by the motor carriers. *Id.* ¶¶ 257–263. IWX's commercial injury arises at a later stage: the asserted effect of the carriers' practices on broker prices and shipper bid awards. At that stage, IWX is one of an indeterminate number of competing carriers and brokers that bid on the same lanes. Any one of them could claim that, but for lower market rates, it would have won the same award. Allowing each to sue would require courts to determine which bidder would have prevailed and to apportion damages among them, which would risk multiple recoveries for the same lost business—the concerns *Holmes* identified without even taking into consideration the fact that the winning bid was properly submitted and accepted. 503 U.S. at 269; *see Anza*, 547 U.S. at 459–60.

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648–50, 658–59 (2008), does not alter that analysis. There, false submissions were made in relation to the exact bids the plaintiffs were making. While the plaintiffs themselves did not receive or rely on the fraudulent statement, it was made in the bidding process which manipulated the allocation of tax liens, directly depriving competing bidders of liens they otherwise would have received. *Id.* at 643–44, 658–59. Unlike in other cases, the government suffered no injury, and the Court found neither independent causal factors nor a more immediate victim better situated to sue. *Id.* at 658. Here, the Complaint does not identify a TQL false submission affecting an award to which IWX otherwise would have been entitled. Its identified IWX bids instead are compared with shipper targets, without identifying TQL's bid or the deceptive representation affecting the award. Compl. ¶¶ 336–337. A competitive bidding process does not automatically defeat proximate cause, but invoking *Bridge* cannot supply those missing causal facts.

4. *Bids Priced Over Shipper Targets and "Defendants" Group-Pleading Still Connect Nothing to TQL.*

IWX's target-rate comparisons do not bridge the causal gap. Paragraphs 336–337 compare IWX's prices with shipper benchmarks, rather than identify TQL's competing price, a false TQL representation affecting the award, or facts connecting a TQL predicate act to the rejection of IWX's bid. Accepting the alleged shortfalls as true does not establish which portion, if any, resulted directly from TQL's alleged racketeering. That deficiency parallels the causal and damages problems identified in *Anza*, 547 U.S. at 458–60, and *Varela*, 773 F.3d at 708–10. And because the Complaint itself describes other forces affecting freight rates, Compl. ¶¶ 62–65, 76–79, determining what portion of IWX's shortfall is attributable to TQL's alleged racketeering—as opposed to those forces, CH Robinson, and other market participants—would require the speculation and apportionment *Anza* held inconsistent with proximate cause. 547 U.S. at 459–60.

The Complaint identifies CH Robinson in its allegations relating to IWX. Compl. ¶ 217. Its allegations addressing the Driscoll's and Graphic Packaging bids refer collectively to Defendants without identifying TQL as a bidder or winner. Id. ¶¶ 336–337. The collective allegations that plaintiffs lost business to TQL and that unlawful labor practices enabled the taking of their business, *id.* ¶¶ 178, 228–229, are conclusions that do not explain how TQL caused IWX's identified losses. The TQL pricing examples likewise are not connected to an IWX lane or award. Id. ¶¶ 186–187. Paragraph 345's anticipated supplementation does not cure the present absence of that connection.

The aggregate cost comparison adds no transaction-specific link. Paragraph 181 estimates industry operating costs from ATRI data. It does not explain why that aggregate benchmark establishes that a particular carrier used forced labor on a particular TQL load, that TQL possessed the required knowledge, or that the practice caused an IWX bid loss. The objection concerns the

missing factual basis for those inferences, not the accuracy of cost evidence to be resolved through factfinding.

IWX's statement that it "will supplement" once defendant- and shipper-held records are produced (Compl. ¶ 345) confirms, rather than cures, the defect: a plaintiff must plead facts making the causal connection plausible before discovery, and the pleading standard does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Iqbal*, 556 U.S. at 678–79, 686. The prospect that discovery might later supply the missing link between a TQL predicate act and an identified IWX loss cannot substitute for pleading that link now. Because IWX does not plead facts plausibly establishing the required direct causal relationship, Counts I through IV fail as to TQL for the reasons shown in the following table.

| Case | First bad act | Intervening step(s) before the plaintiff's loss | Who was directly hurt | Direct or indirect? (court's result) |
|---|---|---|---|---|
| **Anza** (S. Ct.) | Competitor defrauded the NY tax authority | Used tax savings to charge lower prices, which drew away customers | **The State** (the taxing authority) — not the competitor | **Indirect → no proximate cause.** Harm flowed from lower prices, a separate act from the fraud; lost sales "could have resulted from factors other than" the fraud; apportioning the loss would require speculation |
| **Varela** (5th Cir.) | Employers unlawful hiring of undocumented workers | Expanded the labor supply → depressed market wages | Employees generally (market-wide wage effect) | **Indirect → no proximate cause** on these facts. Court did not bar wage-depression theories categorically, but general economic assertions never explained the market or connected the practice to the plaintiffs' pay |
| **Molina-Aranda** (5th Cir.) | Fraudulent visa submissions | Separate later decision to | DOL/visa system (fraud target); | **Indirect → no proximate cause.** Reduced wages were |

| Case | First bad act | Intervening step(s) before the plaintiff's loss | Who was directly hurt | Direct or indirect? (court's result) |
|---|---|---|---|---|
| | | underpay the workers | underpayment of workers was a separate act | several steps removed; the forms did not require the underpayment |
| **Bridge** (S. Ct.) — *the contrast* | False attestations in the tax-lien auction by a bidder | **None** — the false attestations themselves reallocated the liens among multiple bidders | **The competing bidders** (the plaintiffs); the government suffered no injury | **Direct → proximate cause satisfied.** The deception itself determined the award; no independent causal factors and no more immediate victim better situated to sue |
| **Our case — IWX v. TQL** | Carriers' alleged FMCSA filing fraud **and** carriers' alleged forced labor | Multiple layers: lowered carrier costs → lowered broker prices → shipper rate benchmarks → shipper purchasing decisions among many bidders → IWX's bids rejected | **Regulators/public** (filing fraud) and **coerced drivers** (forced labor) — not IWX | **Indirect → no proximate cause.** IWX ties its losses to price (bids 20%+ over shipper targets), with no TQL bid, representation, or predicate act connected to any lost lane |

### B. Count I (§ 1962(a)) Fails Because IWX Ties No Injury to Any TQL Investment, and Instead Only Reasserts the Alleged Underbidding Injury under a Different Label.

Section 1962(a) prohibits the use or investment of racketeering income in an enterprise. The plaintiff must plead injury from that use or investment itself—not from the underlying predicate acts that generated the income. *Abraham v. Singh,* 480 F.3d 351, 356–57 (5th Cir. 2007); *Nolen v. Nucentrix Broadband Networks, Inc.*, 293 F.3d 926, 929–30 (5th Cir. 2002). Merely characterizing income as "reinvested" does not explain how the investment itself injured IWX.

That is all Count I alleges. It asserts that "Defendants" used racketeering proceeds "to expand and sustain their freight brokerage enterprises," which in turn "allowed Defendants to

expand enterprise capacity, underbid lawful competitors, and maintain freight market positions." Compl. ¶¶ 284–287. That is the same underbidding injury on which every other count rests, relabeled as reinvestment. It identifies no specific TQL investment, let alone one that injured IWX in a way distinct from the alleged predicate acts.

The contrast with the remand decision in *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321–23 (2d Cir. 2011), is instructive. There, the plaintiff tied the defendant's use of fraud proceeds to a concrete investment—opening a new store—and so pleaded a distinct investment injury. Count I identifies no comparable TQL investment connected to IWX's losses.

### C. Count II (§ 1962(b)) Fails Because IWX Ties No Injury to TQL's "Control" and Instead Only Reasserts the Same Alleged Underbidding Injury Under Another Different Label.

Section 1962(b) requires injury caused by acquisition or maintenance of an enterprise interest or control through racketeering, and the plaintiff's injury must flow from that acquisition or control, not from the predicate acts themselves. *Abraham*, 480 F.3d at 357. Section 1962(b) does not require an equity acquisition, and control can include maintenance as well as acquisition. But even on that broad reading, a plaintiff must still plead facts connecting its injury to the defendant's control of the enterprise. Count II does not.

Count II alleges that racketeering enabled "Defendants" to acquire and maintain enterprise control and dominance over capacity, bidding pipelines, and customer relationships, Compl. ¶ 291, and asserts (¶.294) that IWX's harm arose from control rather than merely from predicate acts. But it supplies no facts showing how TQL's acquisition or maintenance of control produced an IWX injury. Relabeling the same underbidding and lost-lane injuries as "injuries from control" does not address the missing causal link. That is apparent from comparing the injuries themselves. IWX's alleged injuries—bids rejected as exceeding shipper targets and lanes allegedly lost to underbidding—are the same injuries it attributes to the predicate acts under every other count.

Compl. ¶¶ 287, 294, 302, 336–337. The Complaint identifies no harm IWX suffered because TQL acquired or maintained control of an enterprise that IWX would not have suffered from the alleged predicate acts alone. That failure is fatal to Count II under *Abraham*, 480 F.3d at 357.

### D. Count III (§ 1962(c)) Independently Fails Because It Pleads No TQL Predicate Act and No TQL Direction of Any Enterprise

Independently of proximate cause, Count III fails because the Complaint does not plausibly allege that TQL committed any predicate act or conducted the affairs of any enterprise through a pattern of racketeering.

#### 1. *The Alleged FMCSA and Logging Violations by Motor Carriers Are Not RICO Predicates at All.*

These theories fail as a matter of law, not merely pleading. Regulatory and licensing allegations describe ordinary industry compliance disputes, not racketeering, and cannot be converted into predicates by volume or repetition. Racketeering activity is limited to the offenses enumerated in 18 U.S.C. § 1961(1). Alleged FMCSA violations, electronic-logging regulatory violations, and violations of 18 U.S.C. § 1001 are not independently enumerated predicates, and no amount of re-pleading can add them. Compl. ¶¶ 89–90, 247–248, 300–301.

IWX sweepingly alleges that carriers doctored logs to obtain payment for team service while operating a solo driver. Compl. ¶¶ 252–256. But that is fraud by the *carriers*, not TQL. On IWX's own allegations, the broker is the party that *pays* the carrier. *Id.* ¶ 153. So if carriers misrepresented the service they provided, TQL was the *recipient/victim* of the misrepresentation and the *buyer* of the misdescribed service, not its author. And in fact, TQL having been deceived would purportedly have paid the carrier for the services of a team when one was not utilized.

To make TQL a participant in the carriers' fraud rather than its victim, IWX would need facts showing TQL knew of and joined in the falsification. No such facts exist, and IWX is undone by its own allegations. The Complaint alleges only that carriers transmitted falsified records to brokers and that Defendants "knowingly derive a substantial economic benefit" from the carriers'

log manipulation, *Id.* ¶ 256., that is not enough. It neither identifies a fraudulent communication TQL made nor connects any such participation to IWX's losses. The lack of one of these is fatal. Missing both, IWX's Complaint must be dismissed.

2. *IWX Pleads No TQL Wire Fraud With Particularity — Only "Defendants" Generally*

The Complaint's TQL-specific customer allegations concern four customers: Armacell, an unnamed national bakery, Johnson Controls, and Bridgestone. Compl. ¶¶ 198–204, 221–227, 250. The bakery allegations include the asserted coercion of CW1 by MN89. Id. ¶ 204.

Because Count III rests on wire fraud, IWX must plead each alleged fraudulent communication by TQL with the particularity Rule 9(b) demands — the speaker, the content, the time and place, and what made it false. General allegations against "Defendants" collectively do not satisfy that standard. *See* Fed. R. Civ. P. 9; *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997).

But the general assertions concerning electronic bids, compliance certifications, and advertising refer collectively to Defendants, not to TQL individually. Id. ¶¶ 244–246, 249, 265–266. Identifying categories of communications and customers does not supply the particulars required for a TQL fraud predicate. *Tel-Phonic*, 975 F.2d at 1139.

Because none of the pleaded communications—bids, certifications, logbooks, or promises—is particularized as to TQL, the Complaint states no viable fraud predicate against it.

3. *TQL Is Pleaded as a Buyer of Hauling Services, Not a Knowing Participant in Any Forced-Labor Venture.*

The forced-labor beneficiary predicate under 18 U.S.C. § 1589(b) requires that the defendant (1) knowingly benefited, financially or by receiving anything of value, (2) from participation in a venture, (3) that the defendant knew or recklessly disregarded had engaged in providing or obtaining labor by prohibited coercive means. The statute's own knowledge-or-

reckless-disregard element governs this motion, and the Complaint pleads no facts satisfying it as to TQL.

The dispositive point is that knowing of a benefit from a commercial relationship with a carrier itself engaging in coerced labor is not enough. The statute requires knowing participation in the venture that obtained the coerced labor. Decisions construing the parallel civil standard in 18 U.S.C. § 1595 are instructive by analogy: an ordinary, arm's-length purchase of services from a supplier — without facts showing the buyer joined and facilitated the supplier's abuse — does not establish participation in a venture. *Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024)) (purchasing a commodity through the supply chain, "without more, is not 'participation in a venture' with the seller"). *Doe* construes § 1595 and is persuasive only, not a controlling construction of the criminal predicate asserted here, for which § 1589(b)'s own text governs.

Measured against that standard, the Complaint's allegations describe commercial dealing, not culpable participation. It alleges TQL's posting of loads, carriers' acceptance at quoted rates, and carrier recognition as grounds for the claim. Compl. ¶¶ 148–152, 168. Yet, those commercial activities do not plausibly establish participation in coercion. Paragraph 204's allegation that MN89 held CW1 hostage describes serious carrier conduct, but it does not allege facts showing TQL knew of the confinement, directed it, or knowingly participated in a venture using it to obtain labor. The connection between the carrier's alleged coercion and TQL's culpable participation cannot be supplied solely by TQL's purchase of hauling services or its asserted economic benefit.

The Complaint's most specific forced-labor allegation against TQL does not close this gap. Paragraphs 202 through 204 allege that a national bakery's contract required TQL to use carriers maintaining $10,000,000 in coverage and complying with FMCSA rules, that TQL "knowingly dispatched" carriers with only $1,000,000 in coverage and safety violations, and that one such carrier, MN89, "held CW1 hostage" at its yard. Compl. ¶¶ 202–204 11. Even taken as true, these

allegations establish, at most, that TQL purchased hauling from a carrier that later abused a driver — not that TQL knew of or participated in that coercion. The Complaint pleads no facts that TQL knew of CW1's confinement, directed it, or joined a venture to obtain labor through it. *See* Doe 1, 96 F.4th at 415-16. The other allegations add nothing of legal import. They describe, at most, a carrier's contractual breach — not coercion, and not any knowledge of coercion by TQL — and are designed to inflame rather than to plead a viable claim.

Two other independent factors confirm the absence of plausible allegations. First, there is no connection between the allegations and IWX. The bakery account is an account of other plaintiffs, not IWX; it is not connected to any IWX bid or loss, and so cannot supply the causal link to IWX that Counts I through IV require. See Compl. ¶¶ 336–337

Second, the alleged knowledge allegations fail on timing. Paragraph 175 identifies a single employee's reaction to a November 2025 social-media post – a reaction that post-dated IWX's alleged losses. Absent connecting facts, this does not establish TQL's knowledge in 2024 when the identified Driscoll's and Graphic Packaging bids (two customers for which there also is no allegation specific to TQL) were submitted. Id. ¶¶ 336–337. Asking the Court to infer TQL's criminal knowledge from nothing other than a favorable rate and an employee's reaction to a 2025 social-media post is not pleading knowing participation in a forced-labor venture; it is hindsight dressed as culpability. More broadly, the leap from industry-wide cost averages to TQL's knowledge of coercion rests on the same missing links identified above: an aggregate benchmark does not show what TQL knew about any specific carrier. Id. ¶¶ 181, 275, 278. Accordingly, IWX has pleaded only that TQL simply entered into a commercial relationship from which it received a benefit with a third-party that obtained coerced labor. There is not a single plausible factual allegation that TQL was a knowing participant in a venture to obtain coerced labor, and the Complaint therefore fails to plead the § 1589(b) beneficiary predicate.

4. *Competitors Buying Freight From the Same Carriers Is Not Operating or Managing an Enterprise.*

Section 1962(c) requires participation in the operation or management of the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183–85 (1993). An association-in-fact requires a common purpose, relationships among its members, and longevity sufficient to pursue that purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). TQL does not contend that every vendor relationship is categorically outside RICO or that an enterprise must have a formal hierarchy. The issue here though is narrower: whether the pleaded facts plausibly establish the particular association and TQL's role in directing its affairs through racketeering. On each of the Complaint's three enterprise theories, they do not.

The single-firm theory fails for lack of distinctness and/or lack of common purpose. Paragraph 235 describes the brokers' respective carrier networks. To the extent the purported TQL enterprise is only TQL operating its own business, the statutory person and enterprise must remain distinct. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–63 (2001). If the pleaded enterprise instead includes independent carriers, their inclusion may establish distinct members, but does not dispense with the common-purpose and operation-or-management requirements.

The joint association theory is improperly pled in conclusions, not facts. Paragraphs 236–237 allege a joint association of both brokers and carriers, sharing a purpose of maximizing profits and obtaining contracts through suppressed rates. But those assertions must be supported by facts establishing coordinated enterprise activity and TQL's participation in directing it through racketeering. That two competitors allegedly purchase low-cost hauling from the same carriers does not, without more, establish that they jointly operate a common enterprise. The Complaint describes reciprocal economic incentives, but never explains how the alleged joint organization makes decisions or how TQL directs its affairs through predicate acts.

The Super-Ego theory has nothing to do with TQL, but also contains no factual allegations of control. Paragraph 238 separately invokes the Super Ego enterprise, which allegations are directed towards another defendant rather than TQL. Regardless, the alleged purchase of hauling services from its carriers does not itself show that TQL directs the enterprise's affairs. Nor are there any facts pleaded that support TQL's role as an outsider participating in operation or management. *Reves*, 507 U.S. at 184–85. Assertions of customer status, rate pressure, and economic benefit do not alone establish it.

Across all three theories, the Complaint alleges that TQL bought hauling from the same carriers as its competitors and benefited from low rates—but nowhere pleads facts showing that TQL operated or managed any RICO enterprise through a pattern of racketeering, and the § 1962(c) claim should be dismissed.

### E. Count IV (Conspiracy) Fails Because There Is No Injury Traceable to TQL and Only Parallel Price Competition, Not an Agreement

Count IV's civil RICO conspiracy claim fails independently of the substantive RICO counts on two separate grounds: IWX pleads no RICO injury caused by TQL and pleads no facts plausibly showing that TQL agreed to the conspiracy's unlawful objective.

A civil RICO conspiracy plaintiff must be injured by an overt act that is itself racketeering or otherwise wrongful under RICO. *Beck v. Prupis*, 529 U.S. 494, 505–07 (2000). IWX's failure to plead a qualifying injury proximately caused by TQL's alleged RICO conduct independently defeats Count IV on its own. *See Nolen*, 293 F.3d at 930. A conspiracy label cannot cure the missing causal relationship.

Count IV also alleges that TQL knew of and agreed to the Illegal Carriers' overall activities without facts plausibly supporting that agreement. Compl. ¶ 304. What the Complaint actually describes—using the same carrier network and a shared pursuit of lower costs—reflects parallel commercial incentives, not a meeting of the minds on unlawful conduct. Id. ¶¶ 92–94, 236–238.

And although an agreement may be inferred from circumstances and does not require a written contract or an express communication pleaded verbatim, the circumstances must plausibly make an agreement to the enterprise's *unlawful* activity more plausible than ordinary brokerage transactions or lawful parallel conduct. *See Twombly*, 550 U.S. at 556–57; *Tel-Phonic*, 975 F.2d at 1140–41. The allegations here do not cross that line of plausibility—they are merely consistent with two competitors independently acting to obtain lower costs, which is precisely the parallel conduct that is insufficient to state a claim.

Given that IWX pleads neither a RICO injury traceable to TQL nor facts plausibly showing TQL's agreement to any unlawful objective, Count IV should be dismissed.

**F. Count V (Lanham Act) Fails Because There is No Identified TQL Advertisement and No IWX Loss Traced to Deception Rather Than Price.**

IWX's Lanham Act false-advertising claim fails for three independent reasons. First, the Complaint pleads advertising collectively, attributing a mix of statements to both brokers without identifying the particular TQL promotion, dissemination, or link to IWX's injury—so it does not plead "commercial advertising or promotion" by TQL at all. Second, even taken statement-by-statement, the pleaded representations are either non-actionable puffery or future compliance assertions unsupported by facts, and neither a regulatory nondisclosure nor an alleged breach substitutes for a deceptive representation. Third, the Complaint pleads no injury proximately caused by any deception—only price competition, which does not show that TQL's advertising caused shippers to withhold business from IWX. Each failure independently defeats the claim.

1. *IWX Never Identifies Any TQL Advertisement That Allegedly Took Its Business.*

Section 43(a)(1)(B) requires a false or misleading representation in commercial advertising or promotion. 15 U.S.C. § 1125(a)(1)(B). Whether dissemination is sufficient depends on the relevant purchasing public and industry. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384–86 (5th Cir. 1996). Targeted sales presentations can qualify; individualized communications are not

categorically excluded. *Id*. TQL therefore challenges the sufficiency of the pleaded promotion, not merely the fact that a statement allegedly was directed to a particular shipper.

Measured against that requirement, the Complaints advertising allegations are too diffuse to state a claim. Paragraph 266 mentions web advertisements, and paragraphs 308–310 allege widespread oral, written, and online promotion. But the Complaint never identifies the particular TQL advertising content, its dissemination in the relevant market, and its relationship to IWX's injury. A collective description of statements made by both brokers to a list of customers does not explain which TQL promotion allegedly diverted business from IWX. Without those facts, the advertising theory is not plausible.

2. *Puffery and a later breach are not actionable deception*

The alleged statements must be evaluated individually and so evaluated, are not actionable. General assertions that safety is paramount or that drivers are among the safest are classic non-actionable puffery while assertions that drivers were trained or rigorously vetted likewise are non-actionable puffery though they may toe the line. Compl. ¶¶ 311–312; *see Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496–97 (5th Cir. 2000). Regardless, the Complaint pleads these statements collectively, without adequate context identifying TQL's actionable representation and its causal effect on IWX.

Labeling a representation one of "future compliance" does not automatically insulate it from liability, Compl. ¶ 313, but neither does not alleged breach supply a deception. Paragraph 318 asserts that Defendants had no intention of following contractual terms, yet the Complaint must support that assertion with plausible facts rather than infer intent solely from later carrier conduct. A false-advertising claim requires a deceptive representation when made, not a subsequently asserted breach.

Nor do the Complaint's omission and regulatory theories close the gap. An omission of federally required labeling is not, standing alone, an actionable false advertisement absent the affirmative representation. *IQ Products Co. v. Pennzoil Products Co.*, 305 F.3d 368, 373–74 (5th Cir. 2002) (rejecting an effort to use a competitor's omission of federally required labeling as a Lanham Act claim without the affirmative representation asserted by the plaintiff). That principle does not exclude omissions that make an actual representation misleading, but because the Complaint alleges both affirmative statements as well as nondisclosures, Compl. ¶¶ 311–319, each asserted omission therefore must be connected to the particular TQL statement it allegedly renders false or misleading. Federal regulation does not categorically displace a Lanham Act claim based on deceptive commercial representations, while the converse is equally true: alleging a regulatory violation or non-disclosure does not dispense with the statute's separate requirements of actionable advertising, deception, materiality, and causally related injury. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115–21 (2014). The alleged noncompliance may supply context for an otherwise actionable representation, but it cannot substitute for one.

3. *IWX lost on price, not deception, so there is no injury from any TQL advertising*

Even assuming the Complaint sufficiently pleads actionable TQL advertising, IWX must plead economic or reputational injury flowing directly from that deception, ordinarily through consumers withholding trade from the plaintiff. *Lexmark*, 572 U.S. at 133–34. The Complaint does not. Graphic Packaging appears in the collective statement-recipient allegations, Compl. ¶ 309, and Driscoll's appears in the collective customer allegations, id. ¶¶ 322–324. Those references do not explain how a TQL advertisement affected either shipper's consideration of IWX's bid.

IWX's specific bid allegations concern prices above target and underbidding. Id. ¶¶ 336–337. Price competition can coexist with deception, but a price shortfall alone does not explain

whether TQL's deception—rather than ordinary price competition—caused business to be withheld from IWX. The Complaint must connect the false or misleading promotion to the lost trade, and its collective assertions do not.

### G. Given that the Legal Theories — Not Just the Facts — Are Deficient, Dismissal Should Be With Prejudice and Any Amendment Limited.

IWX has not pleaded facts connecting TQL's asserted statutory violations to its identified injuries. TQL requests dismissal of all five counts as asserted by IWX against TQL. The Court should reject as legally insufficient the proposition that standalone FMCSA or § 1001 violations are RICO predicates, and the proposition that economic benefit alone establishes a forced-labor beneficiary predicate. To the extent IWX rests its claims solely on those propositions, further repetition cannot cure them. No amount of additional detail about carrier misconduct can supply what is missing — a TQL act tied to an IWX loss. That is why IWX leads with the carriers' conduct instead.

Other identified deficiencies concern missing causal, investment, control, participation, or advertising facts. If the Court permits amendment, TQL requests that IWX be required to supply facts addressing the defects, including the particular TQL conduct, its relationship to IWX's loss, the relevant enterprise activity or investment, and the deception allegedly causing lost trade. The request is for a plausible statutory claim, not exhaustive proof or a list of every lost lane. Discovery does not replace the pleading requirement. *Iqbal*, 556 U.S. at 678–79, 686. IWX cannot use discovery to find the TQL conduct its Complaint never alleges. A competitor's lost freight, repackaged with the carriers' alleged misconduct, is not a federal racketeering case against TQL — and no repleading can make it one.

## VI. PRAYER

TQL respectfully requests that the Court first resolve its forum non conveniens motion.[2] If the Court retains IWX's claims against TQL, TQL requests dismissal of Counts I through V as asserted by IWX against TQL, with prejudice to the extent amendment would be futile, and such other relief as the Court deems appropriate. If amendment is allowed, TQL requests that it address the particular defects identified above. This motion seeks no merits ruling on claims dismissed to the contractual forum and no relief concerning IWX's claims against the C.H. Robinson defendants.

Respectfully submitted
***/s/ David L. Ortega***
David L. Ortega
State Bar No. 00791377
James M. Parker, Jr.
State Bar No. 15488710
NAMAN, HOWELL, SMITH & LEE, PLLC
10001 Reunion Place, Suite #600
San Antonio, Texas 78216
Telephone: (210) 731-6364
Facsimile: (210) 785-2950
dortega@namanhowell.com

David B. Dowell
State Bar No. 0677950
NAMAN HOWELL SMITH & LEE, PLLC
1300 Summit Ave., Suite 700
Fort Worth, Texas 76102
Telephone: (817) 509-2062
Facsimile: (817) 509-2060
bdowell@namanhowell.com

**ATTORNEYS FOR DEFENDANT,
TOTAL QUALITY LOGISTICS, LLC**

[2] As noted above TQL has separately moved to dismiss for forum non conveniens and to sever the five contracting plaintiffs' claims for litigation in the agreed Clermont County, Ohio forum. TQL respectfully requests that the Court resolve that motion before reaching the merits addressed here. The arguments concerning the forum-selection agreements, and any argument that IWX's claims are bound to that forum, are made in that motion and are not repeated here.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of October 2026, the foregoing documents, was filed with the Clerk of Court using the CM/ECF system, and was served on all counsel of record via **E-File Notification:**

***/s/ David L. Ortega***
David L. Ortega

James Wren, SBN: 22018200
Louie J. Cook, SBN: 24101191
14205 N Mo Pac Expy Ste. 570
Austin, Texas 78728
Telephone: 737-292-4926
Jim@wrencookattorneys.com
Laura@wrencookattorneys.com
louie@wrencookattorneys.com

Brad Beckworth, SBN. 24001710
Trey Duck, SBN. 24077234
Drew Pate, SBN. 24079111
Jessica Underwood, SBN. 24093291
Ryan Hering, SBN. 24143005
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
bbeckworth@nixlaw.com
tduck@nixlaw.com
dpate@nixlaw.com
junderwood@nixlaw.com
rhering@nixlaw.com

J. Travis Underwood
SBN: 24102587
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
travis@gillamsmithlaw.com

**ATTORNEYS FOR PLAINTIFFS**

***/s/ David L. Ortega***
David L. Ortega