**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **STEVENS TRUCKING CO.,**<br>**WESTERN FLYER EXPRESS, LLC**<br>**D & M CARRIERS, LLC, d/b/a**<br>**FREYMILLER TRUCKING,**<br>**IWX MOTOR FREIGHT, LLC,**<br>**CHRISTENSON TRANSPORTATION, INC,**<br>**and**<br>**E.O.S., INC.**<br>**Plaintiffs,**<br>**v.**<br><br>**C.H. ROBINSON COMPANY, d/b/a**<br>**C.H. ROBINSON WORLDWIDE**<br>**C.H. ROBINSON INTERNATIONAL, INC.**<br>**C.H. ROBINSON COMPANY, LLC,**<br>**d/b/a C.H. ROBINSON WORLDWIDE,**<br>**C.H. ROBINSON WORLDWIDE, INC.,**<br>**and**<br>**TOTAL QUALITY LOGISTICS, LLC,**<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO:**<br>**2:26-cv-00869-JRG** |

**DEFENDANT TOTAL QUALITY LOGISTICS, LLC'S MOTION TO DISMISS THE CLAIMS OF THE FIVE CONTRACTING PLAINTIFFS UNDER RULE 12(b)(6)**

Total Quality Logistics, LLC (TQL) moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts I through V asserted against it by Stevens Trucking Co. (Stevens), Western Flyer Express, LLC (Western Flyer), D & M Carriers, LLC, d/b/a Freymiller Trucking (Freymiller), Christenson Transportation, Inc. (Christenson), and E.O.S. Inc. (EOS). This motion addresses those five plaintiffs together while recognizing the differences in their pleaded injuries. TQL separately moves to dismiss IWX Motor Freight, LLC's claims.

## I. INTERACTION WITH DEFENDANT'S FNC MOTION

Although dismissal is independently warranted on every ground below, the Court should decide TQL's threshold forum non-conveniens motion first for each of these five plaintiffs that agreed to litigate exclusively in Clermont County, Ohio. The Rule 12(b)(6) grounds below are presented strictly in the alternative—and every one of them independently requires dismissal.

TQL therefore requests that the Court decide its separate Rule 21 and forum non conveniens motion before reaching these merits grounds. If the Court severs and dismisses these plaintiffs' claims in favor of the agreed Clermont County, Ohio state forum, that forum should address their merits, or lack thereof. TQL presents this Rule 12(b)(6) motion strictly in the alternative for any claim the Court retains. The merits grounds do not depend on enforcement of a forum agreement and require no contractual exhibit or evidentiary declaration.

## II. SUMMARY OF MOTION

Stripped of its rhetoric, this is a dispute about Plaintiffs losing freight to a lower bidder, the likely result of their poor business practices. Plaintiffs dress this ordinary commercial setback that they are solely responsible for in the language of racketeering and false advertising because they cannot plead a single TQL act that caused a single lost account. Total Quality Logistics, LLC (TQL) is a freight broker that buys hauling services from third-party motor carriers. The Complaint's most serious allegations — unsafe carriers, falsified logs, and coerced drivers — describe the conduct of those carriers, not TQL, and the Complaint never connects any TQL act to any lost account these plaintiffs identify.

In any event, the Complaint's own structure defeats it. It attributes most of these plaintiffs' lost accounts to CH Robinson, not TQL. Its TQL-specific allegations reduce to two narratives — Stevens's and Western Flyer's Johnson Controls diversion and Christenson's Bridgestone account — while Freymiller and EOS rest on collective, undifferentiated attribution to "Defendants." None of these allegations supplies what RICO and the Lanham Act require: a TQL predicate act or advertisement pleaded with particularity and tied directly to a particular plaintiff's lost freight. this is a defect that runs through every count — the absence of a direct causal link between any TQL violation and any plaintiff's injury. Low rates, carrier noncompliance, and a declining freight market do not establish that TQL committed racketeering or false advertising.

Each count also fails for additional independent reasons. Counts I and II (§ 1962(a)–(b)) plead no injury from TQL's investment of racketeering income or its acquisition or control of an enterprise, as distinct from the same underbidding injury alleged elsewhere. Count III (§ 1962(c)) pleads no particularized TQL predicate act and no distinct enterprise that TQL is alleged to operate or manage. Count IV (conspiracy) pleads parallel economic self-interest, not an agreement to racketeer. And Count V (Lanham Act) identifies no specific TQL advertisement and no loss traceable to deception rather than price. The Court should dismiss Counts I through V as to each of the five plaintiffs, with prejudice where amendment would be futile.

## III. STATEMENT OF ISSUES

1. Whether the Court should resolve TQL's threshold Rule 21 and forum non conveniens motion before reaching these alternative merits grounds.
2. Whether Plaintiffs' civil RICO claims (Counts I through IV) fail for lack of proximate cause, where each plaintiff ties its injury to market-wide rate compression and benchmark comparisons rather than to any TQL predicate act connected to a particular lost account, margin, or revenue figure.
3. Whether the Complaint pleads TQL's alleged wire fraud with the particularity Rule 9(b) requires and connects any identified misrepresentation to a particular plaintiff's lost freight.
4. Whether alleged FMCSA violations, electronic-logging violations, 18 U.S.C. § 1001 offenses, and licensing fraud can constitute RICO predicate acts, and whether a government license is "property" under the federal fraud statutes.
5. Whether the Complaint pleads TQL's knowing participation in a forced-labor venture under 18 U.S.C. § 1589(b), or conduct satisfying 18 U.S.C. § 1581 peonage, as distinct from an ordinary purchase of transportation at a favorable rate.
6. Whether Count I (18 U.S.C. § 1962(a)) fails because Plaintiffs plead no injury from TQL's use or investment of racketeering income distinct from the underbidding injury alleged elsewhere.
7. Whether Count II (18 U.S.C. § 1962(b)) fails because Plaintiffs plead no injury from TQL's acquisition or maintenance of an interest in or control of an enterprise distinct from that same injury.
8. Whether Count III (18 U.S.C. § 1962(c)) fails because Plaintiffs plead no enterprise distinct from TQL's own brokerage business and no facts showing TQL operated or managed the affairs of any alleged association-in-fact through a pattern of racketeering.
9. Whether Count IV (RICO conspiracy, 18 U.S.C. § 1962(d)) fails because Plaintiffs plead parallel economic self-interest rather than an agreement to racketeer, and no RICO injury traceable to TQL.
10. Whether Count V (Lanham Act, 15 U.S.C. § 1125(a)(1)(B)) fails because Plaintiffs identify no actionable TQL advertisement and no sale lost to deception rather than price.

11. Whether dismissal should be with prejudice where amendment would be futile, and whether any dismissal and any leave to amend should be addressed count-by-count and plaintiff-by-plaintiff.

## IV. THE COMPLAINT'S PLAINTIFF-SPECIFIC ALLEGATIONS

The Complaint asserts four RICO counts and one Lanham Act false-advertising count against all defendants. Compl., ECF No. 1, ¶¶ 280–325. It describes CH Robinson and TQL separately in substantial portions of the factual narrative. Id. ¶¶ 160–178, 191–205, 206–229. Those differences matter because *each plaintiff* must plead a basis for recovering from TQL, individually or through a sufficiently pleaded joint theory.

In looking at their specific claims, Stevens and Western Flyer have the most explicit TQL-diversion allegations. Paragraphs 220–224 allege that TQL targeted Johnson Controls, made the promises attributed to CH Robinson in paragraph 208, concealed its intended use of allegedly illegal carriers, and caused Johnson Controls to divert freight from those plaintiffs. Paragraph 223 expressly alleges shipper reliance. TQL challenges the particularity and factual support of that fraud narrative and the remaining statutory elements.

Christenson's TQL-specific allegations concern Bridgestone. Paragraphs 225–227 allege lost business, TQL's role in setting distribution pricing, and representations of carrier compliance despite use of nonqualifying carriers. The Complaint separately attributes Christenson's Kroger, WestRock, and Kraft Heinz losses to CH Robinson. *Id.* ¶¶ 213–215. Its damages section aggregates losses across multiple accounts and a two-year decline in total revenue. *Id.* ¶ 340. Those aggregate losses do not identify which injury was caused by the asserted TQL statutory violation.

Freymiller's specific interference allegations identify CH Robinson's Kroger, Pepsi, Spartan Nash, and Nutrisystem business. *Id.* ¶¶ 213–216. Its damages section identifies 63 customers and approximately $51.2 million in lost sales allegedly lost to Defendants collectively.

*Id.* ¶ 341. The TQL section supplies the collective assertion in paragraph 228, but no corresponding Freymiller account-specific TQL transaction.

EOS alleges losses on Graphic Packaging, Riceland Foods, Clearwater Paper, and WestRock accounts and freight moving through Graphic Packaging's Texarkana Mill. Compl. ¶¶ 30–32, 342–344. The Complaint attributes those losses collectively to Defendants without identifying a particular TQL representation or bid tied to EOS's lost freight. Western Flyer's additional alleged losses involve Graphic Packaging's 2025 Waco RFP and Pilgrim's Pride, including Camp County freight. Id. ¶¶ 34–35, 338–339. Stevens' additional damages examples involve Armacell, Ford, and Goodyear. Id. ¶¶ 332–334. The Complaint attributes Stevens' Armacell diversion specifically to CH Robinson elsewhere, although it also alleges that TQL serves Armacell. Id. ¶¶ 198–200, 207–212.

Paragraph 345 anticipates supplementation with records identifying lane winners and rates held by Defendants and shippers. The prospect of later supplementation, however, cannot supply a presently missing statutory element. The Court must assess the facts pleaded now, including the particular TQL narratives, rather than treat anticipated discovery as factual support for every asserted loss.

## V. ARGUMENT AND AUTHORITIES

### A. *Plaintiffs' Statutory Theories Lack the Factual Support Rules 8 and 9(b) Require*

A complaint must contain facts supporting a plausible inference of liability. Conclusory allegations and recitals of elements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The Court accepts well-pleaded facts and reasonable inferences in plaintiffs' favor without assuming that a conclusion of statutory liability follows from every allegation of a poor safety record, low price, or lost customer.

Fraud predicates additionally require particularity concerning the time, place, contents, speaker, and benefit obtained from the alleged misrepresentation. *Tel-Phonic Servs., Inc. v. TBS*

*Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177–78 (5th Cir. 1997); Fed. R. Civ. P. 9(b). Knowledge and intent may be alleged generally, but remain subject to Rule 8's plausibility requirement. *Iqbal*, 556 U.S. at 686–87. The Complaint here contains many anecdotes cloaked as facts, including allegations generally about the industry or of other brokers' practices and third-party driver injuries, but none of those are elements of the particular causes of action asserted against TQL—they are merely rhetoric designed to distract from the absence of factual support..

A civil RICO plaintiff must plead injury to business or property by reason of a violation of § 1962. *See* 18 U.S.C. § 1964(c). The required proximate cause demands a direct relationship between the asserted injury and the injurious conduct. *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268–70 (1992). The directness requirement serves three practical concerns the Court identified in *Holmes*: (1) the less direct the injury, the harder it is to separate damages caused by the violation from damages caused by independent factors; (2) recognizing remote injuries forces courts to adopt complicated rules apportioning damages among plaintiffs at different removes, risking multiple recoveries; and (3) directly injured victims can generally be relied upon to vindicate the law. *Id*. at 269–70. That requirement must be applied to the particular subsection and causal theory it targets, not merely to the Complaint's general assertion of wrongdoing.

B. *Plaintiffs Do Not Plead TQL's Alleged Fraud With Particularity or Tie Any Misrepresentation to a Plaintiff's Loss*

Plaintiffs' wire-fraud theory rests on allegations that TQL made safety-and-compliance promises to shippers, contracted electronically, and then used noncompliant carriers. Compl. ¶¶ 197–205, 243–266. As noted above, when a RICO claim rests on fraud, Rule 9(b) requires the "time, place, contents, speaker, and benefit obtained" of each misrepresentation. *Tel-Phonic*, 975 F.2d at 1139. The Complaint's TQL narratives do not meet that standard, and — separately — none of them connects an identified misrepresentation to a particular plaintiff's lost freight.

The two most developed narratives illustrate the gap. The Johnson Controls allegations

incorporate by reference the promises attributed to CH Robinson in paragraph 208, and the Bridgestone allegations assert a compliance representation coupled with inconsistent carrier use. Compl. ¶¶ 221, 227. Neither identifies the TQL speaker, the particular communication or certification, or the circumstances tying its making and falsity to the diversion alleged. Naming a customer and observing that contracts are typically electronic does not particularize a fraudulent transmission.

The Complaint's other examples do not close the gap either. The national-bakery allegations supply a March 2023 contract and assert inadequate carrier insurance and regulatory violations, Compl. ¶¶ 202–205, and the Armacell allegations identify a code of conduct TQL allegedly agreed to follow, Compl. ¶¶ 192, 198–200, 211–212. But neither connects the identified representation to a moving plaintiff's loss — the bakery freight is tied to no plaintiff, and no particularized TQL communication is alleged to have caused Stevens to lose the Armacell freight it identifies. Compl. ¶ 333.

Further, the Complaint here does not particularize TQL's fraudulent scheme, and it does not connect any misrepresentation to a plaintiff's injury. Paragraphs 199 and 318 assert contemporaneous fraudulent intent, but they infer it from the premise that low rates necessarily reveal forced labor or that later carrier noncompliance proves an earlier false promise — inferences Rule 8 does not require the Court to accept. *Iqbal*, 556 U.S. at 686–87. These deficiencies warrant dismissal of any theory resting on an inadequately pleaded wire-fraud predicate; where a count is also supported by a different, adequately pleaded predicate, the enterprise, participation, and causation elements still must be met.

### C. *Regulatory Violations, Licensing Fraud, and the Carriers' Own Recordkeeping Are Not TQL Wire-Fraud Predicates*

Separately, several categories of alleged misconduct cannot serve as RICO predicates at all. Regulatory and licensing allegations are not enumerated predicates and describe ordinary industry compliance disputes, not racketeering. They cannot be made into proper predicates by

mere volume or repetition.

FMCSA violations, ELD violations, and § 1001 offenses are not among the predicates Congress enumerated in § 1961(1), and no amount of re-pleading can add them to stave off dismissal. 18 U.S.C. § 1961(1);Compl. ¶¶ 89–90, 247–248, 300–301. Such conduct may be relevant to a separately pleaded fraud or forced-labor offense, but that offense must itself be pleaded — the regulatory breach alone is not racketeering.

The licensing-fraud theory also is foreclosed as a matter of law. A government license is not "property" in the government's hands under the federal fraud statutes, so a scheme directed at obtaining regulatory permission is not property fraud merely because the permission later enables commercial activity. *Cleveland v. United States*, 531 U.S. 12, 20–27 (2000); Compl. ¶¶ 257–263. That principle does not reach a separately alleged scheme to obtain a *shipper's* money through material deception.

Finally, the carriers' own allegedly falsified records are not TQL's wire fraud. The allegation that carriers transmitted doctored logs to brokers and shippers to obtain payment for team service performed by a solo driver, Compl. ¶¶ 252–256, describes the carriers' conduct, not TQL's. Receipt of a falsified record does not establish TQL's knowing participation in its falsification; paragraph 256 alleges knowing economic benefit but particularizes no fraudulent communication by TQL and no resulting plaintiff loss. And because the shipper ordinarily generates the bill of lading, Compl. ¶ 247, TQL's appearance on that document does not make TQL the author of a false statement.

### D. *Carrier Misconduct and Low Rates Do Not Plead TQL's Participation in a Forced Labor Venture*

Section 1589(a) addresses labor obtained through specified coercive means, including force, serious harm, abuse of legal process, and coercive schemes. Section 1589(b) addresses knowing financial benefit from participation in a venture engaging in that conduct, with knowledge

or reckless disregard of the coercive activity. 18 U.S.C. § 1589(a)–(c). Ordinary low pay or unfavorable economics is not a substitute for statutory coercion and state-of-mind requirements.

Plaintiffs allege threats, withheld wages, physical restraint, and coercive lease arrangements affecting drivers. Compl. ¶¶ 204, 269–274. TQL does not minimize those allegations or argue that only physical force can constitute forced labor. The blatant defect concerns the pleaded connection between those practices and TQL's supposedly criminally culpable participation in the venture.

Plaintiffs ask the Court to infer TQL's criminal knowledge from nothing but a favorable rate and an employee's reaction to a November 2025 social media post—years after the lost business they complain began in 2022. That is not knowing participation in a forced-labor venture; it is hindsight dressed as culpability. Compl. ¶ 275–278. Nor does an alleged coercive incident involving a motor carrier and its driver become known to TQL simply because it happened to occur on a TQL brokered load. Id. ¶ 204. Nowhere does the Complaint allege facts showing that TQL knew of that captivity, directed the coercion, or knowingly or recklessly participated in the particular forced-labor venture beyond contracting for freight and obtaining a favorable rate. An allegation that TQL profited from inexpensive service addresses financial benefit; it does not automatically establish every remaining statutory element.

At best, the Complaint reflects an ordinary purchase of transportation, which is not, without additional facts, participation in a forced-labor venture. The reasoning of *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415–16 (D.C. Cir. 2024) is persuasively analogous to the allegations here. In *Doe*, the Court, construing the civil beneficiary remedy in § 1595 rejected the pleaded supplier relationships as insufficient to establish venture participation through ordinary purchases. While Section 1589(b)'s own requirements govern here—a knowing benefit from venture participation and knowledge or reckless disregard of the prohibited coercion--, a formulation that TQL merely should have known of misconduct does not substitute for the required criminal elements.

The Complaint's premise that no carrier could accept low bids without forced labor is a conclusion about an entire market. It does not identify what TQL knew about a coercive practice when arranging the pertinent freight. Allegations of poor regulatory compliance or unsafe hours is not interchangeable with a forced-labor violation.

Paragraph 181 uses ATRI industry averages to estimate operating and labor costs. An industry average does not, without further supporting facts, establish that a particular carrier used prohibited coercion on a particular TQL load, or that TQL knew of or recklessly disregarded that coercion. Paragraph 175 identifies a TQL employee's reaction to a November 2025 social-media post. That later reaction does not, without connecting facts, establish culpable knowledge during earlier lost-business periods beginning in 2022.

The alternative reference to peonage also requires conduct by TQL satisfying the asserted criminal offense. Compl. ¶¶ 242, 267. Section 1581(a) prohibits holding or returning a person to peonage or arresting a person with the requisite intent; § 1581(b) addresses obstruction of enforcement. The Complaint's allegations of carrier-imposed debt and confinement do not identify *facts* showing TQL committed, intentionally assisted, or agreed to such conduct. Economic benefit from a carrier relationship alone does not establish TQL's commission of every offense attributed to the carrier. Any conspiracy theory remains subject to the agreement and injury requirements addressed below.

E. *Ordinary Price-Competition Injury is Not RICO Proximate Cause and Does Not Link Any TQL Act to a Plaintiff's Loss*

Plaintiffs allege a broad rate compression across the entire market-wide chain, which reflects what a competitive freight market looks like. Naming coercion or culpability at step one by motor carriers does not supply the missing direct link at step five of the supply chain. Moreover, not a single reference to the repeated allegations involving the shortage of drivers is, or can be, attributed to TQL. Section 1964(c) requires a sufficiently direct relationship between the statutory violation and the plaintiff's business injury. *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 457–

61 (2006), rejected a competitor's claim that tax fraud generated savings, enabled lower prices, and caused lost sales. The lower prices were distinct from the fraud, and the lost sales could reflect other causal factors. *Id*. at 458–60. A purpose to gain market share at a competitor's expense did not supply the required directness. *Id*. at 460. *Molina-Aranda v. Black Magic Enterprises, L.L.C.*, 983 F.3d 779, 784–85 (5th Cir. 2020), likewise distinguished fraudulent visa submissions from later underpayment several causal steps removed from those submissions.

Plaintiffs' market-wide theory moves through several steps: carriers allegedly coerce workers or evade regulation; their costs fall; brokers purchase cheaper capacity; freight prices and shipper benchmarks fall; plaintiffs lose bids or operate at reduced margins. Compl. ¶¶ 153–189, 241–278, 326–345. That narrative does not explain which TQL predicate act directly produced a particular plaintiff's lost account, margin erosion, or aggregate revenue decline. Moreover, Plaintiffs fail to answer how a broker who is using a motor carrier licensed and approved by the Department of Transportation, amounts to fraud or a statutory violation. This is especially true given that at least half of the plaintiffs are licensed as freight brokers with the DOT/FMCSA.

*Varela v. Gonzales*, 773 F.3d 704, 708–10 (5th Cir. 2014), supplies the relevant Fifth Circuit pleading analysis. It did not categorically reject every wage-depression theory, but held that the particular market allegations did not plausibly connect unlawful hiring to the employees' compensation. General economic assertions and averages did not establish the causal market effects alleged. Here, the asserted connection extends further through carrier costs, broker pricing, shipper benchmarks, and purchasing decisions. Plaintiffs must supply facts making that chain sufficiently direct and plausible; naming a market and alleging suppressed rates do not establish every link.

Stevens' Ford benchmark comparisons, Western Flyer's Graphic Packaging benchmark comparisons, Christenson's aggregate revenue decline, Freymiller's 63-customer lost-sales figure, and EOS's generalized account losses quantify alleged harm or describe competition. They do not

identify a direct causal relationship to the particular racketeering violation. Claims of constructive market exclusion and diminished economies of scale present the same missing connection; adding categories of economic loss does not cure it.

Western Flyer's Waco RFP allegations compare its bids with a shipper target, not an identified TQL winning bid or deceptive communication affecting an award. Compl. ¶ 338. Stevens' Ford feedback likewise describes benchmarks, while the Kroger feedback concerning Christenson refers to the most competitive bid without itself identifying a TQL violation causing the loss. Id. ¶¶ 334, 340. Those distinctions show why the size of a shortfall, standing alone, cannot establish its statutory cause. TQL's pricing examples in paragraphs 186–187 also require a factual connection to the plaintiff's claimed freight loss rather than an assumption that every below-benchmark price resulted from criminal coercion.

Plaintiffs need not eliminate every competing explanation in their pleading. The question is whether facts plausibly connect TQL's asserted statutory violation to the claimed injury. The Court should dismiss claims insofar as they rest solely on the undifferentiated cost-advantage theory without that direct relationship.

The following comparison situates plaintiffs' market-wide theory against the governing and persuasive authorities and confirms the missing direct connection:

| Case | First bad act | Intervening step(s) before the plaintiff's loss | Who was directly hurt | Direct or indirect? (court's result) |
|---|---|---|---|---|
| *Anza* (U.S.) | Competitor defrauded the New York tax authority | Used the tax savings to charge lower prices, drawing away customers | The State, not the competitor | Indirect — no proximate cause; the lower prices were a separate act, the lost sales could reflect other factors, and apportionment would require speculation |

| | | | | |
|---|---|---|---|---|
| *Varela* (5th Cir.) | Employer's unlawful hiring of undocumented workers | Expanded the labor supply, allegedly depressing market wages | Employees generally (a market-wide wage effect) | Indirect — no proximate cause on these facts; the court did not categorically bar wage-depression theories, but general economic assertions never connected the practice to the plaintiffs' pay |
| *Molina-Aranda* (5th Cir.) | Fraudulent visa submissions | A separate, later decision to underpay the workers | The Department of Labor/visa system (the fraud's target); the underpayment was a separate act | Indirect — no proximate cause; the reduced wages were several steps removed and the forms did not require underpayment |
| *Bridge* (U.S.) — the contrast | False attestations by a bidder in a tax-lien auction | None — the false attestations themselves reallocated the liens among bidders | The competing bidders (the plaintiffs); the government suffered no injury | Direct — proximate cause satisfied; the deception itself determined the award, with no independent causal factors and no more immediate victim |
| This case — Plaintiffs v. TQL | Carriers' alleged FMCSA-filing fraud and forced labor (the carriers' conduct, not TQL's) | Multiple layers: lower carrier costs → lower broker prices → shipper rate benchmarks → shippers' purchasing decisions among many bidders → plaintiffs' bids rejected or margins compressed | Regulators and the public (filing fraud) and coerced drivers (forced labor) — not plaintiffs | Indirect — no proximate cause; plaintiffs tie their losses to price and benchmark comparisons, with no TQL bid, representation, or predicate act connected to any lost account |

F. *The Specific Shipper Deception Allegations Do Not Cure the Remaining Defects*

Plaintiffs may attempt to escape the causation problems with their claims identified previously by invoking the shipper-deception allegations. TQL does not dispute the overall principle: under *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648–50, 658–59 (2008), a RICO plaintiff may recover for a sufficiently direct injury directly caused by fraud communicated to a third party and need not have received or relied on the misrepresentation itself. But invoking *Bridge* does not save plaintiffs' claims.

First, the plaintiffs never plead the shipper-deception theory *Bridge* requires. In *Bridge* false submissions to a county tax-lien auction reallocated the tax liens and directly deprived the competing bidders of liens they otherwise would have won. The county itself suffered no injury, and the Court identified no more immediate injured party better situated to sue than a competing bidder. *Id*. at 658. *Bridge* presupposes a specific, identified misrepresentation by the bidding party; it does not relieve the plaintiffs of pleading one. Plaintiffs still must (1) identify a particular TQL misrepresentation and plead it with the particularity Rule 9(b) requires, and (2) allege facts showing the misrepresentation caused the particular freight loss each plaintiff claims. The Complaint does neither. It borrows the C.H. Robinson promises by reference, points to regulatory non-compliance, and asserts customer reliance as a conclusion—without naming a single TQL statement or tying any statement to any lost account. The drivers' alleged direct injuries from coercion confirm the gap: direct injuries belong to the coerced drivers, not to the plaintiffs. Whether a plaintiffs' competitive loss was impacted by that merely feeding the attenuated cost-and-pricing chain that TQL is a part of is a far cry from TQL directly making a misrepresentation to which any plaintiff's competitive losses can be attributed. . *See* Holmes, 503 U.S. at 269–70; Anza, 547 U.S. at 459–60.

Second, even if the Court assumed a viable deception theory, the remaining defects would still require dismissal. The independent defects in Counts I and II or the separate statutory elements

of the other counts still fail for the reasons stated in sections G through K. Any dismissal should therefore identify which counts and theories are deficient, as the more detailed allegations concerning three plaintiffs (Stevens, Western Flyer, and Chistenson) cannot carry the collective claims of all five plaintiffs without separate plaintiff-by-plaintiff analysis.

G. *Count I Fails Because Plaintiffs Plead No Injury From TQL's Use or Investment of Racketeering Income*

Section 1962(a) requires injury from use or investment of racketeering income, rather than injury arising solely from the predicate acts. *Abraham v. Singh*, 480 F.3d 351, 356–57 (5th Cir. 2007). This is an independent requirement, not an optional description of the same fraud injury.

Paragraphs 284–287 allege reinvestment to sustain and expand brokerage networks, enabling continued underbidding. No plaintiff supplies facts identifying how TQL's use or investment of racketeering income caused its own loss as distinct from the asserted injury caused by low bids, shipper deception, or carrier misconduct.

The allegation that a profitable enterprise used proceeds to keep operating is not, without a supported causal nexus, an investment injury to every competing carrier. Plaintiffs need factual allegations supporting the injury required by this subsection. Their account losses and benchmark comparisons do not supply that element. Count I should be dismissed for all five plaintiffs regardless of whether another subsection survives.

The remand decision in *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321–23 (2d Cir. 2011), illustrates why the subsection (a) analysis must address the investment itself. There, alleged investment of fraud proceeds into a new competing store supplied a specific investment theory. The Supreme Court had left that claim for separate consideration. *Anza*, 547 U.S. at 461–62. Here, the allegations that proceeds sustained capacity and underbidding identify no comparable concrete TQL investment causally connected to a particular plaintiff's loss.

H. *Count II (§1962(b)) Fails Because Plaintiffs Plead No Injury From TQL's Acquisition or Maintenance of an Enterprise*

Section 1962(b) requires a causal nexus between the plaintiff's injury and acquisition or maintenance of an enterprise interest or control through racketeering. *Abraham*, 480 F.3d at 357. General enterprise participation and competitive growth do not substitute for the subsection's requirements.

Paragraphs 290–294 describe Defendants' alleged control of networks, freight capacity, pricing, and customer relationships. They state that plaintiffs were harmed by enterprise control rather than merely predicate acts. But the facts offered describe winning freight through allegedly low costs and false representations. No plaintiff identifies how TQL's acquisition or maintenance of an enterprise interest produced the claimed injury beyond the same underbidding and diversion alleged elsewhere.

The Court should require facts linking the acquisition or maintenance alleged to the plaintiff's loss. Repeating that defendants dominated the market and calling the resulting loss a control injury does not establish that nexus. Count II should be dismissed independently.

### I. *Count III (§1962(c)) Fails Because Plaintiffs Plead No Distinct Enterprise and No TQL Control of Its Affairs*

Section 1962(c) requires distinction between the RICO person and enterprise. *Abraham,* 480 F.3d at 357–58 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)). Paragraph 235 describes each broker's respective enterprise as its carrier network. To the extent that description means only TQL and its internal brokerage operations, relabeling TQL's own business as a network does not identify a distinct enterprise. To the extent it means an association of TQL and separate carrier entities, the Court must evaluate that actual association.

An association-in-fact requires a purpose, relationships among its associates, and sufficient longevity to pursue the purpose. It need not have a hierarchy, formal meetings, fixed roles, or a structure independent of the racketeering pattern. *Boyle v. United States*, 556 U.S. 938, 944–48 (2009). The Complaint alleges continuing relationships with carriers and a profit objective. Its joint-enterprise theory, however, does not describe factual relationships showing that the two

competing brokers functioned with those carriers as a single continuing unit, rather than each separately purchasing hauling services from overlapping suppliers.

The asserted enterprises also must be distinguished. Paragraph 235 alleges the brokers' respective networks; paragraphs 236–237 allege a joint association of both brokers and carriers; and paragraph 238 separately invokes the Super Ego enterprise. Common use of carriers may describe relationships, but does not factually allege coordinated activity by competing brokers as one unit. Nor does TQL's alleged purchase of hauling from Super Ego carriers itself explain TQL's direction of that enterprise's affairs. The Complaint must support the particular enterprise and TQL role on which recovery depends; it cannot fill the gap by moving between separate and joint enterprise labels.

TQL also must participate in operation or management of the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183–85 (1993). The Complaint alleges TQL's direction of its own bids, platform, customer commitments, and load tenders. What is missing is any facts showing direction of the alleged association's affairs through racketeering, as opposed to direction of TQL's own brokerage business and the asserted purchase of services from carriers accused of wrongdoing.

If the Court finds a sufficiently distinct association and adequately pleaded participation, Count III remains subject to the predicate and causation objections above. These alternative enterprise descriptions should not be treated as a single established enterprise merely because the Complaint uses that term repeatedly.

J. *Count IV (Conspiracy) Fails Because Plaintiffs Plead No Agreement to Racketeer and No RICO Injury*

The conspiracy allegations invoke agreement, shared suppliers, knowledge of low costs, and common economic objectives. Compl. ¶¶ 303–306. Parallel commercial behavior and a common desire for profit do not alone plausibly establish agreement to racketeer. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007); *Tel-Phonic*, 975 F.2d at 1140–41. Paragraph 304

expressly asserts knowing agreement to the carriers' criminal practices but provides no facts supporting that assertion.

Plaintiffs must supply a factual basis for TQL's agreement to the unlawful scheme rather than infer agreement automatically from alleged use of Super Ego or other supposedly illegal carriers. The Complaint's allegations about pressures on TQL brokers, commission incentives, and low bid prices describe TQL's own economic practices. They do not, without further supporting facts, establish an agreement with CH Robinson or the carriers to commit the alleged racketeering.

Civil recovery additionally requires injury from conduct independently wrongful under RICO. *Beck v. Prupis*, 529 U.S. 494, 505–07 (2000). Allegations of conspiracy cannot cure the missing causal nexus or make any freight diversion actionable merely because it furthered a shared profit objective. Count IV should be dismissed to the extent the Complaint fails to plead the agreement or the requisite injury.

K. *Count V (Lanham Act) Fails Because Plaintiffs Plead No Actionable TQL Advertisement and No Injury From Deception*

Plaintiffs identify no TQL advertisement, no falsity, and no sale lost to deception rather than price. Generalized claims that "safety is paramount" are classic puffery, not actionable representations.

The Lanham Act claim requires a misrepresentation in commercial advertising or promotion concerning the nature, characteristics, or qualities of goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B). It also requires commercial injury proximately caused by the challenged deception. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–34 (2014).

The plaintiffs' alleged lost sales concern a protected commercial interest. The question, however, is whether each plaintiff pleads a loss caused by TQL's actionable advertising rather than by prices, carrier practices, or statements attributed to CH Robinson.

Paragraphs 308–325 collectively summarize statements concerning safety, qualification, vetting, and compliance. Plaintiffs must identify what TQL represented, its context, and facts supporting why it was false or misleading, rather than treat all favorable safety descriptions as the same advertisement. An aspiration that safety is paramount differs from a specific representation of a carrier's rating, insurance, or actual vetting procedure.

General claims that safety is paramount or that drivers are among the safest are stronger candidates for puffery than other more objectively verifiable assertions. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496–97 (5th Cir. 2000). For example, Paragraph 318 alleges an intention not to honor safety terms. That allegation must be supported plausibly, rather than inferred from later carrier conduct. Mere nonperformance does not itself establish the pleaded deceptive promotion.

Paragraph 266 references web advertising, and paragraphs 308–310 allege widespread oral, written, and online promotion. But plaintiffs must identify TQL's relevant representation and context sufficiently to make their deception and injury theory plausible. General references to both brokers' communications do not establish which TQL promotion caused which plaintiff's lost trade.

Nondisclosure and regulatory noncompliance likewise do not establish false advertising. *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 373–74 (5th Cir. 2002), rejected an attempt to convert omission of federally required labeling into a Lanham Act claim on the theory presented. Because the Complaint alleges both affirmative representations and omissions, each omission must be connected to the TQL representation it allegedly renders deceptive. Compl. ¶¶ 311–319.

TQL requests dismissal of the Lanham Act claims, specifically as to each instance each plaintiff fails to plead actionable advertising and its causal connection to the claimed injury.

L. *Dismissal, and Any Amendment, Should Address Each Count's Specific Defects*

The Court should assess the five plaintiffs and the five counts separately. Counts I and II lack their distinct causal injury allegations even if a direct shipper-deception theory under another count is sufficient.

TQL requests dismissal with prejudice since amendment would be futile. No amount of additional detail about carrier misconduct can supply what is missing — a TQL act tied to a plaintiff's loss. That is why plaintiffs lead with the carriers' conduct instead. Standalone FMCSA or § 1001 violations are not enumerated predicates, and economic benefit alone does not establish a forced-labor beneficiary offense. Repeating those propositions cannot cure their legal defects. Other objections concern missing facts about causation, fraud, investment, control, venture participation, enterprise conduct, agreement, or advertising. If amendment is allowed, it should address those specific defects. Plaintiffs cannot use discovery to find the TQL conduct their Complaint never alleges. A competitor's lost freight, repackaged with the carriers' alleged misconduct, is not a federal racketeering case against TQL — and no repleading can make it one. *Iqbal*, 556 U.S. at 678–79, 686.

## VI. PRAYER

TQL respectfully requests that the Court first resolve its separate severance and forum non conveniens motion. For any claims by Stevens, Western Flyer, Freymiller, Christenson, or EOS that remain before this Court, TQL requests dismissal of Counts I through V against it, or dismissal of the particular plaintiffs' claims and counts the Court determines are deficient. TQL requests dismissal with prejudice where amendment would be futile and, alternatively, an opportunity to amend to address the specified defects. This motion seeks no merits ruling on claims dismissed in

favor of the agreed forum, no ruling on IWX's claims, and no relief concerning claims against the C.H. Robinson defendants.

Respectfully submitted
***/s/ David L. Ortega***
David L. Ortega
State Bar No. 00791377
James M. Parker, Jr.
State Bar No. 15488710
NAMAN, HOWELL, SMITH & LEE, PLLC
10001 Reunion Place, Suite #600
San Antonio, Texas 78216
Telephone: (210) 731-6364
Facsimile: (210) 785-2950
dortega@namanhowell.com
jparker@namanhowell.com

David B. Dowell
State Bar No. 0677950
NAMAN HOWELL SMITH & LEE, PLLC
1300 Summit Ave., Suite 700
Fort Worth, Texas 76102
Telephone: (817) 509-2062
Facsimile: (817) 509-2060
bdowell@namanhowell.com
**ATTORNEYS FOR DEFENDANT,**
**TOTAL QUALITY LOGISTICS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of October 2026, the foregoing documents, was filed with the Clerk of Court using the CM/ECF system, and was served on all counsel of record via **E-File Notification:**

***/s/ David L. Ortega***
David L. Ortega

James Wren
SBN: 22018200
Louie J. Cook
SBN: 24101191
14205 N Mo Pac Expy Ste. 570
Austin, Texas 78728
Telephone: 737-292-4926
Jim@wrencookattorneys.com
Laura@wrencookattorneys.com,
louie@wrencookattorneys.com

Brad Beckworth
SBN. 24001710
Trey Duck
SBN. 24077234
Drew Pate
SBN. 24079111
Jessica Underwood
SBN. 24093291
Ryan Hering
SBN. 24143005
NIX PATTERSON, LLP
8701 Bee Cave Road, Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
bbeckworth@nixlaw.com,
tduck@nixlaw.com
dpate@nixlaw.com
junderwood@nixlaw.com
rhering@nixlaw.com

J. Travis Underwood
SBN: 24102587
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
travis@gillamsmithlaw.com
**ATTORNEYS FOR PLAINTIFFS**

***/s/ David L. Ortega***
David L. Ortega