**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **STEVENS TRUCKING CO.,** | § | |
| **WESTERN FLYER EXPRESS, LLC** | § | |
| **D & M CARRIERS, LLC, d/b/a** | § | |
| **FREYMILLER TRUCKING,** | § | |
| **IWX MOTOR FREIGHT, LLC,** | § | |
| **CHRISTENSON TRANSPORTATION, INC,** | § | |
| **and E.O.S., INC.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO:** |
| | § | **2:26-cv-00869-JRG** |
| **C.H. ROBINSON COMPANY, d/b/a** | § | |
| **C.H. ROBINSON WORLDWIDE** | § | |
| **C.H. ROBINSON INTERNATIONAL, INC.** | § | |
| **C.H. ROBINSON COMPANY, LLC,** | § | |
| **d/b/a C.H. ROBINSON WORLDWIDE,** | § | |
| **C.H. ROBINSON WORLDWIDE, INC.,** | § | |
| **and** | § | |
| **TOTAL QUALITY LOGISTICS, LLC,** | § | |
| **Defendants.** | § | |

**TOTAL QUALITY LOGISTICS LLC MOTION TO DISMISS FOR FORUM NON CONVENIENS AND TO SEVER PLAINTIFFS' CLAIMS UNDER MANDATORY FORUM SELECTION AGREEMENTS**

Total Quality Logistics, LLC (TQL) moves under Federal Rule of Civil Procedure 21 and the doctrine of forum non conveniens to dismiss the claims against TQL asserted by Stevens Trucking Co. (Stevens), Western Flyer Express, LLC (Western Flyer), D & M Carriers, LLC, d/b/a Freymiller Trucking (Freymiller), Christenson Transportation, Inc. (Christenson), and E.O.S. Inc. (EOS), none of which are Texas companies or have a principal place of business in Texas and each of which agreed to litigate any dispute with TQL exclusively in the state court located in Clermont County, Ohio. The sixth Plaintiff, IWX Motor Freight, LLC (IWX), also not a Texas company and also with no principal place of business in Texas, is bound to the Ohio forum as a closely-related party to Western Flyer, but even if it were not, its claims are subject to dismissal under

Rule 12(b)(6) and can be severed from the other five contracting parties. TQL would show to the Court as follows:

## I. Summary of Argument

Plaintiffs Stevens, Western Flyer, Freymiller, Christenson and EOS are out-of-state businesses that expressly agreed that any dispute between them and TQL must be brought exclusively in the state court located in Clermont County, Ohio. TQL requests enforcement of those agreements before adjudication of the merits.

IWX Motor Freight, LLC (IWX), also an out-of-state business, had no direct contract with TQL and conducted no business with TQL. If plaintiffs contend that IWX's claims cannot be separated from the five contracting plaintiffs' claims, IWX nevertheless is bound to the agreed Ohio forum via common ownership with Western Flyer, as a closely related party. *See Franlink Inc. v. BACE Servs., Inc.*, 50 F.4th 432, 441-42 (5th Cir. 2022). But regardless, IWX's inclusion in this complaint cannot automatically defeat the five contracting plaintiffs' independent forum commitments. IWX's concrete allegations principally identify CH Robinson's conduct; its purported TQL claims rely on generalized assertions of market injury and collective allegations. Those allegations require separate scrutiny and should be dismissed under the contemporaneous Rule 12(b)(6) motion, and, in any event, do not establish that every carrier's dispute with every broker must be tried together. The Court should, at a minimum, enforce the five agreements while retaining only whatever claims are properly before it concerning IWX, subject to TQL's separate 12(b)(6) motion and any merits defenses.

## II. Statement of the Issues

1. Whether the mandatory provisions selecting Clermont County, Ohio, require enforcement through forum non conveniens where the agreements expressly designate a state forum.

2. Whether the five Broker/Carrier Agreements, which encompass any dispute between the contracting parties, cover the contracting plaintiffs' RICO and Lanham

Act claims against TQL, notwithstanding the statutory labels and allegations concerning third-party carriers and shippers.

3. Whether Rule 21 severance should permit enforcement of those agreements when IWX and the C.H. Robinson defendants are not shown to be bound, considering the parties' contractual choices, the remaining parties' interests, individualized injuries, overlapping evidence, and practical means of reducing duplication.

4. Whether, if IWX's claims are shown to be inseparable from the contracting plaintiffs' claims, IWX is a closely related non-signatory whose litigation in the Clermont County, Ohio forum was foreseeable and who may therefore be bound to it.

## III. The Agreements and the Claims Presented

A. *The five contracting plaintiffs selected one exclusive state forum*

The agreements submitted as Exhibits A through E identify TQL as the "Broker" and the respective contracting plaintiff as the "Carrier". They govern the tender and transportation of customers' freight, the carriers' operating authority and regulatory obligations, compensation, the parties' relationship, customer accounts, and related transportation services. They also establish where disputes between the parties must be litigated.

Western Flyer's fully executed agreement provides in Section 15 that the parties consent to the jurisdiction of the state court located in Clermont County, Ohio, waive objection to that court, and agree that "any dispute between the Parties, including, without limitation, those arising under or related to this Agreement, shall be brought in that court," which "shall have exclusive jurisdiction over such dispute." Ex. A, §15, p. 5.

Freymiller's agreement contains the same mandatory language and expressly selects the state court located in Clermont County. Ex. B, §15, p. 6. The agreement identifies D AND M CARRIERS LLC and the Freymiller trade name; its electronic execution record identifies the authorized carrier representative and acceptance of the agreement. Ex. B, PDF pp. 1, 8.

Christenson's March 9, 2026 fully executed agreement likewise requires that any dispute between the parties, including without limitation disputes arising under or related to the agreement,

be brought exclusively in the Clermont County state court. Ex. C, §15, p. 5. Its adjacent Section 16 additionally provides that dispute resolution proceedings "shall be conducted only on an individual basis and not in a class, consolidated, or representative action." *Id*. §16.

EOS executed an agreement on February 6, 2026 using materially identical language: any dispute between the parties, including without limitation disputes arising under or related to the agreement, "will be brought" in the state court located in Clermont County, which "will have exclusive jurisdiction over such dispute." Ex. D, §15, p. 6. Each of these four agreements selects Ohio law, subject to the specified federal transportation preemption exception. Exs. A–D, §15.

Stevens' underlying Broker/Carrier Agreement contains the same provision requiring any dispute between Stevens and TQL, including without limitation disputes arising under or related to that agreement, to be brought exclusively in the state court located in Clermont County, Ohio. Ex. E, underlying Broker/Carrier Agreement, §15. Stevens thus made the same fully executed forum commitment as Western Flyer, Freymiller, Christenson, and EOS.

Each agreement likewise reflects, as do the allegations in the Complaint, that none of the five contracting parties are Texas companies and none have a principal place of business in Texas.

B. *The complaint presents disputes between each contracting plaintiff and TQL*

The complaint asserts four RICO claims under 18 U.S.C. § 1962(a)–(d) and a false-advertising count under 15 U.S.C. § 1125(a)(1)(B). Compl., ECF No. 1, ¶¶ 280–325. The alleged wrongs concern defendants' freight-brokerage businesses, selection and use of carriers, representations to shippers, carrier regulatory compliance, freight pricing, and competition for customer accounts and lanes.

The pleading identifies TQL's own Carrier Dashboard and its alleged pricing practices. Id. ¶¶ 148–152. It separately describes TQL's carrier relationships, shipper agreements, and allegedly unlawful brokerage practices. Id. ¶¶ 167–178, 185–189, 197–205. Its TQL-specific allegations

appear to claim they lost Johnson Controls business for Stevens and Western Flyer, lost Bridgestone business for Christenson, and similar competitive injury to the other plaintiffs. Id. ¶¶ 220–229. These allegations are disputed, and TQL references them here only to identify the nature of the controversy and the proof plaintiffs themselves say it will require.

The complaint also distinguishes the defendants' respective networks from its additional allegation of a joint association-in-fact enterprise. Id. ¶¶ 233–239. And it pleads separate injuries and revenue losses for each plaintiff, expressly characterizing the claimed losses as plaintiff-specific. *Id.* ¶¶ 331–345.

## IV. Argument and Authorities

### A. *Forum non conveniens supplies the correct enforcement mechanism*

Forum non conveniens is the proper mechanism to enforce the state court forum selection clauses. A valid forum-selection clause does not itself render an otherwise proper federal venue defective under Rule 12(b)(3), but the forum-selection clause is enforced through a venue mechanism specific to the forum the contracting parties agreed upon. Where the chosen forum is another federal district, enforcement ordinarily proceeds under 28 U.S.C. § 1404(a). Where the agreement selects a state or foreign forum, the appropriate mechanism is forum non conveniens. *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49, 55–61 (2013). Because the clauses here designate an Ohio state court, TQL accordingly requests dismissal without prejudice in favor of the agreed state forum, rather than a § 1404(a) transfer.

*Atlantic Marine* requires substantial changes to the ordinary balancing analysis when a valid forum agreement applies. The contracting plaintiff's later forum choice receives no weight, its private interests are treated as favoring the selected forum, and the plaintiff bears the burden of showing that public considerations justify disregarding the agreement. *Id.* at 63–66. The Fifth

Circuit applies this framework to forum non conveniens dismissals. *Weber v. PACT XPP Technologies, AG*, 811 F.3d 758, 766–68, 775–76 (5th Cir. 2016). In a mixed-party case, the remaining parties' interests receive the separate treatment discussed below under *In re Rolls Royce Corp*., 775 F.3d 671 (5th Cir. 2014).

B. *The five state court clauses are mandatory and cover these claims*

The operative provisions in each contract do more than consent to jurisdiction—they *require* litigation in a specified court and separately confer ***exclusive*** jurisdiction over any dispute. Such language satisfies *Weber's* distinction between a clause permitting suit in a forum and one requiring it there. *See Weber,* 811 F.3d at 768. A contrary reading would deprive both the mandatory filing language and the exclusivity language of effect.

Interpretation and enforceability present distinct questions. *Weber*, 811 F.3d at 769–73. The agreements expressly choose Ohio law; federal law governs enforceability. *Haynsworth v. The Corporation*, 121 F.3d 956, 962 (5th Cir. 1997). The scope argument begins with the actual words chosen. The parties agreed to litigate any dispute between them in the designated court. Disputes arising under or related to the agreement are included without limitation, rather than stated as the sole covered category.

This is a dispute between each contracting plaintiff and TQL. Plaintiffs seek damages and other relief from TQL. The fact that the alleged conduct involves TQL's dealings with other carriers and shippers does not remove the resulting dispute between TQL and each plaintiff from the clause. Nothing in these five provisions confines the forum promise to unpaid freight charges, cargo claims, breach of contract, or conduct involving a load actually hauled by the suing carrier.

Nor does a statutory cause of action supply a contractual exception. The Fifth Circuit looks to the language and substance of the dispute rather than applying an across-the-board distinction between contract and tort claims. *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222–

23 (5th Cir. 1998). *Ginter ex rel. Ballard v. Belcher, Prendergast & LaPorte* enforced a clause limited to proceedings for enforcement or breach of the agreement against tort claims arising from the contractual relationship. 536 F.3d 439, 444 (5th Cir. 2008). Those decisions support enforcement according to the clause's breadth; they do not require relabeling the pleaded statutory claims as contract claims.

The language here is broader than *Ginter*'s enforcement-or-breach provision. Even if some connection to the agreements were required, the complaint concerns the same brokerage and transportation relationships those agreements regulate: tendering freight, carrier qualifications, compliance, rates, shipper requirements, and customer accounts. Exs. A–D, §§ 2–4, 9, 11–12; Compl. ¶¶ 148–152, 167–178, 197–205, 220–229. TQL need not establish that every alleged predicate act breached a particular provision to show that plaintiffs' dispute falls within the forum commitment.

C. *The statutory claims can be heard in the selected state forum*

The selected forum is available to resolve the controversy against TQL. TQL expressly consented to the state court's jurisdiction and waived objection to that jurisdiction. Exs. A–E, underlying Broker/Carrier Agreements, §15. The agreements identify an Ohio counterparty, and the complete Christenson agreement identifies TQL's main office in Clermont County. Ex. C, PDF p. 2. The proposed dismissal requires refiling only the claims against TQL that are subject to the forum agreements, not procurement of jurisdiction over every remaining defendant.

State courts possess concurrent jurisdiction over civil RICO claims. *Tafflin v. Levitt*, 493 U.S. 455, 458–67 (1990). *Tafflin* expressly rejected the contention that Section 1965's special federal venue and service provisions establish exclusive federal jurisdiction. *Id*. at 466–67. Nationwide service facilitates litigation in federal court; it does not require every related RICO dispute to remain there or eliminate the state forum's authority. The Lanham Act likewise does

not make the pleaded false-advertising claim exclusively federal; 28 U.S.C. § 1338(a) confines only patent, plant variety protection, and copyright cases to the federal court, and does not reach Lanham Act claims. State and federal courts accordingly share concurrent jurisdiction over Lanham Act claims. Plaintiffs therefore retain a forum for their federal theories. Enforcement determines where those claims are heard without adjudicating their sufficiency or restricting their statutory remedies.

The Eighth Circuit recently affirmed forum non conveniens dismissal of Lanham Act claims in favor of an agreed state forum and expressly rejected the argument of exclusive federal jurisdiction for a Lanham Act claim. *Boyd v. Deadwood Tobacco Co.*, 178 F.4th 1132, 1150-51 (8th Cir. 2026) ("Congress did not restrict resolution of disputes arising under the Lanham Trademark Act to federal courts. Therefore, state and federal courts entertain concurrent jurisdiction for claims arising under the Act.") While *Boyd* is persuasive rather than binding authority, its reasoning—applying *Atlantic Marine* to enforce a mandatory state forum clause as to federal Lanham Act claims—directly supports enforcement of the forum selection clauses here. A general preference for federal adjudication or an assumption of greater familiarity with federal law does not establish that the selected state forum is unavailable or inadequate. This motion does not seek a ruling that Ohio contract law displaces RICO or the Lanham Act. It seeks enforcement of the forum commitment so that the designated court can decide the claims and defenses under the governing law.

D. *Allegations of underlying wrongdoing do not invalidate the forum promise*

Federal law presumptively enforces forum-selection agreements, subject to the recognized grounds for unreasonableness. *Haynsworth*, 121 F.3d at 962–63. An attack based on fraud or overreaching must concern inclusion of the forum clause, rather than merely accuse the contracting counterparty of fraud in the underlying transaction. *Id*. at 963. The complaint's allegations of

wire fraud, forced labor, and unlawful brokerage conduct concern the alleged merits; they do not allege that TQL procured the carriers' assent to these forum clauses by fraud.

The electronic acceptance records for the Plaintiffs identify carrier representatives and their acceptance of the agreements. Exs. A–D, execution provisions. The clauses select TQL's home-state forum, not an unrelated jurisdiction lacking a practical connection to the parties. Plaintiffs are commercial carriers that are not themselves at home in Texas as they are out-of-state companies with principal places of business elsewhere, and the complaint alleges substantial multistate freight operations by each carrier. The complaint's accusations of wrongdoing do not themselves defeat the forum agreements.

E. *Rule 21 allows enforcement while protecting the unbound parties*

Rule 21 permits the Court to sever claims against a party. Misjoinder need not be established as a prerequisite to the severance requested here. *Rolls Royce*, 775 F.3d at 680–81. Therefore, to the extent necessary to accomplish the dismissal, TQL requests severance of the contracting plaintiffs' claims against TQL, including their claims alleging joint conduct, while leaving all claims against the C.H. Robinson defendants and any adequately pleaded IWX claims against TQL in the original action, subject to separate adjudication of TQL's Rule 12(b)(6) motion.

*Rolls Royce* requires a fact-sensitive analysis when some parties agreed to a forum and others did not. The signatories' private interests favor the contractual forum as a matter of law. The Court separately considers the private interests of the noncontracting parties and then evaluates judicial economy, including procedural measures capable of reducing the costs of separate litigation. *Id.* at 681–82.

That approach favors the requested relief here. Five plaintiffs **chose** exclusive jurisdiction in the same state court in any claims against TQL. Any private inconvenience they now associate with that forum does not regain weight simply because they sued another defendant and there is a

single plaintiff without a direct contract with TQL (IWX). This would allow Plaintiffs to manipulate themselves out of an enforceable contractual choice. Severance requires no relocation of IWX, no application of another's agreement to it, and no surrender of its substantive claims or remedies. Its possible interests in shared witnesses and evidence can be protected through coordinated discovery; those interests do not give it authority to revoke five other plaintiffs' written forum choices.

The C.H. Robinson defendants likewise retain the right to seek a different forum available through their own contracts or under §1404. No relief against them is sought under TQL's contracts. Their liability can be assessed under the claims against them, and they retain their ability to defend allegations concerning their own carrier networks, customer representations, pricing, and alleged participation in joint conduct. Separation of TQL's contractual disputes does not determine any defendant's liability or resolve the asserted enterprise allegations.

F. *IWX's presence in the suit supplies no basis to disregard the five clear forum agreements*

IWX and TQL never entered a contract and never conducted business together. To that end, TQL is not directly invoking a contractual forum obligation against IWX. The pertinent questions are what conduct IWX attributes to TQL, what injury allegedly resulted, and why adjudicating that dispute should not require every contracting plaintiff to remain here.

The complaint's concrete attribution of IWX's customer losses is to CH Robinson. Paragraph 217 identifies PepsiCo, Ryder, Conagra, Associated Wholesale Grocers, and Danone and attributes IWX's losses on those accounts to CH Robinson. The TQL-specific interference section identifies no IWX account that TQL diverted, no TQL bid against IWX, and no TQL communication that caused a customer to reject IWX. TQL does not overlook the broader allegations made in the petition, but they use collective terms which should not survive a 12(b)(6) analysis and certainly should not give IWX the ability to somehow "veto" directly applicable

forum selection clauses involving *all* of the other plaintiffs. There is certainly nothing suggesting that the generalized allegations are a factual demonstration that IWX's dispute is inseparable from the five contractual disputes. Paragraphs 335–337 describe IWX's own Driscoll's and Graphic Packaging bids, its own lost revenue, and its own cessation of operations. Those claimed injuries remain independently identifiable whether or not IWX can ultimately connect them to TQL.

That distinction matters both to severance and to TQL's separate and contemporaneous Rule 12(b)(6) motion against IWX. Pleading plausibility requires factual support for an inference of liability, not merely conclusions reciting injury and causation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). RICO requires a sufficiently direct relationship between the violation and the plaintiff's injury; a competitor's allegation that wrongdoing enabled lower prices does not dispense with that requirement. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–61 (2006). The Lanham Act likewise requires proximate causation of commercial injury through the challenged deception. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–34 (2014). The present motion simply urges that the Court should not assume that generalized assertions against both brokers somehow establish a need for one indivisible proceeding.

Nor do the conclusory and salacious joint-enterprise and conspiracy allegations eliminate separate causation and damages questions. Plaintiffs cannot avoid their forum-selection agreements merely by adding a plaintiff and joining a nonsignatory defendant and labeling the defendants' separate operations a conspiracy or joint enterprise. Otherwise, a contracting party could nullify its forum commitment through its own pleading: name another defendant, allege concerted conduct, and invoke the resulting overlap as a reason to disregard the agreed forum. That result would undermine the contractual expectations protected by *Atlantic Marine Construction*. The relevant question is whether the actual circumstances establish exceptional reasons against enforcement, not whether plaintiffs have pleaded a collective theory of liability.

In *In re Rolls Royce*, the Fifth Circuit required a severance analysis that accounted for the forum agreement and directed severance and transfer notwithstanding claims against other defendants arising from the same helicopter loss. Although that case involved transfer between federal courts, its reasoning supports rejecting an automatic exception based on joinder or factual overlap. Actual administrative difficulties and prejudice must be evaluated; ordinary overlap can be addressed through coordinated discovery and appropriate sequencing.

Here, the complaint separately describes TQL's and C.H. Robinson's operations and attributes particular customer diversions to particular brokers except where vaguely referring to "Defendants" collectively. Its assertions of a joint enterprise and conspiracy do not identify concrete facts showing how the competing brokers agreed to commit the alleged racketeering or operated their respective networks as a single unit. Shared suppliers, similar pricing incentives, and collective references to Defendants do not themselves explain why the signatory plaintiffs' claims against TQL cannot be adjudicated in their agreed forum. Plaintiffs must identify concrete consequences of severance sufficient to overcome the contractual commitment; repeating the same collective allegations in each count does not supply that showing.

Moreover, IWX's allegations cannot be treated as established simply because the complaint groups Defendants together. The five contracting plaintiffs' agreement to litigate their own disputes in Ohio remains meaningful even when the complaint alleges participation in a larger enterprise. Ohio's concurrent jurisdiction permits those plaintiffs to present their federal theories there without requiring CH Robinson to be made a party to every claim against TQL.

IWX's presence does not alter the analysis, for two independent reasons. First, IWX's claims against TQL are resolved by TQL's contemporaneous Rule 12(b)(6) motion, which shows that IWX has not stated a claim against TQL; if that motion is granted, no non-contracting claim against TQL remains and severance of the five contracting plaintiffs to the agreed Ohio forum is

straightforward. Second, even if an IWX claim against TQL survives, it does not defeat severance: IWX pleads its own, individualized injuries—its Driscoll's and Graphic Packaging bids and its own lost revenue, Compl. ¶¶ 335–337—that can be adjudicated here on IWX's own proof without allowing five contractually bound plaintiffs to litigate in Texas. If IWX's claims, to the extent any survive Rule 12(b)(6), remain here, the five contracting plaintiffs can proceed in their agreed forum. The relief TQL seeks for the five therefore does not depend on how the Court resolves IWX's presence. Nevertheless, IWX's claims also should not remain in this Court for the reasons set out in Section G.

G. *IWX is bound to the agreed forum on an inseparability premise*

To the extent IWX's claims are so intertwined with the five contracting plaintiffs' claims that they cannot be separated, that premise would require enforcing the Ohio forum against IWX as well—not excusing five written forum commitments. A non-signatory may be bound by a forum-selection clause when it is so "closely related" to a signatory or to the dispute that enforcement against it was foreseeable. *Franlink Inc. v. BACE Servs., Inc.*, 50 F.4th at 441-42 (adopting the closely-related-party doctrine and weighing common ownership, direct benefits from the contract, knowledge of the agreement, and awareness of the forum-selection clause); *accord Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 439–41 (7th Cir. 2012). A non-signatory is likewise bound under direct-benefits estoppel when it knowingly exploits or obtains direct benefits from the agreement containing the clause, or asserts claims that must be determined by reference to that agreement. *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–20 (5th Cir. 2006); *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472–73 (5th Cir. 2010). Courts apply these principles to route a closely-related non-signatory to the agreed forum. *See Bruckner Truck Sales, Inc. v. Hoist Liftruck Mfg., LLC*, 501 F. Supp. 3d 409 (N.D. Tex. 2020).

IWX, an out-of-state company that does not maintain its principal place of business in Texas, is affiliated with signatory Western Flyer under common ownership, and plaintiffs themselves allege that all plaintiffs were injured by a single, jointly operated enterprise carrying out the same conduct through the same carrier network. Compl. ¶¶ 233–239. Plaintiffs cannot have it both ways. Any alleged inseparability that keeps IWX's claims tethered to the five contracting plaintiffs, prevents plaintiffs from simultaneously maintaining that IWX is too unrelated to be reached by the forum commitment those five made; on plaintiffs' own theory, IWX's litigation of the same dispute in the contractually selected forum was foreseeable. *Franlink*, 50 F.4th at 441. Each factor *Franlink* points the same way on that premise: IWX shares common ownership with signatory Western Flyer; on plaintiffs' own allegations it participated in and claims injury from the very brokerage relationships the Agreements govern, the hallmark of a direct benefit; and a commonly owned affiliate litigating that identical enterprise cannot plausibly claim ignorance of Western Flyer's Agreement or surprise at its Clermont County forum clause. *Franlink*, 50 F.4th at 441–42. *Franlink* itself bound a commonly owned non-signatory on precisely these considerations while declining to bind unrelated parties who lacked them. *Id.* at 442–43. The consequence of accepting plaintiffs' inseparability premise is therefore enforcement of the Clermont County, Ohio forum as to all plaintiffs' claims against TQL—not the wholesale defeat of five mandatory forum agreements.

While TQL's maintains that IWX's claims should be dismissed under the contemporaneous Rule 12(b)(6) motion and that severance of the five contracting plaintiffs does not depend on the disposition of IWX, .IWX may also be forced to litigate in Ohio on the closely-related-party argument on the inseparability premise that plaintiffs themselves may supply.

H. *Public interests do not justify disregarding the agreed forum*

The relevant public considerations include administrative difficulties, the local interest in a localized controversy, and familiarity with applicable law. *Atlantic Marine*, 571 U.S. at 62 n.6, 64–66. *Atlantic Marine* puts the burden on *Plaintiffs* to show that public-interest considerations *overwhelmingly* disfavor the agreed forum. The complaint alleges Texas freight, customers, facilities, and highway activity. Compl. ¶¶ 19–38. Those allegations warrant consideration, but they form part of an expressly nationwide controversy involving freight markets, carriers, shippers, and operations across state lines. Id. ¶¶ 233–279. None of the plaintiffs is alleged to be a Texas company or have its principal place of business in Texas. Id. ¶¶ 39–44.[1] Ohio has a corresponding interest in disputes involving an Ohio broker and contracts selecting Ohio law and a Clermont County forum.

The allegations concerning highway safety and labor practices do not transform this action for the carriers' commercial losses into a local crash case. No injured motorist or allegedly coerced driver asserts a claim in this complaint. The claimed relief concerns the plaintiffs' lost freight business and other asserted competitive injuries. Ohio state courts can adjudicate those claims under federal law. *Tafflin*, 493 U.S. at 458–67. The nationwide federal interests invoked by RICO are not diminished by adjudication in a state court with concurrent jurisdiction.

There is no developed comparative-congestion evidence demonstrating exceptional administrative difficulty in Clermont County, but it will be plaintiffs' burden to show it. In fact,

[1] Although the forum-selection clauses render the private-interest factors irrelevant for the contracting plaintiffs, the public-interest factors independently favor dismissal. No plaintiff is a Texas resident: Stevens, Western Flyer, and D & M/Freymiller are Oklahoma entities, Christenson and IWX are based in Missouri, and E.O.S. is an Arkansas entity. Compl. ¶¶ 39–44. TQL is an Ohio company headquartered in Cincinnati. Id. ¶ 49. Neither the Eastern District nor, in particular, the Marshall Division where plaintiffs chose to file has any connection to the parties or a local interest in adjudicating a dispute centered on brokerage relationships governed by Ohio agreements and on the plaintiffs' own out-of-state operations. The sole Texas nexus the complaint identifies is the location of a non-party shipper's facility — Graphic Packaging's Texarkana Mill in Cass County, id. ¶¶ 29–32 — which lies in this District's Texarkana Division, not Marshall, and reflects the substance of plaintiffs' lost-freight allegations rather than any local interest of this forum in the controversy.

Plaintiffs are motor carriers with trucks traversing the entire United States so traveling to Ohio is not an undue burden. In fact, as a registered motor carrier, Plaintiffs have to register a statutory agent in every state given their business is interstate transportation and there is an expectation they could be hailed into court in any jurisdiction within a state they traverse. Nor is there a showing that Ohio courts cannot apply the governing federal statutes. The duplication concern is real but can be evaluated and reduced under *Rolls Royce*. It should not become an exception swallowing the forum commitment whenever a carrier joins another plaintiff or sues an additional broker.

I. *The Court should resolve forum enforcement before reaching the merits*

Forum non conveniens is a threshold, nonmerits ground for dismissal. *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 431–32 (2007). Deciding this motion first permits the designated forum to address the substantive disputes that belong there. TQL requests a ruling on severance and forum enforcement before a merits ruling on the contemporaneous Rule 12(b)(6) motion, except as is necessary regarding IWX's proper presence in the claims against TQL. Any separately presented Rule 12 defenses should be preserved and adjudicated in the appropriate procedural sequence.

**Prayer**

TQL requests that the Court sever under Rule 21 all claims asserted against TQL by Stevens, Western Flyer, Freymiller, Christenson, and EOS; dismiss those severed claims without prejudice under forum non conveniens in favor of the contractually selected Clermont County, Ohio state court; and retain the claims against the C.H. Robinson defendants and any remaining IWX claims against TQL for appropriate separate adjudication. IWX's claims, to the extent asserted against TQL, remain subject to TQL's separately presented Rule 12 defenses and should be dismissed for that reason. The requested severance and forum-non-conveniens dismissal of the five contracting plaintiffs' claims does not depend on the Court's disposition of IWX's claims. In

the alternative, if the Court determines that IWX's claims cannot be separated from the contracting plaintiffs' claims, TQL requests that IWX's claims against TQL likewise be severed and dismissed in favor of the Clermont County, Ohio forum as those of a closely related non-signatory. TQL requests that coordinated discovery and other appropriate measures protect the remaining parties without denying enforcement of the five forum agreements, and requests such other relief as the Court deems appropriate.

Respectfully submitted

***/s/ David L. Ortega***

David L. Ortega
State Bar No. 00791377
James M. Parker, Jr.
State Bar No. 15488710
NAMAN, HOWELL, SMITH & LEE, PLLC
10001 Reunion Place, Suite #600
San Antonio, Texas 78216
Telephone: (210) 731-6364
Facsimile: (210) 785-2950
dortega@namanhowell.com

David B. Dowell
State Bar No. 0677950
NAMAN HOWELL SMITH & LEE, PLLC
1300 Summit Ave., Suite 700
Fort Worth, Texas 76102
Telephone: (817) 5069-2062
Facsimile: (817) 509-2060
bdowell@namanhowell.com

**ATTORNEYS FOR DEFENDANT,
TOTAL QUALITY LOGISTICS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of October 2026, the foregoing documents, was filed with the Clerk of Court using the CM/ECF system, and was served on all counsel of record via **E-File Notification:**

James Wren
SBN: 22018200
Louie J. Cook
SBN: 24101191
14205 N Mo Pac Expy Ste. 570
Austin, Texas 78728
Telephone: 737-292-4926
Jim@wrencookattorneys.com
Laura@wrencookattorneys.com
louie@wrencookattorneys.com

Brad Beckworth
SBN. 24001710
Trey Duck
SBN. 24077234
Drew Pate
SBN. 24079111
Jessica Underwood, SBN. 24093291
Ryan Hering, SBN. 24143005
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
bbeckworth@nixlaw.com
tduck@nixlaw.com
dpate@nixlaw.com
junderwood@nixlaw.com
rhering@nixlaw.com

J. Travis Underwood
SBN: 24102587
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
travis@gillamsmithlaw.com

**ATTORNEYS FOR PLAINTIFFS**

***/s/ David L. Ortega***
David L. Ortega

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| STEVENS TRUCKING CO.,<br>WESTERN FLYER EXPRESS, LLC<br>D & M CARRIERS, LLC, d/b/a<br>FREYMILLER TRUCKING,<br>IWX MOTOR FREIGHT, LLC,<br>CHRISTENSON TRANSPORTATION, INC,<br>and<br>E.O.S., INC.<br><br>Plaintiffs,<br><br>v.<br><br><br><br><br>C.H. ROBINSON COMPANY, d/b/a<br>C.H. ROBINSON WORLDWIDE<br>C.H. ROBINSON INTERNATONAL, INC.<br>C.H. ROBINSON COMPANY, LLC,<br>d/b/a C.H. ROBINSON WORLDWIDE,<br>C.H. ROBINSON WORLDWIDE, INC.,<br>and<br>TOTAL QUALITY LOGISTICS, LLC,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO:<br>2:26-cv-00869-JRG |

**<u>DECLARATION OF MARC BOSTWICK</u>**

1. My name is Marc Bostwick. I am over eighteen years of age, competent to make this declaration, and authorized to make it on behalf of Total Quality Logistics, LLC (TQL). The facts stated in this declaration are within my personal knowledge and are true and correct.

2. I hold the title Risk Manager at TQL and have held that position since January 16, 2017. Through my duties with TQL, I am familiar with TQL's practices for receiving, maintaining, and retrieving broker/carrier agreements and related records. I am a qualified witness familiar with how they are created and maintained.

3. In preparing this declaration, I personally reviewed the records identified below in TQL's regularly maintained carrier contract files. My testimony is based on that review and my knowledge of TQL's recordkeeping practices.

4. TQL maintains broker/carrier agreements, related addenda, and execution records in the ordinary course of its freight-brokerage business. It is TQL's regular practice to receive and retain these records as part of establishing and documenting its contractual relationships with motor carriers. These records were created or received at or near the time of the transactions they document by, or from information transmitted by, persons with knowledge. TQL personnel responsible for recording and maintaining this information do so as part of their regular business duties.

5. The records identified below were maintained for TQL's business purposes before their retrieval for this litigation. TQL relies on them in conducting its business. I retrieved or reviewed the retrieval of the copies from the corresponding carrier files and compared them with the records maintained by TQL. The attached copies accurately reproduce those records, including their terms and execution information, without substantive alteration.

6. Exhibit A is a true and correct copy of the Broker/Carrier Agreement maintained by TQL for Western Flyer Express, LLC. Its carrier signature block identifies Michael J. Mattox as CFO and is dated September 27, 2017. This is the agreement received and maintained in TQL's Western Flyer carrier file.

7. Exhibit B is a true and correct copy of the agreement and associated carrier-setup and acceptance records maintained by TQL for D & M Carriers, LLC, doing business as Freymiller. The execution record identifies Dearl McClendon, Director of Operations, and an agreement date of January 15, 2019.

8. Exhibit C is a true and correct copy of the agreement and associated carrier-setup and acceptance records maintained by TQL for Christenson Transportation, Inc. The execution record identifies Elliott Pinson, CCO, and an agreement date of March 9, 2026.

9. Exhibit D is a true and correct copy of the agreement and associated carrier-setup and acceptance records maintained by TQL for E.O.S. Inc. The execution record identifies EOS INC as the FMCSA legal name and an agreement date of February 6, 2026.

10. Exhibit E includes a true and correct copy of the Broker/Carrier Agreement between TQL and Stevens Trucking Co., dated January 10, 2007, together with the related Broker/Carrier Agreement Canadian Addendum maintained by TQL for Stevens. The Canadian Addendum identifies TQL and Stevens Trucking Company as the contracting parties. Section 6 expressly incorporates the underlying Broker/Carrier Agreement.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 19, 2026, at Cincinnati (location)

Marc K. Bostwick

Marc Bostwick, Risk Manager
Total Quality Logistics, LLC

TQL
TOTAL QUALITY LOGISTICS

**Billing Address:**
**P.O. Box 9049, Louisville, KY 40209-0049**

**Overnight Address:**
**1701 Edison Drive, Milford, OH 45150**

**Company Phone:**
**800-580-3101 or 513-831-2600**

# BROKER/CARRIER AGREEMENT

This BROKER/CARRIER AGREEMENT ("Agreement") is made by and between Total Quality Logistics, LLC ("BROKER" or "TQL"), an Ohio limited liability company whose main office is located in Cincinnati, Ohio, and the motor carrier identified in the signature block at the end of this Agreement ("CARRIER") (BROKER and CARRIER are collectively referred to as the "Parties" or individually as "Party"), and is effective on the date on which this Agreement is signed by CARRIER ("Effective Date").

**WHEREAS**, BROKER is licensed by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration ("FMCSA") in Docket No. MC-322572 to engage in operations, in interstate or foreign commerce, as a broker as defined in 49 U.S.C.A § 13102, arranging for transportation of freight (except household goods), and as a broker only, BROKER arranges transportation services for various shippers, brokers, consignors, consignees, motor carriers with broker authority, and other third parties (individually or collectively "CUSTOMER(S)"). The term CUSTOMER includes each shipper, receiver, consignor, and/or consignee related to each load, regardless of who tenders the freight or makes payment to BROKER; and

**WHEREAS**, CARRIER holds the operating authority (identified as the CARRIER MC# and/or DOT# in the signature block at the end of this Agreement) ("Operating Authority") to engage in transportation as a for-hire carrier of property (except household goods) under contracts with shippers, receivers, and/or brokers of general commodities, and shall transport said property under its own Operating Authority and subject to the terms of this Agreement, and CARRIER possesses the necessary competence, expertise, personnel, equipment, licensure, certifications, registrations, and any and all other resources and qualifications necessary to perform the Services (defined below) required in this Agreement in a legal, professional, and safe manner, and makes the representations in this Agreement for the purpose of inducing BROKER to enter into this Agreement; and

**WHEREAS**, BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER, on a non-exclusive basis, to pickup, secure, transport, and deliver CUSTOMERS' freight in compliance with this Agreement ("Services").

**NOW, THEREFORE**, for good and valuable consideration, the Parties agree as follows:

1. **TERM**. The term of this Agreement ("Term") shall be one (1) year, commencing on the Effective Date, and such Term shall automatically renew for successive one-year periods, unless terminated by either Party. Either Party may terminate this Agreement on 30-days prior written notice, to the other Party, without cause, or as otherwise provided in this Agreement. Either Party may terminate this Agreement immediately upon written notice to the other Party for any breach of this Agreement.

2. **CARRIER'S COVENANTS**. In performing the Services, CARRIER agrees that it shall, at all times during the Term, and at its own expense, comply with the following covenants:
   (a) CARRIER shall provide a sufficient number of drivers, with enough available hours of service, to pick up and deliver the tendered load(s) within the time frame(s) requested by BROKER and/or its CUSTOMERS, without violating the FMCSA hours of service regulations, set forth in 49 C.F.R. § 395.3, or any other Laws (defined below);
   (b) CARRIER shall maintain knowledge of and compliance with all federal, state, and local laws and regulations related to the Services ("Laws"), including, without limitation, those laws and regulations related to the transportation of Hazardous Materials, as defined in 49 C.F.R. §§ 172.800, .173, and .397; security; owner/operator lease and lease agreements; loading and securing of freight; implementation and maintenance of driver safety programs (including, without limitation, hiring, controlled substances, and hours-of-service requirements); sanitation, temperature, and contamination requirements for transporting food, perishable, and other products; qualifying, licensing, and training of drivers; implementation and maintenance of equipment safety regulations; environmental or emissions programs in areas in which CARRIER operates, including, without limitation, California Transport Refrigeration Unit (TRU) and Airborne Toxic Control Measure (ATCM); and maintenance and exclusive control of the means and method of transportation, including, without limitation, performance of its drivers and all applicable insurance Laws. CARRIER certifies that any TRU equipment furnished will be in compliance with the in-use requirements of all of California's TRU regulations. CARRIER will be responsible for any and all fines assessed against any party, including BROKER and CUSTOMERS, for CARRIER's failure to adhere, in whole or in part, to any ARB/ACTM regulation or any other Laws. **BROKER is an equal opportunity employer and federal contractor; thus, if CARRIER provides Services subject to a federal contract, then CARRIER agrees that, to the extent applicable: (1) CARRIER will**

**comply with the following laws, which are incorporated herein by reference: Executive Order 11246, Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws, 41 CFR § 60-300.5(a), and 41 CFR § 60-741.5(a); and (2) CARRIER and its subcontractors shall abide by the requirements of 41 CFR § 60-300.5(a) and 41 CFR § 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans and qualified individuals on the basis of disability and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**

(c) CARRIER shall perform the Services with the highest quality of professional skill and care demanded in the transportation industry, with due diligence, and in the best interest of and to the satisfaction of BROKER and CUSTOMERS, each of which shall be determined by BROKER in its sole discretion.

(d) CARRIER bears the ultimate and exclusive responsibility to manage, govern, discipline, direct, and control its employees, agents, contractors, owner/operators, leasees, and equipment in compliance with all Laws. CARRIER and BROKER agree that the safe, legal, and proper operation of the CARRIER and its drivers shall supersede any requests, demands, preferences, instructions, or information provided by BROKER or CUSTOMERS with respect to any shipment; and if any employee of BROKER or CUSTOMERS requests, demands, or instructs CARRIER to do any act in violation of any Laws, CARRIER shall immediately contact BROKER.

(e) CARRIER shall notify BROKER immediately if its Operating Authority is revoked, suspended, downgraded, negatively affected, or rendered inactive for any reason, and/or if CARRIER or any related entity is sold, rights or interests assigned, if there is a change in control of ownership, and/or any insurance required by this Agreement is threatened to be or is terminated, cancelled, suspended, or revoked for any reason. If CARRIER performs any Services without proper Operating Authority, then it shall defend, indemnify, and hold BROKER, CUSTOMERS, and related parties harmless under the terms of Section 10 of this Agreement.

(f) CARRIER authorizes BROKER to invoice CARRIER's freight charges to shippers, consignees, or third-parties responsible for payment.

(g) Any terms of the bill of lading (including, without limitation, payment terms, limitations of liability, and stamped terms) or CARRIER's tariffs or circulars that are inconsistent with either the terms of this Agreement or any agreement between BROKER and CUSTOMERS are superseded by and shall be controlled by the terms of this Agreement.

(h) CARRIER is bound by any agreement entered into between BROKER and CUSTOMERS related to the loads. If CARRIER agrees to perform Services on any loads that involve the transportation of intermodal containers or trailers that are not owned by CARRIER, then CARRIER is fully responsible and liable for (i) ensuring that the container, trailer, and chassis are suitable for transport, including, without limitation, checking the brakes and tires of the trailer or chassis and properly securing containers to chassis; (ii) any loss or damage to the container, trailer, and chassis while in CARRIER's possession or control; and (iii) complying with any Laws, rail carrier tariffs or circulars, and agreements related to the container or trailer.

(i) CARRIER agrees that this Agreement applies to any load tendered directly to CARRIER by BROKER, as well as any load which CARRIER knows or should have known involved BROKER.

3. **BROKER'S COVENANTS**. BROKER warrants and represents that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement.

4. **COMPENSATION**. CARRIER agrees to perform the Services for BROKER, under CARRIER's Operating Authority exclusively, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ("Rate Confirmation"), which shall be incorporated into this Agreement, or by Electronic Communications (defined in Section 20). Additionally:

(a) Any verbally agreed upon rates must be confirmed in a Rate Confirmation or other Electronic Communications. Notwithstanding anything to the contrary, whether in this Agreement, on a bill of lading, at law, or in any other writing, CARRIER's released rates or values, stamped terms, and/or tariff rules or circulars related to rates or compensation shall not be valid.

(b) As a condition to payment, CARRIER shall submit complete and legible invoices, clean bills of lading, and signed loading or delivery receipts for all Services. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstances, will CARRIER contact or seek payment from any CUSTOMER or any other party responsible for any payment related to the Services. CARRIER waives any right to collect from CUSTOMERS, unless BROKER provides CARRIER with consent in a writing signed by a vice president or C-level officer of BROKER.

(c) BROKER and CARRIER shall use commercially reasonable efforts to verify the accuracy of all freight charge billings invoiced by BROKER to CUSTOMERS for the Services performed by CARRIER. BROKER shall have the right to audit, from time to time, CARRIER's freight charges, and CARRIER shall fully cooperate with any audit. BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3.

(d) Except in the case of *force majeure*, CARRIER is responsible for any and all additional costs incurred by BROKER when replacement or cover Services are required arising out of CARRIER's failure to perform the Services as agreed.

(e) CARRIER hereby expressly waives its right to any lien on any freight or other property of CUSTOMERS, except warehouseman lien rights that are exercised in strict compliance with this Agreement.
(f) In any claim by CARRIER against BROKER relating to this Agreement, BROKER's liability shall be limited to the lesser of either (i) the freight costs for the particular load as confirmed in writing or (ii) direct damages, but shall not include consequential, incidental, special, or punitive damages.
(g) Notwithstanding any other provision in this Agreement to the contrary, BROKER may offset against CARRIER's pending invoices for any amounts due to BROKER, including, without limitation, those arising from or related to cargo claims, CARRIER'S breach of this Agreement, or CARRIER's indemnity obligations to BROKER or CUSTOMERS.

5. **DOT SAFETY RATING**. CARRIER represents and warrants that it does not have an "Unsatisfactory" safety rating issued by the FMCSA, and shall notify BROKER in writing immediately if its safety rating changes in any way, including, without limitation, a change to an "Unsatisfactory," "Conditional," "Unfit," "Marginal," or other negative rating. CARRIER shall be responsible for any and all liability and damages asserted against or imposed on BROKER or CUSTOMERS arising out of CARRIER's violation of this Section, including, without limitation, attorneys' fees, expert costs, and all other related costs.

6. **INSURANCE**. At all times during the Term, CARRIER shall maintain in effect the following types and amounts of insurance coverage from reliable insurance companies having an AM Best rating of A-VII or better: Automobile ("Auto") liability $1,000,000; motor vehicle (including hired and non-owned vehicles) $1,000,000 (or $5,000,000 per incident if transporting hazardous materials), which includes coverage for environmental damages and remediation arising out of the release or discharge of hazardous substances; cargo damage/loss $100,000; and workers' compensation with limits required by applicable state law. It is the sole responsibility of CARRIER to ensure compliance with the above limits at all times during the Term. All such insurance shall be written and be required to respond and pay prior to any other available coverage of BROKER or CUSTOMERS. CARRIER shall also comply with the following:
(a) Except as specified above, all insurance policies shall comply with the minimum requirements of the FMCSA and any other Laws. Insurance certificates furnished by CARRIER to BROKER are an affirmative representation by CARRIER that CARRIER complies with the insurance requirements set forth in this Agreement and all Laws. Nothing in this Agreement shall be construed to limit liability of the CARRIER to the insurance limits set forth above, nor shall any exclusion, declaration, or deductible amount in any insurance policy absolve CARRIER from financial liability for any loss or damage. It is CARRIER's sole responsibility to abide by the terms and conditions of its insurance policies, and CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from any and all liability or claims that arise from or are related to CARRIER's failure to maintain such coverage or abide by the terms and conditions of such policies.
(b) CARRIER shall furnish BROKER with a certificate of insurance, in a form satisfactory to BROKER, to prove that each coverage specified in this Section is in effect and properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Each certificate of insurance shall name BROKER as certificate holder, additional insured, and loss payee, with a waiver of subrogation in favor of BROKER and CUSTOMERS. In addition, when available, CARRIER shall obtain an automatic additional insured endorsement which shall apply to BROKER. CARRIER must provide BROKER with at least 30 days advance notice prior to cancellation, change, or non-renewal.
(c) CARRIER shall pay all premiums and deductible amounts under any applicable insurance policies. Upon request by BROKER, CARRIER shall provide a complete copy of all applicable policies along with any exclusions, exemptions, or riders that are not depicted in the governing certificate of insurance. In addition, by signing this Agreement, CARRIER expressly grants BROKER the authority to obtain an actual copy of the policies in effect at the time of any loss directly from CARRIER's insurance companies, and further authorizes its insurance companies to release to BROKER any and all of CARRIER's insurance policies requested by BROKER. In the event any issues arise with respect to CARRIER's insurance, CARRIER agrees to cooperate to the fullest extent possible with BROKER to obtain such information or facilitate communication. CARRIER grants BROKER the right to contact and communicate directly with its insurance companies to the fullest extent of CARRIER's rights.
(d) CARRIER shall only utilize vehicles and drivers that are licensed, identified, and insured under CARRIER's own name and insurance policies with the limits specified above. CARRIER is fully liable for any loss or damage not covered by insurance as a result of CARRIER's failure to comply with this Section, and CARRIER agrees to indemnify, defend, and hold BROKER and CUSTOMERS harmless from and against any such loss or damage regardless of the vehicle or driver used on any shipment tendered to CARRIER by BROKER.

7. **HAZARDOUS MATERIAL**. If CARRIER accepts BROKER's or CUSTOMERS' tender of a load to transport any shipment required to be placarded under Laws for hazardous materials ("Hazmat"), then the additional provisions in Appendix A, including additional insurance requirements, shall also apply for each and every Hazmat shipment.

8. **CARGO LIABILITY AND CLAIMS**. CARRIER shall issue a bill of lading, listing itself as the motor carrier, in compliance with 49 U.S.C. §§ 80101-16, 49 C.F.R. §§ 373.101-.105, .201 (and any amendments thereto), for the property it receives for transportation under this Agreement. CARRIER is fully responsible and liable for the freight once in possession of it, and the trailer(s) is loaded, even partially, regardless of whether a bill of lading has been issued, signed, or delivered to

CARRIER. CARRIER's responsibility and liability shall continue until proper and timely delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt evidencing successful delivery. The Parties also agree as follows:

(a) Any terms of the bill of lading (including, without limitation, payment terms, limitations of liability, stamped terms, etc.) that are inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. CARRIER's failure to issue a bill of lading or sign a bill of lading acknowledging receipt of the cargo shall not affect liability of CARRIER. Under no circumstances shall CARRIER execute a bill of lading or any other document which represents BROKER as the party responsible for the transportation or delivery of freight.

(b) If a consignee refuses a shipment or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman shall not begin until (i) CARRIER has provided BROKER with 24-hour prior written notice of request for direction and complied with those directions, or (ii) if no direction is received as provided in (i), CARRIER has placed the shipment in either a BROKER-approved public warehouse or in CARRIER's storage facility utilizing reasonable security measures.

(c) CARRIER shall comply with 49 C.F.R. §§ 370.1-.11 and any amendments, applicable regulations adopted by the FMCSA, and/or any other Laws relating to processing freight loss and damage claims and salvage. In the event goods are compromised or otherwise damaged, BROKER or its CUSTOMER, in its sole reasonable discretion, may determine whether the goods are salvageable, and if salvageable, the value of the salvageable goods.

(d) Except as otherwise provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether the CARRIER has common or contract Operating Authority shall be governed by common law applicable to common carriers, federal transportation Laws, and by the Carmack Amendment codified in 49 U.S.C. § 14706, including on shipments that are exempt from such Laws such as intrastate shipments or shipments of exempt commodities. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including, without limitation, by Electronic Communications.

(e) Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER shall acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period shall be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement.

9. **INDEPENDENT CONTRACTORS**. The relationship between BROKER and CARRIER shall, at all times, be that of independent contractors. As independent contractors, the Parties agree as follows:

(a) No terms or conditions of this Agreement, or any act or omission of either Party shall be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, or employer/employee relationship between the Parties.

(b) CARRIER and any of its approved carriers or agents shall employ, pay, supervise, direct, discipline, discharge, and assume full responsibility and control over all persons required for CARRIER's performance of the Services. BROKER has no right to discipline or direct the performance of any driver and/or employee, contractor, subcontractor, or agent of CARRIER. Under no circumstances shall CARRIER or any of its approved carriers, agents, or employees be deemed to be or hold themselves out as employees of BROKER or CUSTOMERS.

(c) CARRIER and BROKER agree that safe and legal operation of the CARRIER and its drivers shall completely and without question govern and supersede any service requests, demands, preferences, instructions, or information from BROKER or CUSTOMERS with respect to any shipment at any time.

(d) CARRIER agrees that a CUSTOMER's insertion of BROKER's name as the carrier on a bill of lading is without authorization and in error and shall be for the CUSTOMER's convenience only and shall not change BROKER's status or liability as a property broker only, nor CARRIER's status or obligations as a motor carrier.

(e) CARRIER agrees that any driving directions or routing instructions to or from a CUSTOMER's location given by BROKER are for informational purposes only. It is CARRIER's sole responsibility to ensure the directions are appropriate with regard to equipment, route, protection and securement of the cargo, and safe operation of the vehicle(s), and CARRIER assumes and is fully and exclusively responsible and liable for the route CARRIER actually takes while performing Services.

(f) CARRIER assumes all liability and agrees that it is fully and exclusively responsible for any and all contributions, benefits, taxes, and any other payments which might be expected in an employer-employee relationship, which includes, without limitation, the payment of the following items: any and all taxes under Laws (including payroll taxes), taxes for unemployment insurance, pensions, workers' compensation, and social security for each and every person engaged in CARRIER's performance of the Services. BROKER is not liable for any obligations specified above and CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from any claim, liability, interest, fines, or penalties imposed or asserted against BROKER or CUSTOMERS for any such obligations.

(g) CARRIER agrees that BROKER may, in BROKER's sole discretion, track any or all shipments with or without CARRIER's knowledge by electronic tracking or otherwise.

10. **INDEMNIFICATION**. CARRIER agrees to defend, indemnify, and hold BROKER and CUSTOMERS harmless from and against any and all claims or liability (including, without limitation, Workers' Compensation claims), arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance or failure to perform under this

Agreement, including, without limitation, claims or liability for cargo loss and damage, theft, delay, damage to property, and bodily injury and/or death. Except for Workers' Compensation claims, CARRIER shall not be required to indemnify any party (including BROKER) for claims or liability that are directly and solely caused by the negligence or willful misconduct of that party.

11. **BROKER'S ACCOUNTS**. CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the Term, making no contact with CUSTOMERS except the minimum level of contact necessary to perform the Services. If this Agreement is terminated for any reason, CARRIER shall not solicit freight or provide transportation services to any CUSTOMERS for a period of 12 months after the termination date of this Agreement. If CARRIER solicits freight or provides transportation services to any CUSTOMERS in violation of this Section, then, in addition to any other remedies available under the law (including punitive damages), CARRIER shall also be liable to BROKER for all costs and expenses incurred to enforce this Section, including, without limitation, court costs and attorneys' fees. This Section shall not apply to CUSTOMERS for whom CARRIER has (without the assistance of, introduction by, or involvement in any way of BROKER) performed transportation services in the twelve (12) months immediately preceding the Effective Date, which must be proved in writing.

12. **CO-BROKERING**. CARRIER is prohibited from brokering, re-brokering, co-brokering, subcontracting, transferring, trip leasing, assigning, or interlining the transportation of shipments to any other person or entity conducting business under an operating authority different from CARRIER's Operating Authority without advance written authorization from BROKER. If BROKER becomes aware of such prohibited activity by CARRIER prior to payment of any compensation otherwise due CARRIER, then BROKER may withhold payment to CARRIER and instead pay appropriate compensation to the motor carrier that actually transported the shipment. Any subcontracting or brokering of any shipment by CARRIER to any third party shall be deemed an assignment of CARRIER's right to be compensated for that shipment to the third party. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement. CARRIER will be liable for any and all losses or damages (including reasonable attorney's fees and costs) for violation of this Section.

13. **WAIVER AND DISCHARGE**. The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver of such provision or the waiver of the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part of this Agreement. To the extent that terms and conditions in this Agreement are inconsistent with Part (b), Subtitle IV of Title 49 U.S.C. (ICC Termination Act of 1995)(the "Act"), the Parties expressly waive any or all rights and remedies they may have under the Act.

14. **NOTICES**. All notices required or permitted under this Agreement shall be in writing, signed by or on behalf of the Party giving the notice, and sent to the other Party at its main office listed above via certified U.S. Mail, overnight courier with delivery receipt, or facsimile with machine printed proof of delivery.

15. **GOVERNING LAW**. This Agreement shall be governed by the laws of the State of Ohio, except to the extent that federal transportation laws and regulations preempt those laws, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law. The Parties consent to the jurisdiction of the state court located in Clermont County, Ohio, waive any objection to the jurisdiction of that court, and agree that any dispute between the Parties, including, without limitation, those arising under or related to this Agreement, shall be brought in that court, which shall have exclusive jurisdiction over such dispute. The prevailing Party in any lawsuit between the Parties shall be entitled to all reasonable expenses, attorneys' fees, and costs (including court costs).

16. **ENTIRE AGREEMENT**. This Agreement constitutes the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and no extrinsic evidence may be introduced to reform or change this Agreement in any judicial or equitable proceeding arising out of this Agreement. Any changes to this Agreement must be in a writing executed by both Parties.

17. **INVALIDITY OF PROVISIONS / SEVERABILITY**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such a manner as to make such provision valid, legal, or enforceable.

18. **ASSIGNMENT AND DELEGATION**. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of both Parties. Notwithstanding anything to the contrary in this Agreement, BROKER may assign this Agreement, whether in whole or part, without notice to or consent of CARRIER, to any entity which controls, is controlled by, or is under common control with BROKER or which acquires all or substantially all of the assets or ownership interests of BROKER, provided that said assignee assumes, in full, the obligations of BROKER under this Agreement.

19. **FACTORING**. CARRIER shall provide BROKER written notice of any assignment, factoring, amendment, or other transfer of its right to receive payment arising under this Agreement ("Pay Assignment") at least thirty (30) days prior to

the effective date of such Pay Assignment, which may affect BROKER's payment obligations. BROKER is not obligated to honor any Pay Assignment unless such notice is proper and timely received. At minimum, each written notice shall include the name and address of the factoring company, assignee, or transferee; date signed; date Pay Assignment is to begin; and the terms of the Pay Assignment. Notice is considered delivered upon receipt of written notice by BROKER. BROKER shall have the right to ask for, and CARRIER shall be obligated to furnish, any further documentation BROKER requires in order to satisfy BROKER as to the authenticity and requirements of the Pay Assignment. BROKER's payment obligations shall not be subject to more than one Pay Assignment at any one time. Any and all Pay Assignments are taken subject to all the terms of this Agreement regardless of when or if BROKER receives a notice of Pay Assignment. CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from and against any and all lawsuits, claims, actions, and damages (including reasonable attorneys' fees, costs, liabilities, and liens) arising from, imposed upon BROKER in connection with, or in any way related to any Pay Assignment. If CARRIER wants to terminate a Pay Assignment, a written release from the CARRIER and the Pay Assignment's assignee, in a form satisfactory to BROKER's counsel, must be received by BROKER specifying the terms and date of release. If CARRIER fails to comply with any one of the requirements of this Section, then CARRIER releases and waives any and all right, claim, or action against BROKER and CUSTOMERS for any amount due and owing under this Agreement.

20. **ELECTRONIC COMMUNICATIONS**. The following terms apply to any and all Electronic Communication (defined below) with BROKER:
    (a) During the Term, the Parties anticipate that they will exchange materials and information in electronic form, including, without limitation, through websites, e-mail, fax, text messaging, mobile apps, and other electronic means (collectively "Electronic Communications"), and each Party consents to receiving Electronic Communications related to the Services.
    (b) Under no circumstances will BROKER be liable for, and CARRIER hereby expressly waives and releases BROKER from, any liability for any loss or damage caused by computer viruses, Trojans, worms, or similar programs.
    (c) Electronic Communications may contain information that is confidential and subject to legal privilege. Such Electronic Communications are intended solely for the individual or entity to whom it is addressed and to others who have the authority to receive it, and CARRIER may not, under any circumstances, disclose, copy, or distribute the information without BROKER's written consent.
    (d) BROKER does not make any representation regarding any links and does not endorse the products or services that may be offered from or through any link. BROKER accepts no responsibility for the content or use of information contained in any link.
    (e) Unless otherwise noted, Electronic Communications are subject to intellectual property rights of BROKER. Use of the content in web pages, electronic or written publications, smartphone applications, or any other media and/or words, phrases, names, designs, or logos that are BROKER's trademarks are prohibited without the express written permission of BROKER.
    (f) BROKER disclaims all implied warranties, including, without limitation, warranties of compatibility, security, and accuracy, and BROKER will not be liable for any special, indirect, consequential, or punitive damages of any kind arising out of the use of Electronic Communications by CARRIER.
    (g) By providing an email address to BROKER, CARRIER is expressly opting-in to BROKER's promotional email distribution list. CARRIER can opt-out at any time by contacting BROKER via telephone, email, or mail.
    (h) CARRIER understands that all calls to or from BROKER may be recorded, and CARRIER consents to being recorded during any and all calls with BROKER. CARRIER waives and releases BROKER from any liability or claim related to calls with BROKER being recorded, and waives any right to obtain a copy of such recording to the extent any such right exists under the law.

21. **CONFIDENTIALITY**. In addition to confidential information protected by law, whether statutory or otherwise, the Parties agree that all of their financial information and that of CUSTOMERS, including, without limitation, freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, amounts of freight charges paid, freight volume requirements, as well as related CUSTOMER information, CUSTOMER shipping or other logistic requirements shared or learned between the Parties and CUSTOMERS shall be treated as confidential, and shall not be disclosed or used for any reason without prior written consent by the Parties. If confidentiality is breached, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy available, to an injunction restraining the violating Party from further violation of this Agreement.

22. **GENERAL CARRIER DUTIES**. CARRIER agrees as follows: (*These duties are in addition to any other duties required in this Agreement or in Laws*)
    (a) Drivers shall check in with BROKER every day (including Saturday, Sunday, and holidays) between 8:00 a.m. and 9:00 a.m. EST, giving their current location and load temperature.
    (b) CARRIER shall call BROKER immediately to report any problems related to the Services. BROKER is available 24 hours a day, 7 days a week, 365 days a year.

(c) CARRIER shall report any overage, shortage, or damage at loading or delivery to BROKER immediately upon becoming aware of such overage, shortage, or damage, and CARRIER assumes all liability for failing to so notify BROKER.

(d) CARRIER is responsible for any damage or loss to the product, shipment, or its packaging, and any and all shortages, from the time the shipment, or any portion thereof, first comes into CARRIER's possession or control at pickup, until the shipment is no longer in CARRIER's possession or control at delivery.

(e) If any payment for lumper services (loading/unloading) is agreed upon between BROKER and CARRIER, CARRIER must supply a legible unloading receipt with lumper's full name, address, and contact information accompanied by the BROKER's authorization number assigned to this particular load. Unless CARRIER provides this information within 24 hours of delivery, CARRIER will not be reimbursed for lumper costs.

(f) For all pallet exchange loads, the number of pallets in and out must be clearly notated on the original bill of lading.

(g) All loads tendered to CARRIER require exclusive use of trailer space solely for the freight related to that particular load, unless otherwise agreed in writing with BROKER. CARRIER assumes all liability, including, without limitation, any costs incurred by BROKER, caused by CARRIER loading any unauthorized freight on a load.

(h) Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to CARRIER.

(i) Any product which must be disposed of must have prior consent from BROKER before being disposed of by any party. If a load is disposed of without prior written consent from BROKER, CARRIER is liable for the entire value of the load, plus any other associated damages. CARRIER is required to remit to BROKER any funds received from salvage and/or insurance.

(j) Before loading begins, CARRIER's driver must have a sufficient number of load locks or other suitable cargo securing devices to secure the load.

(k) Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, CARRIER shall be fully liable for the greater of either (i) the invoice amount to CUSTOMER or (ii) the cost of the product. In addition, CARRIER shall also be liable for any other expenses arising from or related to the unauthorized removal of the seal.

(l) CARRIER shall provide a trailer that is in sound mechanical and structural condition, and is clean, dry, free of defects, and suitable in all respects to accept, load, and transport the shipment.

(m) CARRIER shall not, unless expressly authorized to do so by BROKER, contact or communicate directly with CUSTOMER. This includes CARRIER's agents, representatives, heirs, or assigns. This Section 22(m) shall not prohibit communication with dock workers, as long as such communication is limited to the minimum amount of communication necessary to perform the Services for that load.

(n) CARRIER's drivers shall not, under any circumstances, use a cellular phone, whether by talking, texting, or otherwise, while operating a vehicle related to the Services.

(o) At all times, CARRIER shall use proper, working equipment acceptable to CUSTOMER, train its personnel in sanitary transportation practices and document all training, maintain all necessary records, abide by all Laws, and follow all protocols communicated to CARRIER when transporting human and/or animal food.

23. **CARRIER DUTIES FOR REFRIGERATED LOADS**. In order to fulfill CUSTOMERS' delivery and tracking requests, if CARRIER accepts BROKER's tender of a refrigerated load, then CARRIER agrees as follows: (*These duties are in addition to the General Carrier Duties listed above*)

(a) Prior to loading, CARRIER shall confirm that the reefer unit is working properly and pre-cool trailer to the temperature specified on BROKER's Rate Confirmation. The temperature on BROKER's Rate Confirmation will be in Fahrenheit unless otherwise specified in writing. CARRIER must strictly adhere to the temperature listed on the Rate Confirmation and shall make sure the temperature pulped for the product at loading is reflected on the bill of lading.

(b) Trailers hauling refrigerated loads are required to have a properly functioning air chute for circulation. It is CARRIER's responsibility to make sure the chute is not damaged, obstructed, blocked, or malfunctioning in any way. It is CARRIER's sole responsibility to make sure sufficient space is provided for air circulation in front, rear, top, bottom, and between the load.

(c) CARRIER shall check pulp temperature of the product to ensure that product has been pre-cooled to the proper temperature prior to loading. CARRIER shall not accept any product with a pulp temperature that is more than 2 degrees above or below the specified temperature noted on BROKER's Rate Confirmation. If the temperature on BROKER's Rate Confirmation differs from that on the bill of lading, CARRIER shall call BROKER before signing the bill of lading or transporting the freight. If CARRIER loads or otherwise accepts freight contrary to the terms on BROKER's Rate Confirmation or applicable bill of lading, CARRIER is liable for any and all loss or damage arising from or related to such acceptance.

(d) By signing the bill of lading, CARRIER is confirming that the correct product and correct product count were received at the proper temperature. CARRIER is solely responsible for cargo loss or damage incurred related to discrepancies in product information between the bill of lading, Rate Confirmation, and the actual product. If a discrepancy as to count, condition, or temperature is encountered, CARRIER shall immediately notify BROKER, and no change to loading information shall be made until confirmed in writing by BROKER.

(e) CARRIER shall continuously maintain the temperature noted on BROKER's Rate Confirmation from pickup at shipper until delivery at receiver. CARRIER shall not, at any time, set reefer on start/stop, cycle, or any other non-continuous temperature setting unless otherwise notified in writing by BROKER. CARRIER shall contact BROKER immediately in the event of any problems including, without limitation, out-of-temperature condition, equipment malfunction, accident, or delay.

24. **SURVIVAL**. The terms and conditions of this Agreement which contemplate the need for performance after the expiration or termination of this Agreement, which includes, without limitation, provisions regarding indemnification, solicitation of CUSTOMERS, attorneys' fees, cargo liability, claims processing, and compensation for Services performed prior to termination, shall survive any such expiration or termination of this Agreement.

25. **RECITAL PARAGRAPHS / HEADINGS**. The statements in the recital paragraphs at the beginning of this Agreement are true and correct and may be relied upon in this Agreement. However, the Section headings in this Agreement are for convenience only and shall not be used to interpret this Agreement.

26. **COUNTERPARTS**. This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, and may be exchanged by Electronic Communications. Each executed counterpart shall be deemed to be an original and all of which together shall constitute one and the same agreement. CARRIER's execution of the signature page and return of that page to BROKER, shall be evidence that CARRIER has agreed to all of the terms and conditions of this Agreement without change or modification.

**IN WITNESS WHEREOF**, the Parties have, through their duly authorized representatives, executed this Agreement, and by signing below, the Parties acknowledge that they have read this Agreement in its entirety; understand the terms and conditions of this Agreement; have had the opportunity to consult with legal counsel regarding terms and conditions of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

**CARRIER:** WESTERN FLYER EXPRESS, ~~INC.~~ LLC
(Legal Name of CARRIER)

| | | | |
|---|---|---|---|
| **Signed By:** | MICHAEL J MATTOX<br>(Printed Name of Authorized Representative) | **State of Incorporation:** | Oklahoma<br>(Not Applicable for Sole Proprietor) |
| **Signature:** | [signature]<br>(Signature of Authorized Representative) | **City and State of Office:** | OKC, OK<br>(CARRIER's Home City and State) |
| **Title:** | CFO<br>(Title of Authorized Representative) | **CARRIER MC#:** | 309036<br>(CARRIER's MC# from FMCSA) |
| **Date:** | 9/27/17<br>(Date Signed) | **CARRIER DOT#:** | 658909<br>(CARRIER's DOT# from FMCSA) |
| **Entity Type:** | LLC<br>(Ex: LLC, Corporation, Sole Proprietor) | **CARRIER EIN#:** | 73-1500799<br>(CARRIER's Employer Identification #) |

**BROKER:** TOTAL QUALITY LOGISTICS, LLC
(Legal Name of BROKER)

**FORM REVISED 5 / 25 / 16**

**Signed By:** MARC BOSTWICK
(Printed Name of Authorized Representative)

**Signature:** Marc Bostwick
(Signature of Authorized Representative)

**Title:** Operational Sales Manager
(Title of Authorized Representative)

| | | | |
|---|---|---|---|
| **Carrier ID:** | 33239 | **Agreement Date:** | 1/15/2019 11:03:12 AM (Pacific Time) |
| **Carrier Name:** | D & M CARRIERS, LLC | **MC Number:** | MC410900 |
| **Address:** | 8125 SW 15TH STREET | **US DOT Number:** | 963300 |
| **City, State & Zip:** | OKLAHOMA CITY, OK 73128 | **DBA Name:** | FREYMILLER |
| **Contact:** | Dearl McClendon | **W9 State:** | OK |
| **Phone:** | 405-491-2800 | **W9 Incorporation Type:** | S Corporation |

## Payment Terms

**Your selection will remain as your default payment terms until TQL is notified that you would like your terms changed.** If no selection is made, your payment terms will default to **28 DAYS**. Payment terms can be updated at any time through your TQL Carrier Dashboard account.

**All pay terms are calculated from the day TQL **receives** your complete and legible paperwork**

**Payment Terms:** Please select **ONE** payment term as your regular payment term.

__X__ **28-Day Pay** - No fees – check mailed or payment direct deposited within 28 days of TQL receiving complete and legible paperwork. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8782 or e-mail to cinvoices@tql.com.

_____ **7-Day Quick Pay** - A 3% service charge will be deducted from the gross truck rate. This is issued through either check or direct deposit. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8895 or e-mail to quickpay@tql.com and be sure to write or type "Quick Pay" on your invoice and/or the Rate Confirmation. Payment will be issued within 7 days of TQL receiving complete and legible paperwork.

_____ **1-Day Quick Pay** - A 5% service charge will be deducted from the gross truck rate. Payment is made with either a Comchek, which includes a $25 dollar per invoice Comchek fee, or direct deposit with no Comchek fee. **To use this option you must mark "1-Day Quick Pay" clearly on both your envelope and invoice/Rate Confirmation.** A Comchek will be issued in the amount owed one business day after TQL receives complete and legible paperwork. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8895 or e-mail to quickpay@tql.com and be sure to write or type "1-Day Quick Pay" on your envelope and invoice/Rate Confirmation.

***If we receive your paperwork on Friday, you will receive your Comchek on Monday (1-Day Quick Pay and 7-Day Quick Pay will not be guaranteed if there are any problems with the load overages, shortages, late delivery, temperature issues, etc.).*

****You can select 1-Day Quick Pay on a per invoice basis if you have selected either 28-Day or 7-Day. To use this option "1-Day Quick Pay" must be marked clearly on both your envelope and invoice/Rate Confirmation.*

No **Direct Deposit *** - Select if you want direct deposit ( **available on all payment terms** ). CARRIER authorizes Total Quality Logistics, LLC ( "TQL") to initiate automatic deposits to CARRIER's account at the financial institution entered. CARRIER also authorizes and permits TQL to make withdrawals from this account if a credit entry is made in error or to pay any amount that CARRIER may owe to TQL.

CARRIER agrees to release, defend, indemnify, and hold TQL harmless from and against any delay or loss of funds due to incorrect or incomplete information supplied by CARRIER or CARRIER's financial institution or due to an error on the part of CARRIER's financial institution in depositing funds to CARRIER's account. CARRIER agrees that TQL cannot be held responsible or liable for overdrafts or overdraft fees incurred before funds are deposited. This agreement and authorization will remain in effect until TQL receives a written notice of cancellation or changes from CARRIER or CARRIER's financial institution.

E-mail Address for Remittance Advices: billing@freymiller.com

*Direct Deposit: Only available on continental United States bank accounts and may not be available on initial loads due to bank account setup time.

*TQL allows invoices and bills of lading to be sent via fax, email, mobile device scanning, or TransFlo scanning. Sending paperwork via one of these methods will ensure we receive your documents the same day and will help you get paid faster. Fax invoices to (513) 688-8782 or email them to cinvoices@tql.com for **28-Day pay** . Fax invoices to (513) 688-8895 or email them to quickpay@tql.com **for all 1-Day and 7-Day Quick Pays.** Our TransFlo code is **TQYL** for TransFlo Express truck stop scans, or **TQYLV** for scans using TransFlo Velocity downloadable software. Before sending paperwork electronically, please check your TQL Rate Confirmation to be sure that original paperwork is not needed. This information can be found in the "Invoice Information" section of the Rate Confirmation. If the box is checked, then original documents are required and you must mail your paperwork to receive payment.*

All paperwork submitted must be complete and legible and include:

- Invoice with your company name and address, and with your payment terms clearly indicated. TQL's Rate Confirmation can serve as your invoice. Payment will be made according to terms printed on the Rate Confirmation, unless you indicate a different term on your invoice or Rate Confirmation.
- Original B.O.L./P.O.D. signed by the receiver.
- Any unloading or pallet receipts with TQL authorization number printed on them.

**Comchek Authorization**

| |
|---|
| **Comcheks are available only after freight has been loaded. If you would like to limit who at your company is permitted to receive Comcheks, please mark the appropriate "No" box below. If the "No" box is not selected, that category of persons are permitted to receive Comcheks. If nothing is marked, then you are indicating that Comcheks may be given to any person representing you or your company. TQL will not be responsible for unauthorized persons obtaining Comcheks on behalf of your company. Due to business concerns, all drivers, dispatchers, and other representatives of your company are eligible to receive unloading (lumper) Comcheks. TQL must be notified separately in writing if you do not want anyone at your company to be able to receive unloading (lumper) Comcheks. There is a $25 fee for each Comchek issued. The amount permitted for fuel advance Comcheks is limited to the lesser of 40% of the gross truck pay or $2,000.** |
| **Drivers** are permitted to receive fuel advance Comcheks. Yes _____ No __X__<br>**Dispatchers** are permitted to receive fuel advance Comcheks. Yes _____ No __X__<br>**Anyone** at our company is permitted to receive fuel advance Comcheks. Yes _____ No __X__ |

*****TQL After-Hours and Weekend/Holiday Comchek Procedure*****

TQL after-hours personnel can only issue a fuel advance Comchek upon confirmation from the shipper that the truck has been loaded. In the event that we are unable to reach a shipper, we may request a fax copy of each ansteved every bill of lading before issuing the fuel advance Comchek. Furthermore, to ensure that we are giving the fuel advance Comchek to the correct carrier, it is imperative that all drivers be able to recite their company's MC number. TQL after-hours personnel cannot issue an advance for more than 40% of the total rate to the truck up to a $2,000.00 maximum advance. This policy will be in effect after 5 P.M. EST every weekday and throughout each weekend and holiday.

**Diverse Owned Business**

Is your company a **certified** diverse-owned business *(under a federal, state, or local diversity contracting program based upon the diversity of its ownership)*?

Yes _____ No __X__

If so, what category?

# BROKER/CARRIER AGREEMENT

This BROKER/CARRIER AGREEMENT ( "Agreement") is made by and between Total Quality Logistics, LLC ( "BROKER" or "TQL"), an Ohio limited liability company whose main office is located in Cincinnati, Ohio, and the motor carrier identified in the signature block at the end of this Agreement ( "CARRIER") (BROKER and CARRIER are collectively referred to as the "Parties" or individually as "Party"), and is effective on the date on which this Agreement is signed by CARRIER ( "Effective Date").

**WHEREAS**, BROKER is licensed by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration ( "FMCSA") in Docket No. MC-322572 to engage in operations, in interstate or foreign commerce, as a broker as defined in 49 U.S.C.A § 13102, arranging for transportation of freight (except household goods), and as a broker only, BROKER arranges transportation services for various shippers, brokers, consignors, consignees, motor carriers with broker authority, and other third parties (individually or collectively "CUSTOMER(S)"). The term CUSTOMER includes each shipper, receiver, consignor, and/or consignee related to each load, regardless of who tenders the freight or makes payment to BROKER; and

**WHEREAS**, CARRIER holds the operating authority (identified as the CARRIER MC# and/or DOT# in the signature block at the end of this Agreement) ( "Operating Authority") to engage in transportation as a for-hire carrier of property (except household goods) under contracts with shippers, receivers, and/or brokers of general commodities, and shall transport said property under its own Operating Authority and subject to the terms of this Agreement, and CARRIER possesses the necessary competence, expertise, personnel, equipment, licensure, certifications, registrations, and any and all other resources and qualifications necessary to perform the Services (defined below) required in this Agreement in a legal, professional, and safe manner, and makes the representations in this Agreement for the purpose of inducing BROKER to enter into this Agreement; and

**WHEREAS**, BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER, on a non-exclusive basis, to pickup, secure, transport, and deliver CUSTOMERS' freight in compliance with this Agreement ( "Services").

**NOW, THEREFORE**, for good and valuable consideration, the Parties agree as follows:

1. **TERM.** The term of this Agreement ( "Term") shall be one (1) year, commencing on the Effective Date, and such Term shall automatically renew for successive one-year periods, unless terminated by either Party. Either Party may terminate this Agreement on 30-days prior written notice, to the other Party, without cause, or as otherwise provided in this Agreement. Either Party may terminate this Agreement immediately upon written notice to the other Party for any breach of this Agreement.
2. **CARRIER'S COVENANTS.** In performing the Services, CARRIER agrees that it shall, at all times during the Term, and at its own expense, comply with the following covenants:
    a. CARRIER shall provide a sufficient number of drivers, with enough available hours of service, to pick up and deliver the tendered load(s) within the time frame(s) requested by BROKER and/or its CUSTOMERS, without violating the FMCSA hours of service regulations, set forth in 49 C.F.R. § 395.3, or any other Laws (defined below);
    b. CARRIER shall maintain knowledge of and compliance with all federal, state, and local laws and regulations related to the Services ( "Laws"), including, without limitation, those laws and regulations related to the transportation of Hazardous Materials, as defined in 49 C.F.R. §§ 172.800, .173, and .397; security; owner/operator lease and lease agreements; loading and securing of freight; implementation and maintenance of driver safety programs (including, without limitation, hiring, controlled substances, and hours-of-service requirements); sanitation, temperature, and contamination requirements for transporting food, perishable, and other products; qualifying, licensing, and training of drivers; implementation and maintenance of equipment safety regulations; environmental or emissions programs in areas in which CARRIER operates, including, without limitation, California Transport Refrigeration Unit (TRU) and Airborne Toxic Control Measure (ATCM); and maintenance and exclusive control of the means and method of transportation, including, without limitation, performance of its drivers and all applicable insurance Laws. CARRIER certifies that any TRU equipment furnished will be in compliance with the in-use requirements of all of California's TRU regulations. CARRIER will be responsible for any and all fines assessed against any party, including BROKER and CUSTOMERS, for CARRIER's failure to adhere, in whole or in part, to any ARB/ACTM regulation or any other Laws. **BROKER is an equal opportunity employer and federal contractor; thus, if CARRIER provides Services subject to a federal contract, then CARRIER agrees that, to the extent applicable: (1) CARRIER will comply with the following laws, which are incorporated herein by reference: Executive Order 11246, Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws, 41 CFR § 60-300.5(a), and 41 CFR § 60-741.5(a); and (2) CARRIER and its subcontractors shall abide by the requirements of 41 CFR § 60-300.5(a) and 41 CFR § 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans and qualified individuals on the basis of disability and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**
    c. CARRIER shall perform the Services with the highest quality of professional skill and care demanded in the transportation industry, with due diligence, and in the best interest of and to the satisfaction of BROKER and CUSTOMERS, each of which shall be determined by BROKER in its sole discretion.
    d. CARRIER bears the ultimate and exclusive responsibility to manage, govern, discipline, direct, and control its employees, agents, contractors, owner/operators, leasees, and equipment in compliance with all Laws. CARRIER and BROKER agree that the safe, legal, and proper operation of the CARRIER and its drivers shall supersede any requests, demands, preferences, instructions, or information provided by BROKER or CUSTOMERS with respect to any shipment; and if any employee of BROKER or CUSTOMERS requests, demands, or instructs CARRIER to do any act in violation of any Laws, CARRIER shall immediately contact BROKER.
    e. CARRIER shall notify BROKER immediately if its Operating Authority is revoked, suspended, downgraded, negatively affected, or rendered inactive for any reason, and/or if CARRIER or any related entity is sold, rights or interests assigned, if there is a change in control of ownership, and/or any insurance required by this Agreement is threatened to be or is terminated, cancelled, suspended, or revoked for any reason. If CARRIER performs any Services without proper Operating Authority, then it shall defend, indemnify, and hold BROKER, CUSTOMERS, and related parties harmless under the terms of Section 10 of this Agreement.
    f. CARRIER authorizes BROKER to invoice CARRIER's freight charges to shippers, consignees, or third-parties responsible for payment.
    g. Any terms of the bill of lading (including, without limitation, payment terms, limitations of liability, and stamped terms) or CARRIER's tariffs or circulars that are inconsistent with either the terms of this Agreement or any agreement between BROKER and CUSTOMERS are superseded by and shall be

controlled by the terms of this Agreement.

h. CARRIER is bound by any agreement entered into between BROKER and CUSTOMERS related to the loads. If CARRIER agrees to perform Services on any loads that involve the transportation of intermodal containers or trailers that are not owned by CARRIER, then CARRIER is fully responsible and liable for (i) ensuring that the container, trailer, and chassis are suitable for transport, including, without limitation, checking the brakes and tires of the trailer or chassis and properly securing containers to chassis; (ii) any loss or damage to the container, trailer, and chassis while in CARRIER's possession or control; and (iii) complying with any Laws, rail carrier tariffs or circulars, and agreements related to the container or trailer.

i. CARRIER agrees that this Agreement applies to any load tendered directly to CARRIER by BROKER, as well as any load which CARRIER knows or should have known involved BROKER.

3. **BROKER'S COVENANTS.** BROKER warrants and represents that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement.

4. **COMPENSATION.** CARRIER agrees to perform the Services for BROKER, under CARRIER's Operating Authority exclusively, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ( "Rate Confirmation"), which shall be incorporated into this Agreement, or by Electronic Communications (defined in Section 20). Additionally:

   a. Any verbally agreed upon rates must be confirmed in a Rate Confirmation or other Electronic Communications. Notwithstanding anything to the contrary, whether in this Agreement, on a bill of lading, at law, or in any other writing, CARRIER's released rates or values, stamped terms, and/or tariff rules or circulars related to rates or compensation shall not be valid.

   b. As a condition to payment, CARRIER shall submit complete and legible invoices, clean bills of lading, and signed loading or delivery receipts for all Services. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstances, will CARRIER contact or seek payment from any CUSTOMER or any other party responsible for any payment related to the Services. CARRIER waives any right to collect from CUSTOMERS, unless BROKER provides CARRIER with consent in a writing signed by a vice president or C-level officer of BROKER.

   c. BROKER and CARRIER shall use commercially reasonable efforts to verify the accuracy of all freight charge billings invoiced by BROKER to CUSTOMERS for the Services performed by CARRIER. BROKER shall have the right to audit, from time to time, CARRIER's freight charges, and CARRIER shall fully cooperate with any audit. BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3.

   d. Except in the case of *force majeure*, CARRIER is responsible for any and all additional costs incurred by BROKER when replacement or cover Services are required arising out of CARRIER's failure to perform the Services as agreed.

   e. CARRIER hereby expressly waives its right to any lien on any freight or other property of CUSTOMERS, except warehouseman lien rights that are exercised in strict compliance with this Agreement.

   f. In any claim by CARRIER against BROKER relating to this Agreement, BROKER's liability shall be limited to the lesser of either (i) the freight costs for the particular load as confirmed in writing or (ii) direct damages, but shall not include consequential, incidental, special, or punitive damages.

   g. Notwithstanding any other provision in this Agreement to the contrary, BROKER may offset against CARRIER's pending invoices for any amounts due to BROKER, including, without limitation, those arising from or related to cargo claims, CARRIER'S breach of this Agreement, or CARRIER's indemnity obligations to BROKER or CUSTOMERS.

5. **DOT SAFETY RATING.** CARRIER represents and warrants that it does not have an "Unsatisfactory" safety rating issued by the FMCSA, and shall notify BROKER in writing immediately if its safety rating changes in any way, including, without limitation, a change to an "Unsatisfactory," "Conditional," "Unfit," "Marginal," or other negative rating. CARRIER shall be responsible for any and all liability and damages asserted against or imposed on BROKER or CUSTOMERS arising out of CARRIER's violation of this Section, including, without limitation, attorneys' fees, expert costs, and all other related costs.

6. **INSURANCE.** At all times during the Term, CARRIER shall maintain in effect the following types and amounts of insurance coverage from reliable insurance companies having an AM Best rating of A-VII or better: Automobile ( "Auto") liability $1,000,000; motor vehicle (including hired and non-owned vehicles) $1,000,000 (or $5,000,000 per incident if transporting hazardous materials), which includes coverage for environmental damages and remediation arising out of the release or discharge of hazardous substances; cargo damage/loss $100,000; and workers' compensation with limits required by applicable state law. It is the sole responsibility of CARRIER to ensure compliance with the above limits at all times during the Term. All such insurance shall be written and be required to respond and pay prior to any other available coverage of BROKER or CUSTOMERS. CARRIER shall also comply with the following:

   a. Except as specified above, all insurance policies shall comply with the minimum requirements of the FMCSA and any other Laws. Insurance certificates furnished by CARRIER to BROKER are an affirmative representation by CARRIER that CARRIER complies with the insurance requirements set forth in this Agreement and all Laws. Nothing in this Agreement shall be construed to limit liability of the CARRIER to the insurance limits set forth above, nor shall any exclusion, declaration, or deductible amount in any insurance policy absolve CARRIER from financial liability for any loss or damage. It is CARRIER's sole responsibility to abide by the terms and conditions of its insurance policies, and CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from any and all liability or claims that arise from or are related to CARRIER's failure to maintain such coverage or abide by the terms and conditions of such policies.

   b. CARRIER shall furnish BROKER with a certificate of insurance, in a form satisfactory to BROKER, to prove that each coverage specified in this Section is in effect and properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Each certificate of insurance shall name BROKER as certificate holder, additional insured, and loss payee, with a waiver of subrogation in favor of BROKER and CUSTOMERS. In addition, when available, CARRIER shall obtain an automatic additional insured endorsement which shall apply to BROKER. CARRIER must provide BROKER with at least 30 days advance notice prior to cancellation, change, or non-renewal.

   c. CARRIER shall pay all premiums and deductible amounts under any applicable insurance policies. Upon request by BROKER, CARRIER shall provide a complete copy of all applicable policies along with any exclusions, exemptions, or riders that are not depicted in the governing certificate of insurance. In addition, by signing this Agreement, CARRIER expressly grants BROKER the authority to obtain an actual copy of the policies in effect at the time of any loss directly from CARRIER's insurance companies, and further authorizes its insurance companies to release to BROKER any and all of CARRIER's insurance policies requested by BROKER. In the event any issues arise with respect to CARRIER's insurance, CARRIER agrees to cooperate to the fullest extent possible with BROKER to obtain such information or facilitate communication. CARRIER grants BROKER the right to contact and communicate directly with its insurance companies to the fullest extent of CARRIER's rights.

   d. CARRIER shall only utilize vehicles and drivers that are licensed, identified, and insured under CARRIER's own name and insurance policies with the limits specified above. CARRIER is fully liable for any loss or damage not covered by insurance as a result of CARRIER's failure to comply with this Section, and CARRIER agrees to indemnify, defend, and hold BROKER and CUSTOMERS harmless from and against any such loss or damage regardless of the

vehicle or driver used on any shipment tendered to CARRIER by BROKER.

7. **HAZARDOUS MATERIAL.** If CARRIER accepts BROKER's or CUSTOMERS' tender of a load to transport any shipment required to be placarded under Laws for hazardous materials ( "Hazmat"), then the additional provisions in Appendix A, including additional insurance requirements, shall also apply for each and every Hazmat shipment.
8. **CARGO LIABILITY AND CLAIMS.** CARRIER shall issue a bill of lading, listing itself as the motor carrier, in compliance with 49 U.S.C. §§ 80101-16, 49 C.F.R. §§ 373.101-.105, .201 (and any amendments thereto), for the property it receives for transportation under this Agreement. CARRIER is fully responsible and liable for the freight once in possession of it, and the trailer(s) is loaded, even partially, regardless of whether a bill of lading has been issued, signed, or delivered to CARRIER. CARRIER's responsibility and liability shall continue until proper and timely delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt evidencing successful delivery. The Parties also agree as follows:
    a. Any terms of the bill of lading (including, without limitation, payment terms, limitations of liability, stamped terms, etc.) that are inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. CARRIER's failure to issue a bill of lading or sign a bill of lading acknowledging receipt of the cargo shall not affect liability of CARRIER. Under no circumstances shall CARRIER execute a bill of lading or any other document which represents BROKER as the party responsible for the transportation or delivery of freight.
    b. If a consignee refuses a shipment or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman shall not begin until (i) CARRIER has provided BROKER with 24-hour prior written notice of request for direction and complied with those directions, or (ii) if no direction is received as provided in (i), CARRIER has placed the shipment in either a BROKER-approved public warehouse or in CARRIER's storage facility utilizing reasonable security measures.
    c. CARRIER shall comply with 49 C.F.R. §§ 370.1-.11 and any amendments, applicable regulations adopted by the FMCSA, and/or any other Laws relating to processing freight loss and damage claims and salvage. In the event goods are compromised or otherwise damaged, BROKER or its CUSTOMER, in its sole reasonable discretion, may determine whether the goods are salvageable, and if salvageable, the value of the salvageable goods.
    d. Except as otherwise provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether the CARRIER has common or contract Operating Authority shall be governed by common law applicable to common carriers, federal transportation Laws, and by the Carmack Amendment codified in 49 U.S.C. § 14706, including on shipments that are exempt from such Laws such as intrastate shipments or shipments of exempt commodities. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including, without limitation, by Electronic Communications.
    e. Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER shall acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period shall be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement.
9. **INDEPENDENT CONTRACTORS.** The relationship between BROKER and CARRIER shall, at all times, be that of independent contractors. As independent contractors, the Parties agree as follows:
    a. No terms or conditions of this Agreement, or any act or omission of either Party shall be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, or employer/employee relationship between the Parties.
    b. CARRIER and any of its approved carriers or agents shall employ, pay, supervise, direct, discipline, discharge, and assume full responsibility and control over all persons required for CARRIER's performance of the Services. BROKER has no right to discipline or direct the performance of any driver and/or employee, contractor, subcontractor, or agent of CARRIER. Under no circumstances shall CARRIER or any of its approved carriers, agents, or employees be deemed to be or hold themselves out as employees of BROKER or CUSTOMERS.
    c. CARRIER and BROKER agree that safe and legal operation of the CARRIER and its drivers shall completely and without question govern and supersede any service requests, demands, preferences, instructions, or information from BROKER or CUSTOMERS with respect to any shipment at any time.
    d. CARRIER agrees that a CUSTOMER's insertion of BROKER's name as the carrier on a bill of lading is without authorization and in error and shall be for the CUSTOMER's convenience only and shall not change BROKER's status or liability as a property broker only, nor CARRIER's status or obligations as a motor carrier.
    e. CARRIER agrees that any driving directions or routing instructions to or from a CUSTOMER's location given by BROKER are for informational purposes only. It is CARRIER's sole responsibility to ensure the directions are appropriate with regard to equipment, route, protection and securement of the cargo, and safe operation of the vehicle(s), and CARRIER assumes and is fully and exclusively responsible and liable for the route CARRIER actually takes while performing Services.
    f. CARRIER assumes all liability and agrees that it is fully and exclusively responsible for any and all contributions, benefits, taxes, and any other payments which might be expected in an employer-employee relationship, which includes, without limitation, the payment of the following items: any and all taxes under Laws (including payroll taxes), taxes for unemployment insurance, pensions, workers' compensation, and social security for each and every person engaged in CARRIER's performance of the Services. BROKER is not liable for any obligations specified above and CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from any claim, liability, interest, fines, or penalties imposed or asserted against BROKER or CUSTOMERS for any such obligations.
    g. CARRIER agrees that BROKER may, in BROKER's sole discretion, track any or all shipments with or without CARRIER's knowledge by electronic tracking or otherwise.
10. **INDEMNIFICATION.** CARRIER agrees to defend, indemnify, and hold BROKER and CUSTOMERS harmless from and against any and all claims or liability (including, without limitation, Workers' Compensation claims), arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance or failure to perform under this Agreement, including, without limitation, claims or liability for cargo loss and damage, theft, delay, damage to property, and bodily injury and/or death. Except for Workers' Compensation claims, CARRIER shall not be required to indemnify any party (including BROKER) for claims or liability that are directly and solely caused by the negligence or willful misconduct of that party.
11. **BROKER'S ACCOUNTS.** CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the Term, making no contact with CUSTOMERS except the minimum level of contact necessary to perform the Services. If this Agreement is terminated for any reason, CARRIER shall not solicit freight or provide transportation services to any CUSTOMERS for a period of 12 months after the termination date of this Agreement. If CARRIER solicits freight or provides transportation services to any CUSTOMERS in violation of this Section, then, in addition to any other remedies available under the law (including punitive damages), CARRIER shall also be liable to BROKER for all costs and expenses incurred to enforce this Section, including, without limitation, court costs and attorneys' fees. This Section shall not apply to CUSTOMERS for whom CARRIER has (without the assistance of, introduction by, or involvement in any way of BROKER) performed transportation services in the twelve (12) months immediately preceding the Effective Date, which must be proved in writing.

12. **CO-BROKERING.** CARRIER is prohibited from brokering, re-brokering, co-brokering, subcontracting, transferring, trip leasing, assigning, or interlining the transportation of shipments to any other person or entity conducting business under an operating authority different from CARRIER's Operating Authority without advance written authorization from BROKER. If BROKER becomes aware of such prohibited activity by CARRIER prior to payment of any compensation otherwise due CARRIER, then BROKER may withhold payment to CARRIER and instead pay appropriate compensation to the motor carrier that actually transported the shipment. Any subcontracting or brokering of any shipment by CARRIER to any third party shall be deemed an assignment of CARRIER's right to be compensated for that shipment to the third party. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement. CARRIER will be liable for any and all losses or damages (including reasonable attorney's fees and costs) for violation of this Section.
13. **WAIVER AND DISCHARGE.** The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver of such provision or the waiver of the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part of this Agreement. To the extent that terms and conditions in this Agreement are inconsistent with Part (b), Subtitle IV of Title 49 U.S.C. (ICC Termination Act of 1995)(the "Act"), the Parties expressly waive any or all rights and remedies they may have under the Act.
14. **NOTICES.** All notices required or permitted under this Agreement shall be in writing, signed by or on behalf of the Party giving the notice, and sent to the other Party at its main office listed above via certified U.S. Mail, overnight courier with delivery receipt, or facsimile with machine printed proof of delivery.
15. **GOVERNING LAW.** This Agreement shall be governed by the laws of the State of Ohio, except to the extent that federal transportation laws and regulations preempt those laws, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law. The Parties consent to the jurisdiction of the state court located in Clermont County, Ohio, waive any objection to the jurisdiction of that court, and agree that any dispute between the Parties, including, without limitation, those arising under or related to this Agreement, shall be brought in that court, which shall have exclusive jurisdiction over such dispute. The prevailing Party in any lawsuit between the Parties shall be entitled to all reasonable expenses, attorneys' fees, and costs (including court costs).
16. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and no extrinsic evidence may be introduced to reform or change this Agreement in any judicial or equitable proceeding arising out of this Agreement. Any changes to this Agreement must be in a writing executed by both Parties.
17. **INVALIDITY OF PROVISIONS / SEVERABILITY.** Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such a manner as to make such provision valid, legal, or enforceable.
18. **ASSIGNMENT AND DELEGATION.** This Agreement shall inure to the benefit of and be binding upon the successors and assigns of both Parties. Notwithstanding anything to the contrary in this Agreement, BROKER may assign this Agreement, whether in whole or part, without notice to or consent of CARRIER, to any entity which controls, is controlled by, or is under common control with BROKER or which acquires all or substantially all of the assets or ownership interests of BROKER, provided that said assignee assumes, in full, the obligations of BROKER under this Agreement.
19. **FACTORING.** CARRIER shall provide BROKER written notice of any assignment, factoring, amendment, or other transfer of its right to receive payment arising under this Agreement ( "Pay Assignment") at least thirty (30) days prior to the effective date of such Pay Assignment, which may affect BROKER's payment obligations. BROKER is not obligated to honor any Pay Assignment unless such notice is proper and timely received. At minimum, each written notice shall include the name and address of the factoring company, assignee, or transferee; date signed; date Pay Assignment is to begin; and the terms of the Pay Assignment. Notice is considered delivered upon receipt of written notice by BROKER. BROKER shall have the right to ask for, and CARRIER shall be obligated to furnish, any further documentation BROKER requires in order to satisfy BROKER as to the authenticity and requirements of the Pay Assignment. BROKER's payment obligations shall not be subject to more than one Pay Assignment at any one time. Any and all Pay Assignments are taken subject to all the terms of this Agreement regardless of when or if BROKER receives a notice of Pay Assignment. CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from and against any and all lawsuits, claims, actions, and damages (including reasonable attorneys' fees, costs, liabilities, and liens) arising from, imposed upon BROKER in connection with, or in any way related to any Pay Assignment. If CARRIER wants to terminate a Pay Assignment, a written release from the CARRIER and the Pay Assignment's assignee, in a form satisfactory to BROKER's counsel, must be received by BROKER specifying the terms and date of release. If CARRIER fails to comply with any one of the requirements of this Section, then CARRIER releases and waives any and all right, claim, or action against BROKER and CUSTOMERS for any amount due and owing under this Agreement.
20. **ELECTRONIC COMMUNICATIONS.** The following terms apply to any and all Electronic Communication (defined below) with BROKER:
    a. During the Term, the Parties anticipate that they will exchange materials and information in electronic form, including, without limitation, through websites, e-mail, fax, text messaging, mobile apps, and other electronic means (collectively "Electronic Communications"), and each Party consents to receiving Electronic Communications related to the Services.
    b. Under no circumstances will BROKER be liable for, and CARRIER hereby expressly waives and releases BROKER from, any liability for any loss or damage caused by computer viruses, Trojans, worms, or similar programs.
    c. Electronic Communications may contain information that is confidential and subject to legal privilege. Such Electronic Communications are intended solely for the individual or entity to whom it is addressed and to others who have the authority to receive it, and CARRIER may not, under any circumstances, disclose, copy, or distribute the information without BROKER's written consent.
    d. BROKER does not make any representation regarding any links and does not endorse the products or services that may be offered from or through any link. BROKER accepts no responsibility for the content or use of information contained in any link.
    e. Unless otherwise noted, Electronic Communications are subject to intellectual property rights of BROKER. Use of the content in web pages, electronic or written publications, smartphone applications, or any other media and/or words, phrases, names, designs, or logos that are BROKER's trademarks are prohibited without the express written permission of BROKER.
    f. BROKER disclaims all implied warranties, including, without limitation, warranties of compatibility, security, and accuracy, and BROKER will not be liable for any special, indirect, consequential, or punitive damages of any kind arising out of the use of Electronic Communications by CARRIER.
    g. By providing an email address to BROKER, CARRIER is expressly opting-in to BROKER's promotional email distribution list. CARRIER can opt-out at any time by contacting BROKER via telephone, email, or mail.
    h. CARRIER understands that all calls to or from BROKER may be recorded, and CARRIER consents to being recorded during any and all calls with BROKER. CARRIER waives and releases BROKER from any liability or claim related to calls with BROKER being recorded, and waives any right to obtain a copy of such recording to the extent any such right exists under the law.
21. **CONFIDENTIALITY.** In addition to confidential information protected by law, whether statutory or otherwise, the Parties agree that all of their financial information and that of CUSTOMERS, including, without limitation, freight and brokerage rates, amounts received for brokerage services, amounts of freight

charges collected, amounts of freight charges paid, freight volume requirements, as well as related CUSTOMER information, CUSTOMER shipping or other logistic requirements shared or learned between the Parties and CUSTOMERS shall be treated as confidential, and shall not be disclosed or used for any reason without prior written consent by the Parties. If confidentiality is breached, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy available, to an injunction restraining the violating Party from further violation of this Agreement.

22. **GENERAL CARRIER DUTIES.** CARRIER agrees as follows: *(These duties are in addition to any other duties required in this Agreement or in Laws)*
    a. Drivers shall check in with BROKER every day (including Saturday, Sunday, and holidays) between 8:00 a.m. and 9:00 a.m. EST, giving their current location and load temperature.
    b. CARRIER shall call BROKER immediately to report any problems related to the Services. BROKER is available 24 hours a day, 7 days a week, 365 days a year.
    c. CARRIER shall report any overage, shortage, or damage at loading or delivery to BROKER immediately upon becoming aware of such overage, shortage, or damage, and CARRIER assumes all liability for failing to so notify BROKER.
    d. CARRIER is responsible for any damage or loss to the product, shipment, or its packaging, and any and all shortages, from the time the shipment, or any portion thereof, first comes into CARRIER's possession or control at pickup, until the shipment is no longer in CARRIER's possession or control at delivery.
    e. If any payment for lumper services (loading/unloading) is agreed upon between BROKER and CARRIER, CARRIER must supply a legible unloading receipt with lumper's full name, address, and contact information accompanied by the BROKER's authorization number assigned to this particular load. Unless CARRIER provides this information within 24 hours of delivery, CARRIER will not be reimbursed for lumper costs.
    f. For all pallet exchange loads, the number of pallets in and out must be clearly notated on the original bill of lading.
    g. All loads tendered to CARRIER require exclusive use of trailer space solely for the freight related to that particular load, unless otherwise agreed in writing with BROKER. CARRIER assumes all liability, including, without limitation, any costs incurred by BROKER, caused by CARRIER loading any unauthorized freight on a load.
    h. Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to CARRIER.
    i. Any product which must be disposed of must have prior consent from BROKER before being disposed of by any party. If a load is disposed of without prior written consent from BROKER, CARRIER is liable for the entire value of the load, plus any other associated damages. CARRIER is required to remit to BROKER any funds received from salvage and/or insurance.
    j. Before loading begins, CARRIER's driver must have a sufficient number of load locks or other suitable cargo securing devices to secure the load.
    k. Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, CARRIER shall be fully liable for the greater of either the invoice amount to CUSTOMER or (ii) the cost of the product. In addition, CARRIER shall also be liable for any other expenses arising from or related to the unauthorized removal of the seal.
    l. CARRIER shall provide a trailer that is in sound mechanical and structural condition, and is clean, dry, free of defects, and suitable in all respects to accept, load, and transport the shipment.
    m. CARRIER shall not, unless expressly authorized to do so by BROKER, contact or communicate directly with CUSTOMER. This includes CARRIER's agents, representatives, heirs, or assigns. This Section 22(m) shall not prohibit communication with dock workers, as long as such communication is limited to the minimum amount of communication necessary to perform the Services for that load.
    n. CARRIER's drivers shall not, under any circumstances, use a cellular phone, whether by talking, texting, or otherwise, while operating a vehicle related to the Services.
    o. At all times, CARRIER shall use proper, working equipment acceptable to CUSTOMER, train its personnel in sanitary transportation practices and document all training, maintain all necessary records, abide by all Laws, and follow all protocols communicated to CARRIER when transporting human and/or animal food.

23. **CARRIER DUTIES FOR REFRIGERATED LOADS.** In order to fulfill CUSTOMERS' delivery and tracking requests, if CARRIER accepts BROKER's tender of a refrigerated load, then CARRIER agrees as follows: *(These duties are in addition to the General Carrier Duties listed above)*
    a. Prior to loading, CARRIER shall confirm that the reefer unit is working properly and pre-cool trailer to the temperature specified on BROKER's Rate Confirmation. The temperature on BROKER's Rate Confirmation will be in Fahrenheit unless otherwise specified in writing. CARRIER must strictly adhere to the temperature listed on the Rate Confirmation and shall make sure the temperature pulped for the product at loading is reflected on the bill of lading.
    b. Trailers hauling refrigerated loads are required to have a properly functioning air chute for circulation. It is CARRIER's responsibility to make sure the chute is not damaged, obstructed, blocked, or malfunctioning in any way. It is CARRIER's sole responsibility to make sure sufficient space is provided for air circulation in front, rear, top, bottom, and between the load.
    c. CARRIER shall check pulp temperature of the product to ensure that product has been pre-cooled to the proper temperature prior to loading. CARRIER shall not accept any product with a pulp temperature that is more than 2 degrees above or below the specified temperature noted on BROKER's Rate Confirmation. If the temperature on BROKER's Rate Confirmation differs from that on the bill of lading, CARRIER shall call BROKER before signing the bill of lading or transporting the freight. If CARRIER loads or otherwise accepts freight contrary to the terms on BROKER's Rate Confirmation or applicable bill of lading, CARRIER is liable for any and all loss or damage arising from or related to such acceptance.
    d. By signing the bill of lading, CARRIER is confirming that the correct product and correct product count were received at the proper temperature. CARRIER is solely responsible for cargo loss or damage incurred related to discrepancies in product information between the bill of lading, Rate Confirmation, and the actual product. If a discrepancy as to count, condition, or temperature is encountered, CARRIER shall immediately notify BROKER, and no change to loading information shall be made until confirmed in writing by BROKER.
    e. CARRIER shall continuously maintain the temperature noted on BROKER's Rate Confirmation from pickup at shipper until delivery at receiver. CARRIER shall not, at any time, set reefer on start/stop, cycle, or any other non-continuous temperature setting unless otherwise notified in writing by BROKER. CARRIER shall contact BROKER immediately in the event of any problems including, without limitation, out-of-temperature condition, equipment malfunction, accident, or delay.

24. **SURVIVAL.** The terms and conditions of this Agreement which contemplate the need for performance after the expiration or termination of this Agreement, which includes, without limitation, provisions regarding indemnification, solicitation of CUSTOMERS, attorneys' fees, cargo liability, claims processing, and compensation for Services performed prior to termination, shall survive any such expiration or termination of this Agreement.

25. **RECITAL PARAGRAPHS / HEADINGS.** The statements in the recital paragraphs at the beginning of this Agreement are true and correct and may be relied

upon in this Agreement. However, the Section headings in this Agreement are for convenience only and shall not be used to interpret this Agreement.

26. **COUNTERPARTS.** This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, and may be exchanged by Electronic Communications. Each executed counterpart shall be deemed to be an original and all of which together shall constitute one and the same agreement. CARRIER's execution of the signature page and return of that page to BROKER, shall be evidence that CARRIER has agreed to all of the terms and conditions of this Agreement without change or modification.

**IN WITNESS WHEREOF**, the Parties have, through their duly authorized representatives, executed this Agreement, and by signing below, the Parties acknowledge that they have read this Agreement in its entirety; understand the terms and conditions of this Agreement; have had the opportunity to consult with legal counsel regarding terms and conditions of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

FMCSA Legal Name: D & M CARRIERS, LLC
Name of Authorized Carrier Representative: Dearl McClendon
Title of Authorized Carrier Representative: Director of Operations
Phone number of Authorized Carrier Representative: 405-491-2800
Email of Authorized Carrier Representative: dmcclendon@freymiller.com

Agreement Date: 1/15/2019

☑ "I, Dearl McClendon, am the Director of Operations for Freymiller. I am authorized to execute the Transportation Brokerage Agreement (the "Agreement") set out above dated 1/15/2019 11:03:12 AM Pacific Time between TQL and Freymiller and legally bind Freymiller to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the Agreement. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I acknowledge I have read this agreement in its entirety; understand the terms and conditions of this agreement; and knowingly, voluntarily, and willfully enter into this agreement without any duress or coercion of any kind. THE AGREEMENT SHALL BE BINDING ON FREYMILLER. I UNDERSTAND AND ACKNOWLEDGE THAT FREYMILLER IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

| | | | |
|---|---|---|---|
| **Carrier ID:** | 4231 | **Agreement Date:** | 3/9/2026 10:08:03 AM (Pacific Time) |
| **Carrier Name:** | CHRISTENSON TRANSPORTATION, INC. | **MC Number:** | MC279799 |
| **Address:** | 2301 WEST OLD ROUTE 66 | **US DOT Number:** | 576568 |
| **City, State & Zip:** | STRAFFORD, MO 65757 | **DBA Name:** | Christenson Transportation Inc |
| **Contact:** | Elliott Pinson | **W9 State:** | MO |
| **Phone:** | 417-866-5993 | **W9 Incorporation Type:** | S Corporation |

**Payment Terms**

Please indicate which of the following payment terms you would like to use. **Your selection will remain as your permanent payment term until TQL Carrier Services is notified in writing that you would like your terms changed.** If this form is not filled out, signed, and returned, then your payment terms will default to **28 DAYS.**

**All pay terms are calculated from the day TQL **receives** your complete and legible paperwork**

**Payment Terms:** Please select **ONE** payment term as your regular payment term.

__X__ **28-Day Pay** - No fees - check mailed or payment direct deposited within 28 days of TQL receiving complete and legible paperwork. Please refer to your Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please e-mail paperwork to cinvoices@tql.com.

_____ **7-Day Quick Pay** - A 3% service charge will be deducted from the gross truck rate. This is issued through either check or direct deposit. Please refer to your Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please e-mail paperwork to quickpay@tql.com and be sure to write or type "Quick Pay" on your invoice and/or the Rate Confirmation. Payment will be issued within 7 days of TQL receiving complete and legible paperwork.

_____ **1-Day Quick Pay** - A 5% service charge will be deducted from the gross truck rate. Payment is made with either a Comchek, which includes a Comchek fee which shall be specified on each TQL Rate Confirmation. TQL reserves the right to modify such fee at any time in its sole discretion, or direct deposit with no Comchek fee. **To use this option you must mark "1-Day Quick Pay" clearly on your invoice/Rate Confirmation.** A Comchek will be issued in the amount owed one business day after TQL receives complete and legible paperwork. Please refer to your Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please e-mail paperwork to quickpay@tql.com and be sure to write or type "1-Day Quick Pay" on your invoice/Rate Confirmation.

***If we receive your paperwork on Friday, you will receive your Comchek on Monday (1-Day Quick Pay and 7-Day Quick Pay will not be guaranteed if there are any problems with the load overages, shortages, late delivery, temperature issues, etc.).*

****You can select 1-Day Quick Pay on a per invoice basis if you have selected either 28-Day or 7-Day. To use this option "1-Day Quick Pay" must be marked clearly on your invoice/Rate Confirmation.*

Yes **Direct Deposit** - Select if you want direct deposit (available on all payment terms). Fill out Agreement Form and email it to achrequests@tql.com.

*We allow invoices and bills of lading to be sent via fax, email, mobile device scanning, or TransFlo scanning. Sending paperwork via one of these methods will ensure we receive your documents the same day and will help you get paid faster. Email invoices to cinvoices@tql.com **for 28-Day pay**. Email invoices to quickpay@tql.com **for all 1-Day and 7-Day Quick Pays**. Our TransFlo code is **TQYL** for TransFlo Express truck stop scans, or **TQYLV** for scans using TransFlo Velocity downloadable software. Before sending paperwork electronically, please check your TQL Rate Confirmation to be sure that original paperwork is not needed. If notated, then original documents are required and you must mail your paperwork to receive payment.*

**All paperwork submitted must be complete and legible and include:**

- Invoice with your company name and address, and with your payment terms clearly indicated. TQL's Rate Confirmation can serve as your invoice. Payment will be made according to terms printed on the Rate Confirmation, unless you indicate a different term on your invoice or Rate Confirmation.
- Original B.O.L./P.O.D. signed by the receiver.
- Any unloading or pallet receipts with TQL authorization number printed on them.

**Comchek Authorization**

**Comcheks are available only after TQL has received sufficient verification that freight has been loaded. At a minimum, sufficient verification shall include a BOL issued by the Shipper, which must be consistent with past BOLs TQL has received from that shipper (if applicable). If you would like to limit who at your company is permitted to receive Comcheks, please mark the appropriate "No" box below. If the "No" box is not selected, that category of persons are permitted to receive Comcheks. If nothing is marked below, then you are indicating that Comcheks may be given to any person representing you or your company. TQL shall not be responsible for unauthorized persons obtaining Comcheks on behalf of your company. Due to business concerns, all drivers, dispatchers, and other representatives of your company are eligible to receive unloading (lumper) Comcheks. TQL must be notified separately in writing if you do not want anyone at your company to be able to receive unloading (lumper) Comcheks. There is a fee for each Comchek issued, which shall be specified on each TQL Rate Confirmation. TQL reserves the right to modify such fee at any time in its sole discretion. The amount permitted for fuel advance Comcheks is limited to the lesser of 40% of the gross truck pay or $2,000. Notwithstanding the above, TQL reserves the right to deny any Comchek request upon its sole discretion.**

**Drivers** are permitted to receive fuel advance Comcheks. Yes __X__ No _____

**Dispatchers** are permitted to receive fuel advance Comcheks. Yes __X__ No _____
**Anyone** at our company is permitted to receive fuel advance Comcheks. Yes __X__ No _____

*****TQL After-Hours and Weekend/Holiday Comchek Procedure*****

TQL after-hours personnel can only issue a fuel advance Comchek upon TQL's receipt of confirmation from the shipper that the truck has been loaded. In the event that we are unable to reach a shipper, we may request a scanned or photograph copy of each and every bill of lading before issuing the fuel advance Comchek. Furthermore, to ensure that we are giving the fuel advance Comchek to the correct carrier, it is imperative that all drivers be able to receive a phone call from TQL and be able to recite their company's MC number. TQL after-hours personnel cannot issue an advance for more than 40% of the total rate to the truck up to a $2,000.00 maximum advance. This policy will be in effect after 5 P.M. EST every weekday and any time over each weekend and holiday.

**BROKER/CARRIER AGREEMENT**

This BROKER/CARRIER AGREEMENT ("Agreement") is made by and between Total Quality Logistics, LLC ("BROKER" or "TQL"), an Ohio limited liability company with its main office located in Clermont County, Ohio, and the motor carrier identified in the signature block at the end of this Agreement ("CARRIER") (BROKER and CARRIER are collectively referred to as the "Parties" or individually as "Party"), and is effective on the date on which this Agreement is signed by CARRIER ("Effective Date").

BROKER is licensed by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration ("FMCSA") in Docket No. MC-322572 to engage in operations, in interstate or foreign commerce, as a broker as defined in 49 U.S.C.A § 13102, arranging for transportation of freight (except household goods), and as a broker only, BROKER arranges transportation services for various shippers, brokers, consignors, consignees, motor carriers with broker authority, and other third parties (individually or collectively "CUSTOMER(S)"). The term CUSTOMER includes each shipper, receiver, consignor, consignee, and/or intermediary related to each load, regardless of who tenders the freight or makes payment to BROKER.

CARRIER holds all necessary operating authority required by Laws (defined below) with the appropriate government entities (which operating authority is identified, for transport in the U.S., as the CARRIER MC# and/or DOT# in the signature block at the end of this Agreement or otherwise provided by CARRIER during its setup process with BROKER) to engage in transportation as a for-hire carrier of property ("Operating Authority"), under contracts with shippers, receivers, and/or brokers of general commodities, and shall transport said property subject to the terms of this Agreement under its own Operating Authority, and CARRIER possesses the necessary competence, expertise, personnel, equipment, licensure, certifications, registrations, and any and all other resources and qualifications necessary to perform the Services (defined below) required in this Agreement in a legal, professional, and safe manner, and makes the representations in this Agreement for the purpose of inducing BROKER to enter into this Agreement.

BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER, on a non-exclusive basis, to pickup, secure, transport, and deliver CUSTOMERS' freight in compliance with this Agreement ("Services").

Now, therefore, for good and valuable consideration, the Parties agree as follows.

1. **TERM.** The term of this Agreement ("Term") shall be one (1) year, commencing on the Effective Date, and such Term shall automatically renew for successive one-year periods, unless terminated by either Party. Either Party may terminate this Agreement on 30-days prior written notice, to the other Party, without cause, or as otherwise provided in this Agreement. Either Party may terminate this Agreement immediately upon written notice to the other Party for any breach of this Agreement.

2. **CARRIER'S COVENANTS** In performing the Services, CARRIER agrees that it shall, at all times during the Term, and at its own expense, comply with the following covenants.

(a) CARRIER shall provide a sufficient number of drivers, with enough available hours of service, to pick up and deliver the tendered load(s) within the time frame(s) requested by BROKER and/or its CUSTOMERS, without violating the FMCSA hours of service regulations, set forth in 49 C.F.R. § 395.3, or any other Laws (defined below).

(b) CARRIER shall maintain knowledge of and compliance with all federal, state, and local laws and regulations of the United States, or any other country in which CARRIER transports the load, related to the Services ("Laws"), including, without limitation, those Laws related to the transportation of Hazardous Materials, as defined in 49 C.F.R. §§ 172.800, .173, and .397, or waste (collectively "HAZMAT"); security; owner/operator lease and lease agreements; loading and securing of freight; implementation and maintenance of driver safety programs (including, without limitation, hiring, controlled substances, and hours-of-service requirements), electronic logging devices, sanitation, temperature, and contamination requirements for transporting food, perishable, and other products; qualifying, licensing, and training of drivers; implementation and maintenance of equipment safety regulations; environmental or emissions programs in areas in which CARRIER operates, including, without limitation, California Transport Refrigeration Unit (TRU) and Airborne Toxic Control Measure (ATCM); and maintenance and exclusive control of the means and method of transportation, including, without limitation, performance of its drivers and all applicable insurance Laws. CARRIER certifies that any TRU equipment furnished shall be in compliance with the in-use requirements of all of California's TRU regulations. CARRIER shall be responsible for any and all fines assessed against any party, including BROKER and CUSTOMERS, for CARRIER's failure to adhere, in whole or in part, to any ARB/ATCM regulation or any other Laws. **BROKER is an equal opportunity employer and federal contractor; thus, if CARRIER provides Services subject to a federal contract, then CARRIER agrees that, to the extent applicable: (1) CARRIER shall comply with the following laws, which are incorporated herein by reference: Executive Order 11246, Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws, 41 CFR § 60-300.5(a), and 41 CFR § 60-741.5(a); and (2) CARRIER and its subcontractors shall abide by the requirements of 41 CFR § 60-300.5(a) and 41 CFR § 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans and qualified individuals on the basis of disability and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**

(c) CARRIER shall perform the Services with the highest quality of professional skill and care demanded in the transportation industry, with due diligence, and in a workmanlike manner.

(d) CARRIER bears the ultimate and exclusive responsibility to manage, govern, discipline, direct, and control its employees, agents, contractors, owner/operators, lessees, and equipment in compliance with all Laws. CARRIER and BROKER agree that the safe, legal, and proper operation of the CARRIER and its drivers supersede any requests, demands, preferences, instructions, or information provided by BROKER or CUSTOMERS with respect to any load; and if any employee of BROKER or CUSTOMERS requests, demands, or instructs CARRIER to do any act in violation of any Laws, CARRIER shall not violate such Laws and shall immediately contact BROKER.

(e) CARRIER shall notify BROKER immediately if its Operating Authority is revoked, suspended, downgraded, negatively affected, or rendered inactive for any reason, and/or if CARRIER or any related entity is sold, rights or interests assigned, if there is a change in control of ownership, and/or any insurance required by this Agreement is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

(f) CARRIER authorizes BROKER to invoice CARRIER's freight charges to shippers, consignees, or third-parties responsible for payment.

(g) Any terms of the bill of lading ("BOL") (including, without limitation, payment terms, limitations of liability, and stamped terms) or CARRIER's tariffs or circulars that are inconsistent with either the terms of this Agreement or any agreement between BROKER and CUSTOMERS are void and shall be controlled by the terms of this Agreement.

(h) CARRIER is bound by any agreement entered into between BROKER and CUSTOMERS related to the loads. If CARRIER agrees to perform Services on any loads that involve the transportation of intermodal containers or trailers that are not owned by CARRIER, then CARRIER is fully responsible and liable for (i) ensuring that the container, trailer, and chassis are suitable for transport, including, without limitation, checking the brakes and tires of the trailer or chassis, checking that any refrigerator unit attached to the trailer or container is fueled and working properly and at the correct temperature, and properly securing containers to chassis; (ii) any loss or damage to the container, trailer, and chassis while in CARRIER's possession or control; (iii) complying with any Laws, rail or ocean carrier tariffs or circulars, and agreements related to the container or trailer; and (iv) insuring the trailer or container and its cargo, including refrigerator breakdown coverage.

(i) CARRIER agrees that this Agreement applies to any load tendered to CARRIER by BROKER, directly or indirectly, as well as any load which CARRIER knows or should have known involved BROKER.

3. **BROKER'S COVENANTS.** BROKER warrants and represents that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement.

4. **COMPENSATION.** CARRIER agrees to perform the Services for BROKER, exclusively under CARRIER's Operating Authority, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ("Rate Confirmation"), which shall be incorporated into this Agreement, or by Electronic Communications (defined in Section 21). Additionally:

(a) Any verbally agreed upon rates must be confirmed in a Rate Confirmation or other Electronic Communications. Notwithstanding anything to the contrary, whether in this Agreement, on a BOL, at law, or in any other writing, CARRIER's released rates or values, stamped terms, and/or tariff rules or circulars related to rates or compensation are void.

(b) As a condition to payment, CARRIER must submit complete and legible invoices, clean BOLs, and signed loading or delivery receipts for all Services. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstances, shall CARRIER contact or seek payment from any CUSTOMER or any other party responsible for any payment related to the Services. CARRIER waives any right to collect from CUSTOMERS, unless BROKER provides CARRIER with consent in a writing signed by a vice president or C-level officer of BROKER.

(c) BROKER and CARRIER shall use commercially reasonable efforts to verify the accuracy of all freight charge billings invoiced by BROKER to CUSTOMERS for the Services performed by CARRIER. BROKER shall have the right to audit, from time to time, CARRIER's freight charges, and CARRIER shall fully cooperate with any audit. BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3.

(d) Except in the case of *force majeure,* CARRIER is responsible for any and all additional costs incurred by BROKER when replacement or cover Services are required arising out of CARRIER's failure to perform the Services as agreed.

(e) CARRIER hereby expressly waives its right to any lien on any freight or other property of CUSTOMERS, except warehouseman lien rights that are exercised in strict compliance with this Agreement.

(f) In any claim by CARRIER against BROKER relating to this Agreement, BROKER's liability is limited to the lesser of either (i) the freight costs for the particular load as confirmed in writing or (ii) direct damages, but shall not include consequential, incidental, special, or punitive damages.

(g) Notwithstanding any other provision in this Agreement to the contrary, BROKER may offset against CARRIER's pending invoices for any amounts due to BROKER, including, without limitation, those arising from or related to cargo claims, CARRIER'S breach of this Agreement, or CARRIER's indemnity obligations to BROKER or CUSTOMERS.

5. **DOT SAFETY RATING.** CARRIER represents and warrants that it does not have an "Unsatisfactory" safety rating issued by the FMCSA, and shall notify BROKER in writing immediately if its safety rating changes in any way, including, without limitation, a change to an "Unsatisfactory," "Conditional," "Unfit," "Marginal," or other negative rating.

6. **INSURANCE.** At all times during the Term, CARRIER shall maintain in effect the following types and amounts of insurance coverage from reliable insurance companies having an AM Best rating of A-VII or better: Automobile ("Auto") liability $1,000,000; motor vehicle (including hired and non-owned vehicles) $1,000,000, which includes coverage for environmental damages, cleanup, and remediation arising out of the release or discharge of HAZMAT; cargo damage/loss $100,000; and workers' compensation with limits required by applicable state law. All such insurance shall be written and be required to respond and pay prior to any other available coverage of BROKER or CUSTOMERS. CARRIER shall also comply with the following terms.

(a) Except as specified above, all insurance policies shall comply with the minimum requirements of the FMCSA and any other Laws. Insurance certificates or policies

furnished by CARRIER to BROKER or its designee are an affirmative representation by CARRIER that CARRIER complies with the insurance requirements set forth in this Agreement, the insurance policies, and all Laws. Nothing in this Agreement shall be construed to limit liability of the CARRIER to the insurance limits set forth above, nor shall any exclusion, declaration, or deductible amount in any insurance policy absolve CARRIER from financial liability for any loss or damage. CARRIER shall at all times while performing Services maintain such coverage and abide by the terms and conditions of such policies.

(b) CARRIER shall furnish BROKER or its designee with a certificate of insurance, in a form satisfactory to BROKER, to prove that each coverage specified in this Section is in effect and properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Each insurance policy shall name BROKER as additional insured and loss payee, with a waiver of subrogation in favor of BROKER and CUSTOMERS, and each certificate of insurance shall name BROKER or its designee as certificate holder. In addition, when available, CARRIER shall obtain an automatic additional insured endorsement which shall apply to BROKER. CARRIER shall provide BROKER with at least 30 days advance notice prior to cancellation, change, or non-renewal.

(c) CARRIER shall pay all premiums and deductible amounts under any applicable insurance policies. Upon request by BROKER, CARRIER shall provide a complete copy of all applicable policies along with any exclusions, exemptions, or riders that are not depicted in the certificate of insurance. In addition, by signing this Agreement, CARRIER expressly grants BROKER the authority to obtain an actual copy of the policies in effect at the time of any loss directly from CARRIER's insurance companies, and further authorizes its insurance companies to release to BROKER any and all of CARRIER's insurance policies requested by BROKER. In the event any issues arise with respect to CARRIER's insurance, CARRIER agrees to cooperate to the fullest extent possible with BROKER to obtain such information or facilitate communication. CARRIER grants BROKER the right to contact and communicate directly with its insurance companies to the fullest extent of CARRIER's rights.

(d) CARRIER shall only utilize vehicles and drivers that are licensed, identified, and insured under CARRIER's own name and insurance policies with the limits specified above. CARRIER is fully liable for any loss or damage not covered by insurance as a result of CARRIER's failure to comply with this Section.

(e) BROKER shall have no obligation to examine such certificate(s) or to advise CARRIER in the event its insurance policies are not in compliance with this Section. Acceptance of such certificate(s) of insurance which are not compliant with the coverages and requirements set forth herein shall in no way imply that BROKER has waived its insurance requirements or that coverage maintained is adequate to protect CARRIER liability assumed under this Agreement.

7. **HAZARDOUS MATERIAL.** If CARRIER accepts BROKER's or CUSTOMERS' tender of a load that is required to be placarded under Laws for HAZMAT, then the additional provisions in this Section, including additional insurance requirements, shall also apply for each and every Hazmat load.

(a) CARRIER represents and warrants that (i) it holds all federal and/or state permits and registrations necessary to transport HAZMAT and CARRIER shall promptly provide BROKER copies of all documents validating its authority to transport such materials upon BROKER's request; (ii) all CARRIER's drivers who transport HAZMAT are (A) properly trained and qualified under all applicable Laws, including, without limitation, 49 C.F.R. §§ 172.000 and 177.800, and (B) have the proper endorsements on their Commercial Driver's License to transport HAZMAT; (iii) it shall comply with all Laws relating to the transportation of HAZMAT as defined in 49 C.F.R. §§ 172.800, 173, and 397, et seq. (including any amendments), including, without limitation, all applicable security plan requirements and training required by the Department of Homeland Security, the DOT, and all related Laws; and (iv) CARRIER is solely responsible for any violation of any Laws regardless of any representations or instructions by BROKER.

(b) If CARRIER is requested to transport HAZMAT for which CARRIER by Law must maintain greater than $1 million (U.S.) liability coverage under 49 C.F.R. § 387.9 or any other Laws, CARRIER shall procure and maintain, at its sole expense, public liability and property damage insurance from an insurance company authorized to do business in all continental states, Canada, and Mexico, if applicable, insuring CARRIER for at least the minimum coverage per occurrence. Such insurance shall name BROKER and BROKER's CUSTOMER, each as additional insured and loss payees for any and all liabilities for all bodily injuries (including death) and property damage, including environmental damage due to the release or discharge of HAZMAT and cost of cleanup and remediation.

8. **CARGO LIABILITY AND CLAIMS.** CARRIER shall issue a BOL, listing itself as the motor carrier, in compliance with 49 U.S.C. §§ 80101-16, 49 C.F.R. §§ 373.101-.105, .201 (and any amendments), for the property it receives for transportation under this Agreement. CARRIER is fully responsible and liable for any damage, loss, or shortage of the freight or its packaging once in possession or control of it and the trailer(s) is loaded, even partially, regardless of whether a BOL has been issued, signed, or delivered to CARRIER. CARRIER's responsibility and liability shall continue until the load is no longer in CARRIER's possession or control with proper and timely delivery of the load to the consignee and the consignee signs the BOL or delivery receipt evidencing successful delivery. The Parties also agree to the following terms.

(a) Any terms of the BOL (including, without limitation, payment terms, limitations of liability, stamped terms, etc.) that are inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. CARRIER's failure to issue a BOL or sign a BOL acknowledging receipt of the cargo shall not affect liability of CARRIER. Under no circumstances shall CARRIER execute a BOL or any other document which represents BROKER as the party responsible for the pickup, transportation, or delivery of freight.

(b) If a consignee refuses a load or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman shall not begin until (i) CARRIER has provided BROKER with 24-hour prior written notice of request for direction and complied with those directions, or (ii) if no direction is received as provided in (i), CARRIER has placed the load in either a BROKER-approved public warehouse or in CARRIER's storage facility utilizing reasonable security measures.

(c) CARRIER shall comply with 49 C.F.R. §§ 370.1-.11 and any amendments, applicable regulations adopted by the FMCSA, and/or any other Laws relating to processing freight loss and damage claims and salvage. In the event goods are compromised or otherwise damaged, BROKER or its CUSTOMER, in its sole reasonable discretion, may determine whether the goods are salvageable, and if salvageable, the value of the salvageable goods.

(d) Except as otherwise provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether the CARRIER has common or contract Operating Authority shall be governed by common law applicable to common carriers, federal transportation Laws, and by the Carmack Amendment codified in 49 U.S.C. § 14706, including on loads that are exempt from such Laws such as intrastate loads or loads of exempt commodities. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including, without limitation, by Electronic Communications.

(e) Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER shall acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period shall be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement.

9. **INDEPENDENT CONTRACTORS.** The relationship between BROKER and CARRIER shall, at all times, be that of independent contractors. As independent contractors, the Parties agree to the following terms.

(a) No terms or conditions of this Agreement, or any act or omission of either Party shall be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, or employer/employee relationship between the Parties.

(b) CARRIER and any of its approved carriers or agents shall employ, pay, supervise, direct, discipline, discharge, and assume full responsibility and control over all persons required for CARRIER's performance of the Services. BROKER has no right to discipline or direct the performance of any driver and/or employee, contractor, subcontractor, or agent of CARRIER. Under no circumstances shall CARRIER or any of its approved carriers, agents, or employees be deemed to be or hold themselves out as employees of BROKER or CUSTOMERS.

(c) CARRIER agrees that a CUSTOMER's insertion of BROKER's name as the carrier on a BOL is without authorization and in error and shall be for the CUSTOMER's convenience only and shall not change BROKER's status or liability as a property broker only, nor CARRIER's status or obligations as a motor carrier.

(d) CARRIER agrees that any driving directions or routing instructions to or from a CUSTOMER's location given by BROKER are for informational purposes only. It is CARRIER's sole responsibility to ensure the directions are appropriate with regard to equipment, route, protection and securement of the cargo, and safe operation of the vehicle(s), and CARRIER assumes and is fully and exclusively responsible and liable for the route CARRIER actually takes while performing Services.

(e) CARRIER assumes all liability and agrees that it is fully and exclusively responsible for any and all contributions, benefits, taxes, and any other payments which might be expected in an employer-employee relationship, which includes, without limitation, the payment of the following items: any and all taxes under Laws (including payroll taxes), taxes for unemployment insurance, pensions, workers' compensation, and social security for each and every person engaged in CARRIER's performance of the Services. BROKER is not liable for any obligations specified above and CARRIER shall indemnify, defend, reimburse, and hold BROKER and CUSTOMERS harmless from any claim, liability, interest, fines, or penalties imposed or asserted against BROKER or CUSTOMERS for any such obligations.

(f) CARRIER agrees that BROKER may, in BROKER's sole discretion, track any or all loads with or without CARRIER's knowledge by electronic tracking or otherwise. Such tracking may include, but is not limited to, tracking by mobile phone of the driver, electronic logging devices, and gps devices. CARRIER warrants and represents that it has obtained any necessary consents from its drivers for such tracking.

10. **INDEMNIFICATION.** CARRIER agrees to defend, indemnify, reimburse, and hold BROKER and CUSTOMERS harmless from and against any and all claims or liability (including, without limitation, Workers' Compensation claims), arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance, failure to perform, or breach of this Agreement, including, without limitation, claims or liability for cargo loss and damage, theft, delay, damage to property, and bodily injury and/or death. Except for Workers' Compensation claims, CARRIER shall not be required to indemnify BROKER or CUSTOMERS for claims or liability that are directly and solely caused by the negligence or willful misconduct of that party.

11. **BROKER'S ACCOUNTS.** CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the Term, making no contact with CUSTOMERS except the minimum level of contact necessary to perform the Services. If this Agreement is terminated for any reason, CARRIER shall not solicit freight or provide transportation services to any CUSTOMERS for a period of twelve (12) months after the termination date of this Agreement. If CARRIER violates this Section, then, in addition to any other remedies available under the law (including punitive damages) or in equity, CARRIER shall also be liable to BROKER for all costs and expenses incurred to enforce this Section, including, without limitation, court costs and reasonable attorneys' fees. This Section shall not apply to CUSTOMERS for whom CARRIER has (without the assistance of, introduction by, or involvement in any way of BROKER) performed transportation services in the twelve (12) months immediately preceding the Effective Date, which must be proved in writing.

12. **CO-BROKERING.** CARRIER is prohibited from brokering, re-brokering, co-brokering, subcontracting, transferring, trip leasing, assigning, or interlining the transportation of loads to any other person or entity conducting business under an operating authority different from CARRIER's Operating Authority without advance written authorization from BROKER. If BROKER becomes aware of such prohibited activity by CARRIER prior to payment of any compensation otherwise due CARRIER, then BROKER may withhold payment to CARRIER and instead pay appropriate compensation to the motor carrier that actually transported the load. Any subcontracting or brokering of any load by CARRIER to any third party shall be deemed an assignment of CARRIER's right to be compensated for that load to the third party. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement.

13. **WAIVER AND DISCHARGE.** The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver of such provision or the waiver of the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part of this Agreement. To the extent that terms and conditions in this Agreement are inconsistent with Part (b), Subtitle IV of Title 49 U.S.C. (ICC Termination Act of 1995)(the "Act"), the Parties expressly waive any or all rights and remedies they may have under the Act.

14. **NOTICES.** All notices required or permitted under this Agreement shall be in writing, signed by or on behalf of the Party giving the notice, and sent to the other Party at its main office (listed above or provided through Electronic Communication) via certified U.S. Mail, overnight courier with delivery receipt, or facsimile with machine printed proof of delivery. All notices to BROKER must also be sent to BROKER by email at contracts@tql.com.

15. **GOVERNING LAW / JURISDICTION / VENUE.** This Agreement shall be governed by the laws of the State of Ohio, except to the extent that federal transportation Laws preempt those laws, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law. The Parties consent to the jurisdiction of the state court located in Clermont County, Ohio, waive any objection to the jurisdiction of that court, and agree that any dispute between the Parties, including, without limitation, those arising under or related to this Agreement, shall be brought in that court, which shall have exclusive jurisdiction over such dispute. The prevailing Party in any lawsuit between the Parties shall be entitled to all reasonable expenses, attorneys' fees, and costs (including court costs).

16. **CLASS ACTION WAIVER.** The Parties agree that any dispute resolution proceedings shall be conducted only on an individual basis and not in a class, consolidated, or representative action. CARRIER hereby waives any right to bring or participate in any class action or representative proceeding against BROKER, in any form, to the fullest extent permitted by applicable law.

17. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the

complete and exclusive statement of its terms, and no extrinsic evidence may be introduced to reform or change this Agreement in any judicial or equitable proceeding arising out of this Agreement. Any changes to this Agreement must be in a signed writing.

18. **INVALIDITY OF PROVISIONS / SEVERABILITY.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed, and enforced in such a manner as to make such provision valid, legal, or enforceable.

19. **ASSIGNMENT AND DELEGATION.** This Agreement inures to the benefit of and is binding upon the successors and assigns of both Parties. Neither Party may assign this Agreement without the consent of the other Party, except as expressly provided in this Agreement. Any assignment in violation of this Agreement is voidable at the sole discretion of the Party that did not violate this Section. BROKER may assign this Agreement, whether in whole or part, without notice to or consent of CARRIER, to any entity which controls, is controlled by, or is under common control with BROKER or which acquires all or substantially all of the assets or ownership interests of BROKER, provided that said assignee assumes, in full, the obligations of BROKER under this Agreement.

20. **FACTORING.** CARRIER shall provide BROKER written notice of any assignment, factoring, amendment, or other transfer of its right to receive payment arising under this Agreement, which may affect BROKER's payment obligations ("Pay Assignment"), at least thirty (30) days prior to the effective date of such Pay Assignment. BROKER is not obligated to honor any Pay Assignment unless such notice is proper and timely received. At minimum, each written notice shall include the name and address of the factoring company, assignee, or transferee; date signed; date Pay Assignment is to begin; and the terms of the Pay Assignment. Notice is considered delivered upon receipt of written notice by BROKER. BROKER shall have the right to ask for, and CARRIER shall be obligated to furnish, any further documentation BROKER requires in order to satisfy BROKER as to the authenticity and requirements of the Pay Assignment. BROKER's payment obligations shall not be subject to more than one Pay Assignment at any one time. Any and all Pay Assignments are taken subject to all the terms of this Agreement regardless of when or if BROKER receives a notice of Pay Assignment. If CARRIER wants to terminate a Pay Assignment, a written release from the CARRIER and the Pay Assignment's assignee, in a form satisfactory to BROKER's counsel, must be received by BROKER specifying the terms and date of release. If CARRIER fails to comply with any one of the requirements of this Section, then CARRIER releases and waives any and all right, claim, or action against BROKER and CUSTOMERS for any amount due and owing under this Agreement.

21. **ELECTRONIC COMMUNICATIONS AND DATA.** The following terms apply to any and all Electronic Communication (defined below) with BROKER.

(a) During the Term, the Parties anticipate that they will exchange materials and information in electronic form, including, without limitation, through websites, e-mail, fax, text messaging, mobile applications, and other electronic means (collectively "Electronic Communications"), and each Party consents to receiving Electronic Communications related to the Services. CARRIER agrees to BROKER's privacy policy and terms of use found on its website at www.tql.com, as the same may be modified from time to time.

(b) Under no circumstances shall BROKER be liable for, and CARRIER hereby expressly waives and releases BROKER from, any liability for any loss or damage caused by computer viruses, Trojans, worms, or similar programs.

(c) Electronic Communications may contain information that is confidential and subject to legal privilege. Such Electronic Communications are intended solely for the individual or entity to whom it is addressed and to others who have the authority to receive it, and CARRIER may not, under any circumstances, disclose, copy, or distribute the information without BROKER's written consent.

(d) BROKER does not make any representation regarding any links and does not endorse the products or services that may be offered from or through any link. BROKER is not responsible for the content or use of information contained in any link.

(e) Unless otherwise noted, Electronic Communications are subject to intellectual property rights of BROKER. Use of the content in web pages, electronic or written publications, mobile applications, or any other media and/or words, phrases, names, designs, or logos that are BROKER's trademarks are prohibited without the express written permission of BROKER.

(f) BROKER disclaims all implied warranties, including, without limitation, warranties of compatibility, security, and accuracy, and BROKER shall not be liable for any special, indirect, consequential, or punitive damages of any kind arising out of the use of Electronic Communications by CARRIER.

(g) By providing an email address to BROKER, CARRIER is expressly opting-in to BROKER's promotional email distribution list. CARRIER can opt-out at any time by contacting BROKER via telephone, email, or mail.

(h) CARRIER understands that all calls to or from BROKER may be recorded, and CARRIER consents to being recorded during any and all calls with BROKER. CARRIER waives and releases BROKER from any liability or claim related to calls with BROKER being recorded and waives any right to obtain a copy of such recording to the extent any such right exists under the law. Without limiting the foregoing, CARRIER represents and warrants that it has obtained all necessary consents as required under applicable laws and regulations for BROKER to contact CARRIER's drivers(s) via phone call or text message, including but not limited to, communications made using artificial intelligence technologies, recorded voices or auto dialer technologies.

(i) CARRIER understands that BROKER, or its designee, may use Electronic Communications to setup CARRIER with various websites, mobile applications, and other account services. CARRIER is solely responsible for the security of any accounts setup with BROKER and any other Electronic Communications, including, without limitation, CARRIER's passwords, user identification, financial information, or account settings. If CARRIER believes that the security of any of its accounts with BROKER have been compromised in any way, CARRIER must contact BROKER immediately.

(j) CARRIER agrees to be bound by, and shall comply with, the Data Processing Agreement (as may be modified from time to time, "DPA") or any similar documents found at https://www.tql.com/carrier-data-processing-agreement (or a copy will be emailed to CARRIER upon request sent to compliance@tql.com), which DPA is incorporated by reference.

22. **CONFIDENTIALITY.** In addition to confidential information protected by law, whether statutory or otherwise, the Parties agree that all of their financial information and that of CUSTOMERS, including, without limitation, freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected,

amounts of freight charges paid, freight volume requirements, as well as related CUSTOMER information, CUSTOMER shipping or other logistic requirements shared or learned between the Parties and CUSTOMERS shall be treated as confidential, and shall not be disclosed or used for any reason without prior written consent by the Parties. If confidentiality is breached, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties are entitled, in addition to any other remedy available, to an injunction restraining the violating Party from further violation of this Agreement.

23. **GENERAL CARRIER DUTIES.** CARRIER agrees to the following general carrier duties. (*These duties are in addition to any other duties required in this Agreement or in Laws*)

(a) CARRIER and/or their drivers shall check in with BROKER every day (including Saturday, Sunday, and holidays) between 8:00 a.m. and 9:00 a.m. EST, giving their current location and load temperature.

(b) CARRIER shall call BROKER immediately to report any problems related to the Services. BROKER is available 24 hours a day, 7 days a week, 365 days a year.

(c) CARRIER shall report any overage, shortage, or damage at loading or delivery to BROKER immediately upon becoming aware of such overage, shortage, or damage, and CARRIER assumes all liability for failing to so notify BROKER.

(d) If any payment for lumper services (loading/unloading) is agreed upon between BROKER and CARRIER, CARRIER must supply a legible unloading receipt with lumper's full name, address, and contact information accompanied by the BROKER's authorization number assigned to this particular load. Unless CARRIER provides this information within 24 hours of delivery, CARRIER shall not be reimbursed for lumper costs.

(e) For all pallet exchange loads, the number of pallets in and out must be clearly notated on the original BOL.

(f) All loads tendered to CARRIER require exclusive use of trailer space solely for the freight related to that particular load, unless otherwise agreed in writing with BROKER. CARRIER assumes all liability, including, without limitation, any costs incurred by BROKER, caused by CARRIER loading any unauthorized freight on a load.

(g) Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to CARRIER.

(h) Any product which must be disposed of must have prior consent from BROKER before being disposed of by any party. If a load is disposed of without prior written consent from BROKER, CARRIER is liable for the entire value of the load, plus any other associated damages. CARRIER is required to remit to BROKER any funds received from salvage and/or insurance.

(i) Before loading begins, CARRIER's driver must have a sufficient number of load locks or other suitable cargo securing devices to secure the load.

(j) Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, CARRIER shall be fully liable for the greater of either (i) the invoice amount to CUSTOMER or (ii) the cost of the product. In addition, CARRIER shall also be liable for any other expenses arising from or related to the unauthorized removal of the seal.

(k) CARRIER shall provide a trailer that is in sound mechanical and structural condition, and is clean, dry, free of defects, and suitable in all respects to accept, load, and transport the load.

(l) CARRIER shall not, unless expressly authorized to do so by BROKER, contact or communicate directly with CUSTOMER. This includes CARRIER's agents, representatives, heirs, or assigns. This Section shall not prohibit communication with dock workers, as long as such communication is limited to the minimum amount of communication necessary to perform the Services for that load.

(m) CARRIER's drivers shall not, under any circumstances, use a cellular phone, whether by talking, texting, or otherwise, while operating a vehicle related to the Services.

(n) At all times, CARRIER shall use proper, working equipment acceptable to CUSTOMER, train its personnel in sanitary transportation practices and document all training, maintain all necessary records, abide by all Laws, and follow all protocols communicated to CARRIER when transporting human and/or animal food. CARRIER agrees to promptly make all records available to BROKER upon BROKER's request.

24. **CARRIER DUTIES FOR REFRIGERATED LOADS.** In order to fulfill CUSTOMERS' delivery and tracking requests, if CARRIER accepts BROKER's tender of a refrigerated load, then CARRIER agrees to the following duties. (*These duties are in addition to the General Carrier Duties listed above*)

(a) Prior to loading, CARRIER shall confirm that the reefer unit is working properly and pre-cool trailer to the temperature specified on BROKER's Rate Confirmation. The temperature on BROKER's Rate Confirmation shall be in Fahrenheit unless otherwise specified in writing. CARRIER must strictly adhere to the temperature listed on the Rate Confirmation and shall check pulp temperature of the product to ensure that product has been pre-cooled to the proper temperature prior to loading. CARRIER shall not accept any product with a pulp temperature that is more than two (2) degrees above or below the specified temperature noted on BROKER's Rate Confirmation. If the temperature on BROKER's Rate Confirmation differs from that on the BOL, CARRIER shall call BROKER before signing the BOL or transporting the freight. If CARRIER loads or otherwise accepts freight contrary to the terms on BROKER's Rate Confirmation or applicable BOL, CARRIER is liable for any and all loss or damage arising from or related to such acceptance.

(b) Trailers hauling refrigerated loads are required to have a properly functioning air chute for circulation. It is CARRIER's responsibility to make sure the chute is not damaged, obstructed, blocked, or malfunctioning in any way. It is CARRIER's sole responsibility to make sure sufficient space is provided for air circulation in front, rear, top, bottom, and between the load.

(c) By signing the BOL, CARRIER is confirming that the correct product and correct product count were received at the proper temperature. CARRIER is solely responsible for cargo loss or damage incurred related to discrepancies in product information between the BOL, Rate Confirmation, and the actual product. If a discrepancy as to count, condition, or temperature is encountered, CARRIER shall immediately notify BROKER, and no change to loading information shall be made until confirmed in writing by BROKER.

(d) CARRIER shall continuously maintain the temperature noted on BROKER's Rate Confirmation from pickup at shipper until delivery at receiver. CARRIER shall not, at any time, set reefer on start/stop, cycle, or any other non-continuous temperature setting unless otherwise notified in writing by BROKER. CARRIER shall contact BROKER immediately in the event of any problems including, without limitation, out-of-temperature condition, equipment malfunction, accident, or delay. It is CARRIER's sole responsibility to ensure all refrigeration equipment is in a properly working condition at all times while in possession, custody, or control of the cargo.

25. **INTERNATIONAL TERMS AND CONDITIONS.** If CARRIER transports any load outside of the U.S., whether in whole or part, then CARRIER agrees to BROKER's Global Supplier Code of Conduct ("Code of Conduct") and Broker's International Terms Addendum ("International Terms"), both of which are incorporated into this Agreement as if fully rewritten in this Section. BROKER may revise the Code of Conduct and the International Terms at any time, and CARRIER agrees to be bound by the version in effect on the later of either the Effective Date or the date of the most recent load tendered to CARRIER by BROKER. The International Terms and the Code of Conduct are available at www.tql.com/International_Terms_Addendum and www.tql.com/Supplier_Code_of_Conduct respectively, or a hardcopy shall be provided to CARRIER upon written request to BROKER.

26. **SURVIVAL.** The terms and conditions of this Agreement which contemplate the need for performance after the expiration or termination of this Agreement, which includes, without limitation, provisions regarding indemnification, solicitation of CUSTOMERS, attorneys' fees, cargo liability, claims processing, and compensation for Services performed prior to termination, shall survive any such expiration or termination of this Agreement.

27. **RECITAL PARAGRAPHS / HEADINGS.** The statements in the recital paragraphs at the beginning of this Agreement are true and correct and may be relied upon in this Agreement. The Section headings in this Agreement are for convenience only and shall not be used to interpret this Agreement.

28. **COUNTERPARTS.** This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts and may be executed by electronic means and exchanged by Electronic Communications. Each executed counterpart shall be deemed to be an original and all of which together constitute one and the same agreement.

29. **TRANSLATIONS SUBJECT TO ENGLISH.** Any translation of this Agreement into languages other than English are for convenience only, and if any conflict arises between the English language version and any other translation, the English language version controls.

The Parties, through their duly authorized representatives, agree that this Agreement may be signed by electronic means, and by their electronic endorsement through TQL's designated system or their physical signature below, the parties intend to sign this Agreement and acknowledge that they have read this Agreement in its entirety; understand the terms and conditions of this Agreement; have had the opportunity to consult with legal counsel regarding terms and conditions of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

FMCSA Legal Name: CHRISTENSON TRANSPORTATION, INC.
Name of Authorized Carrier Representative: Elliott Pinson
Title of Authorized Carrier Representative: CCO
Phone number of Authorized Carrier Representative: 417-866-5993
Email of Authorized Carrier Representative: elliottp@christensontrans.com

Agreement Date: 3/9/2026

☑ "I, Elliott Pinson, am the CCO for Christenson Transportation, Inc.. I am authorized to execute the Transportation Brokerage Agreement (the "Agreement") set out above dated 3/9/2026 10:08:03 AM Pacific Time between TQL and Christenson Transportation, Inc. and legally bind Christenson Transportation, Inc. to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the Agreement. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I acknowledge I have read this agreement in its entirety; understand the terms and conditions of this agreement; and knowingly, voluntarily, and willfully enter into this agreement without any duress or coercion of any kind. THE AGREEMENT SHALL BE BINDING ON CHRISTENSON TRANSPORTATION, INC.. I UNDERSTAND AND ACKNOWLEDGE THAT CHRISTENSON TRANSPORTATION, INC. IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

| | | | |
|---|---|---|---|
| **Carrier ID:** | 482298 | **Agreement Date:** | 2/6/2026 1:14:29 PM (Pacific Time) |
| **Carrier Name:** | EOS INC | **MC Number:** | MC830689 |
| **Address:** | 1000 FIBER OPTIC DRIVE | **US DOT Number:** | 2413373 |
| **City, State & Zip:** | N LITTLE ROCK, AR 72117 | **DBA Name:** | EOS INC |
| **Contact:** | Nick Dettlinger | **W9 State:** | AR |
| **Phone:** | 501-503-4000 | **W9 Incorporation Type:** | S Corporation |

## Payment Terms

**Your selection will remain as your default payment terms until TQL is notified that you would like your terms changed.** If no selection is made, your payment terms will default to **28 DAYS**. Payment terms can be updated at any time through your TQL Carrier Dashboard account.

**All pay terms are calculated from the day TQL **receives** your complete and legible paperwork**

**Payment Terms:** Please select **ONE** payment term as your regular payment term.

__X__ **28-Day Pay** - No fees – check mailed or payment direct deposited within 28 days of TQL receiving complete and legible paperwork. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8782 or e-mail to cinvoices@tql.com.

_____ **7-Day Quick Pay** - A 3% service charge will be deducted from the gross truck rate. This is issued through either check or direct deposit. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8895 or e-mail to quickpay@tql.com and be sure to write or type "Quick Pay" on your invoice and/or the Rate Confirmation. Payment will be issued within 7 days of TQL receiving complete and legible paperwork.

_____ **1-Day Quick Pay** - A 5% service charge will be deducted from the gross truck rate. Payment is made with either a Comchek, which includes a $25 dollar per invoice Comchek fee, or direct deposit with no Comchek fee. **To use this option you must mark "1-Day Quick Pay" clearly on both your envelope and invoice/Rate Confirmation.** A Comchek will be issued in the amount owed one business day after TQL receives complete and legible paperwork. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8895 or e-mail to quickpay@tql.com and be sure to write or type "1-Day Quick Pay" on your envelope and invoice/Rate Confirmation.

***If we receive your paperwork on Friday, you will receive your Comchek on Monday (1-Day Quick Pay and 7-Day Quick Pay will not be guaranteed if there are any problems with the load overages, shortages, late delivery, temperature issues, etc.).*

****You can select 1-Day Quick Pay on a per invoice basis if you have selected either 28-Day or 7-Day. To use this option "1-Day Quick Pay" must be marked clearly on both your envelope and invoice/Rate Confirmation.*

Yes **Direct Deposit *** - Select if you want direct deposit ( **available on all payment terms** ). CARRIER authorizes Total Quality Logistics, LLC ( "TQL") to initiate automatic deposits to CARRIER's account at the financial institution entered. CARRIER also authorizes and permits TQL to make withdrawals from this account if a credit entry is made in error or to pay any amount that CARRIER may owe to TQL.

CARRIER agrees to release, defend, indemnify, and hold TQL harmless from and against any delay or loss of funds due to incorrect or incomplete information supplied by CARRIER or CARRIER's financial institution or due to an error on the part of CARRIER's financial institution in depositing funds to CARRIER's account. CARRIER agrees that TQL cannot be held responsible or liable for overdrafts or overdraft fees incurred before funds are deposited. This agreement and authorization will remain in effect until TQL receives a written notice of cancellation or changes from CARRIER or CARRIER's financial institution.

E-mail Address for Remittance Advices: billing@eostrucking.com

*Direct Deposit: Only available on continental United States bank accounts and may not be available on initial loads due to bank account setup time.

*TQL allows invoices and bills of lading to be sent via fax, email, mobile device scanning, or TransFlo scanning. Sending paperwork via one of these methods will ensure we receive your documents the same day and will help you get paid faster. Fax invoices to (513) 688-8782 or email them to cinvoices@tql.com for **28-Day pay** . Fax invoices to (513) 688-8895 or email them to quickpay@tql.com **for all 1-Day and 7-Day Quick Pays.** Our TransFlo code is **TQYL** for TransFlo Express truck stop scans, or **TQYLV** for scans using TransFlo Velocity downloadable software. Before sending paperwork electronically, please check your TQL Rate Confirmation to be sure that original paperwork is not needed. This information can be found in the "Invoice Information" section of the Rate Confirmation. If the box is checked, then original documents are required and you must mail your paperwork to receive payment.*

All paperwork submitted must be complete and legible and include:

- Invoice with your company name and address, and with your payment terms clearly indicated. TQL's Rate Confirmation can serve as your invoice. Payment will be made according to terms printed on the Rate Confirmation, unless you indicate a different term on your invoice or Rate Confirmation.
- Original B.O.L./P.O.D. signed by the receiver.
- Any unloading or pallet receipts with TQL authorization number printed on them.

**Comchek Authorization**

**Comcheks are available only after freight has been loaded. If you would like to limit who at your company is permitted to receive Comcheks, please mark the appropriate "No" box below. If the "No" box is not selected, that category of persons are permitted to receive Comcheks. If nothing is marked, then you are indicating that Comcheks may be given to any person representing you or your company. TQL will not be responsible for unauthorized persons obtaining Comcheks on behalf of your company. Due to business concerns, all drivers, dispatchers, and other representatives of your company are eligible to receive unloading (lumper) Comcheks. TQL must be notified separately in writing if you do not want anyone at your company to be able to receive unloading (lumper) Comcheks. There is a $25 fee for each Comchek issued. The amount permitted for fuel advance Comcheks is limited to the lesser of 40% of the gross truck pay or $2,000.**

**Drivers** are permitted to receive fuel advance Comcheks. Yes _____ No __X__

**Dispatchers** are permitted to receive fuel advance Comcheks. Yes _____ No __X__

**Anyone** at our company is permitted to receive fuel advance Comcheks. Yes _____ No __X__

*****TQL After-Hours and Weekend/Holiday Comchek Procedure*****

TQL after-hours personnel can only issue a fuel advance Comchek upon confirmation from the shipper that the truck has been loaded. In the event that we are unable to reach a shipper, we may request a fax copy of each ansteved every bill of lading before issuing the fuel advance Comchek. Furthermore, to ensure that we are giving the fuel advance Comchek to the correct carrier, it is imperative that all drivers be able to recite their company's MC number. TQL after-hours personnel cannot issue an advance for more than 40% of the total rate to the truck up to a $2,000.00 maximum advance. This policy will be in effect after 5 P.M. EST every weekday and throughout each weekend and holiday.

**Diverse Owned Business**

Is your company a **certified** diverse-owned business *(under a federal, state, or local diversity contracting program based upon the diversity of its ownership)*?

Yes _____ No __X__

If so, what category?

# BROKER/CARRIER AGREEMENT

This BROKER/CARRIER AGREEMENT ("Agreement") is made by and between Total Quality Logistics, LLC ("BROKER" or "TQL"), an Ohio limited liability company with its main office located in Clermont County, Ohio, and the motor carrier identified in the signature block at the end of this Agreement ("CARRIER") (BROKER and CARRIER are collectively referred to as the "Parties" or individually as "Party"), and is effective on the date on which this Agreement is signed by CARRIER ("Effective Date").

BROKER is licensed by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration ("FMCSA") in Docket No. MC-322572 to engage in operations, in interstate or foreign commerce, as a broker as defined in 49 U.S.C.A § 13102, arranging for transportation of freight (except household goods), and as a broker only, BROKER arranges transportation services for various shippers, brokers, consignors, consignees, motor carriers with broker authority, and other third parties (individually or collectively "CUSTOMER(S)"). The term CUSTOMER includes each shipper, receiver, consignor, consignee, and/or intermediary related to each load, regardless of who tenders the freight or makes payment to BROKER.

CARRIER holds all necessary operating authority required by Laws (defined below) with the appropriate government entities (which operating authority is identified, for transport in the U.S., as the CARRIER MC# and/or DOT# in the signature block at the end of this Agreement or otherwise provided by CARRIER during its setup process with BROKER) to engage in transportation as a for-hire carrier of property ("Operating Authority"), under contracts with shippers, receivers, and/or brokers of general commodities, and will transport said property under its own Operating Authority and subject to the terms of this Agreement, and CARRIER possesses the necessary competence, expertise, personnel, equipment, licensure, certifications, registrations, and any and all other resources and qualifications necessary to perform the Services (defined below) required in this Agreement in a legal, professional, and safe manner, and makes the representations in this Agreement for the purpose of inducing BROKER to enter into this Agreement.

BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER, on a non-exclusive basis, to pickup, secure, transport, and deliver CUSTOMERS' freight in compliance with this Agreement ("Services").

Now, therefore, for good and valuable consideration, the Parties agree as follows.

1. **TERM**. The term of this Agreement ("Term") will be one (1) year, commencing on the Effective Date, and such Term will automatically renew for successive one-year periods, unless terminated by either Party. Either Party may terminate this Agreement on 30-days prior written notice, to the other Party, without cause, or as otherwise provided in this Agreement. Either Party may terminate this Agreement immediately upon written notice to the other Party for any breach of this Agreement.

2. **CARRIER'S COVENANTS**. In performing the Services, CARRIER agrees that it will, at all times during the Term, and at its own expense, comply with the following covenants.
    a. CARRIER will provide a sufficient number of drivers, with enough available hours of service, to pick up and deliver the tendered load(s) within the time frame(s) requested by BROKER and/or its CUSTOMERS, without violating the FMCSA hours of service regulations, set forth in 49 C.F.R. § 395.3, or any other Laws (defined below).
    b. CARRIER will maintain knowledge of and compliance with all federal, state, and local laws and regulations of the United States, or any other country in which CARRIER transports the load, related to the Services ("Laws"), including, without limitation, those Laws related to the transportation of Hazardous Materials, as defined in 49 C.F.R. §§ 172.800, .173, and .397, or waste (collectively "HAZMAT"); security; owner/operator lease and lease agreements; loading and securing of freight; implementation and maintenance of driver safety programs (including, without limitation, hiring, controlled substances, and hours-of-service requirements), electronic logging devices, sanitation, temperature, and contamination requirements for transporting food, perishable, and other products; qualifying, licensing, and training of drivers; implementation and maintenance of equipment safety regulations; environmental or emissions programs in areas in which CARRIER operates, including, without limitation, California Transport Refrigeration Unit (TRU) and Airborne Toxic Control Measure (ATCM); and maintenance and exclusive control of the means and method of transportation, including, without limitation, performance of its drivers and all applicable insurance Laws. CARRIER certifies that any TRU equipment furnished will be in compliance with the in-use requirements of all of California's TRU regulations. CARRIER will be responsible for any and all fines assessed against any party, including BROKER and CUSTOMERS, for CARRIER's failure to adhere, in whole or in part, to any ARB/ATCM regulation or any other Laws. **BROKER is an equal opportunity employer and federal contractor; thus, if CARRIER provides Services subject to a federal contract, then CARRIER agrees that, to the extent applicable: (1) CARRIER will comply with the following laws, which are incorporated herein by reference: Executive Order 11246, Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws, 41 CFR § 60-300.5(a), and 41 CFR § 60-741.5(a); and (2) CARRIER and its subcontractors will abide by the requirements of 41 CFR § 60-300.5(a) and 41 CFR § 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans and qualified individuals on the basis of disability and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**
    c. CARRIER will perform the Services with the highest quality of professional skill and care demanded in the transportation industry, with due diligence, and in the best interest of and to the satisfaction of BROKER and CUSTOMERS, each of which will be determined by BROKER in its sole discretion.
    d. CARRIER bears the ultimate and exclusive responsibility to manage, govern, discipline, direct, and control its employees, agents, contractors, owner/operators, leasees, and equipment in compliance with all Laws. CARRIER and BROKER agree that the safe, legal, and proper operation of the CARRIER and its drivers supersede any requests, demands, preferences, instructions, or information provided by BROKER or CUSTOMERS with respect to any load; and if any employee of BROKER or CUSTOMERS requests, demands, or instructs CARRIER to do any act in violation of any Laws, CARRIER will not violate such Laws and will immediately contact BROKER.
    e. CARRIER will notify BROKER immediately if its Operating Authority is revoked, suspended, downgraded, negatively affected, or rendered inactive for any reason, and/or if CARRIER or any related entity is sold, rights or interests assigned, if there is a change in control of ownership, and/or any insurance required by this Agreement is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.
    f. CARRIER authorizes BROKER to invoice CARRIER's freight charges to shippers, consignees, or third-parties responsible for payment.
    g. Any terms of the bill of lading ("BOL")(including, without limitation, payment terms, limitations of liability, and stamped terms) or CARRIER's tariffs or circulars that are inconsistent with either the terms of this Agreement or any agreement between BROKER and CUSTOMERS are void and will be

controlled by the terms of this Agreement.

h. CARRIER is bound by any agreement entered into between BROKER and CUSTOMERS related to the loads. If CARRIER agrees to perform Services on any loads that involve the transportation of intermodal containers or trailers that are not owned by CARRIER, then CARRIER is fully responsible and liable for (i) ensuring that the container, trailer, and chassis are suitable for transport, including, without limitation, checking the brakes and tires of the trailer or chassis, checking that any refrigerator unit attached to the trailer or container is fueled and working properly and at the correct temperature, and properly securing containers to chassis; (ii) any loss or damage to the container, trailer, and chassis while in CARRIER's possession or control; (iii) complying with any Laws, rail or ocean carrier tariffs or circulars, and agreements related to the container or trailer; and (iv) insuring the trailer or container and its cargo, including refrigerator breakdown coverage.

i. CARRIER agrees that this Agreement applies to any load tendered directly to CARRIER by BROKER, as well as any load which CARRIER knows or should have known involved BROKER.

3. **BROKER'S COVENANTS**. BROKER warrants and represents that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement.

4. **COMPENSATION**. CARRIER agrees to perform the Services for BROKER, under CARRIER's Operating Authority exclusively, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ("Rate Confirmation"), which will be incorporated into this Agreement, or by Electronic Communications (defined in Section 20). Additionally:

a. Any verbally agreed upon rates must be confirmed in a Rate Confirmation or other Electronic Communications. Notwithstanding anything to the contrary, whether in this Agreement, on a BOL, at law, or in any other writing, CARRIER's released rates or values, stamped terms, and/or tariff rules or circulars related to rates or compensation are void.

b. As a condition to payment, CARRIER must submit complete and legible invoices, clean BOLs, and signed loading or delivery receipts for all Services. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstances, will CARRIER contact or seek payment from any CUSTOMER or any other party responsible for any payment related to the Services. CARRIER waives any right to collect from CUSTOMERS, unless BROKER provides CARRIER with consent in a writing signed by a vice president or C-level officer of BROKER.

c. BROKER and CARRIER will use commercially reasonable efforts to verify the accuracy of all freight charge billings invoiced by BROKER to CUSTOMERS for the Services performed by CARRIER. BROKER will have the right to audit, from time to time, CARRIER's freight charges, and CARRIER will fully cooperate with any audit. BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3.

d. Except in the case of force majeure, CARRIER is responsible for any and all additional costs incurred by BROKER when replacement or cover Services are required arising out of CARRIER's failure to perform the Services as agreed.

e. CARRIER hereby expressly waives its right to any lien on any freight or other property of CUSTOMERS, except warehouseman lien rights that are exercised in strict compliance with this Agreement.

f. In any claim by CARRIER against BROKER relating to this Agreement, BROKER's liability is limited to the lesser of either (i) the freight costs for the particular load as confirmed in writing or (ii) direct damages, but will not include consequential, incidental, special, or punitive damages.

g. Notwithstanding any other provision in this Agreement to the contrary, BROKER may offset against CARRIER's pending invoices for any amounts due to BROKER, including, without limitation, those arising from or related to cargo claims, CARRIER'S breach of this Agreement, or CARRIER's indemnity obligations to BROKER or CUSTOMERS.

5. **DOT SAFETY RATING**. CARRIER represents and warrants that it does not have an "Unsatisfactory" safety rating issued by the FMCSA, and will notify BROKER in writing immediately if its safety rating changes in any way, including, without limitation, a change to an "Unsatisfactory," "Conditional," "Unfit," "Marginal," or other negative rating.

6. **INSURANCE**. At all times during the Term, CARRIER will maintain in effect the following types and amounts of insurance coverage from reliable insurance companies having an AM Best rating of A-VII or better: Automobile ("Auto") liability $1,000,000; motor vehicle (including hired and non-owned vehicles) $1,000,000, which includes coverage for environmental damages, cleanup, and remediation arising out of the release or discharge of HAZMAT; cargo damage/loss $100,000; and workers' compensation with limits required by applicable state law. All such insurance will be written and be required to respond and pay prior to any other available coverage of BROKER or CUSTOMERS. CARRIER will also comply with the following terms.

a. Except as specified above, all insurance policies will comply with the minimum requirements of the FMCSA and any other Laws. Insurance certificates furnished by CARRIER to BROKER or its designee are an affirmative representation by CARRIER that CARRIER complies with the insurance requirements set forth in this Agreement, the insurance policies, and all Laws. Nothing in this Agreement will be construed to limit liability of the CARRIER to the insurance limits set forth above, nor will any exclusion, declaration, or deductible amount in any insurance policy absolve CARRIER from financial liability for any loss or damage. CARRIER will at all times while performing Services maintain such coverage and abide by the terms and conditions of such policies.

b. CARRIER will furnish BROKER or its designee with a certificate of insurance, in a form satisfactory to BROKER, to prove that each coverage specified in this Section is in effect and properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Each insurance policy will name BROKER as additional insured and loss payee, with a waiver of subrogation in favor of BROKER and CUSTOMERS, and each certificate of insurance will name BROKER or its designee as certificate holder. In addition, when available, CARRIER will obtain an automatic additional insured endorsement which will apply to BROKER. CARRIER must provide BROKER with at least 30 days advance notice prior to cancellation, change, or non-renewal.

c. CARRIER will pay all premiums and deductible amounts under any applicable insurance policies. Upon request by BROKER, CARRIER will provide a complete copy of all applicable policies along with any exclusions, exemptions, or riders that are not depicted in the certificate of insurance. In addition, by signing this Agreement, CARRIER expressly grants BROKER the authority to obtain an actual copy of the policies in effect at the time of any loss directly from CARRIER's insurance companies, and further authorizes its insurance companies to release to BROKER any and all of CARRIER's insurance policies requested by BROKER. In the event any issues arise with respect to CARRIER's insurance, CARRIER agrees to cooperate to the fullest extent possible with BROKER to obtain such information or facilitate communication. CARRIER grants BROKER the right to contact and communicate directly

with its insurance companies to the fullest extent of CARRIER's rights.

d. CARRIER will only utilize vehicles and drivers that are licensed, identified, and insured under CARRIER's own name and insurance policies with the limits specified above. CARRIER is fully liable for any loss or damage not covered by insurance as a result of CARRIER's failure to comply with this Section.

7. **HAZARDOUS MATERIAL**. If CARRIER accepts BROKER's or CUSTOMERS' tender of a load that is required to be placarded under Laws for HAZMAT, then the additional provisions in this Section, including additional insurance requirements, will also apply for each and every Hazmat load.
   a. CARRIER represents and warrants that (i) it holds all federal and/or state permits and registrations necessary to transport HAZMAT and CARRIER will promptly provide BROKER copies of all documents validating its authority to transport such materials upon BROKER's request; (ii) all CARRIER's drivers who transport HAZMAT are (A) properly trained and qualified under all applicable Laws, including, without limitation, 49 C.F.R. §§ 172.000 and 177.800, and (B) have the proper endorsements on their Commercial Driver's License to transport HAZMAT; (iii) it will comply with all Laws relating to the transportation of HAZMAT as defined in 49 C.F.R. §§ 172.800, 173, and 397, et seq. (including any amendments), including, without limitation, all applicable security plan requirements and training required by the Department of Homeland Security, the DOT, and all related Laws; and (iv) CARRIER is solely responsible for any violation of any Laws regardless of any representations or instructions by BROKER.
   b. If CARRIER is requested to transport HAZMAT for which CARRIER by Law must maintain greater than $1 million (U.S.) liability coverage under 49 C.F.R. § 387.9 or any other Laws, CARRIER will procure and maintain, at its sole expense, public liability and property damage insurance from an insurance company authorized to do business in all continental states, Canada, and Mexico, if applicable, insuring CARRIER for at least the minimum coverage per occurrence. Such insurance will name BROKER and BROKER's CUSTOMER, each as additional insured and loss payees for any and all liabilities for all bodily injuries (including death) and property damage, including environmental damage due to the release or discharge of HAZMAT and cost of cleanup and remediation.

8. **CARGO LIABILITY AND CLAIMS**. CARRIER will issue a BOL, listing itself as the motor carrier, in compliance with 49 U.S.C. §§ 80101-16, 49 C.F.R. §§ 373.101-.105, .201 (and any amendments), for the property it receives for transportation under this Agreement. CARRIER is fully responsible and liable for any damage, loss, or shortage of the freight or its packaging once in possession or control of it and the trailer(s) is loaded, even partially, regardless of whether a BOL has been issued, signed, or delivered to CARRIER. CARRIER's responsibility and liability will continue until the load is no longer in CARRIER's possession or control with proper and timely delivery of the load to the consignee and the consignee signs the BOL or delivery receipt evidencing successful delivery. The Parties also agree to the following terms.
   a. Any terms of the BOL (including, without limitation, payment terms, limitations of liability, stamped terms, etc.) that are inconsistent with the terms of this Agreement will be controlled by the terms of this Agreement. CARRIER's failure to issue a BOL or sign a BOL acknowledging receipt of the cargo will not affect liability of CARRIER. Under no circumstances will CARRIER execute a BOL or any other document which represents BROKER as the party responsible for the transportation or delivery of freight.
   b. If a consignee refuses a load or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman will not begin until (i) CARRIER has provided BROKER with 24-hour prior written notice of request for direction and complied with those directions, or (ii) if no direction is received as provided in (i), CARRIER has placed the load in either a BROKER-approved public warehouse or in CARRIER's storage facility utilizing reasonable security measures.
   c. CARRIER will comply with 49 C.F.R. §§ 370.1-.11 and any amendments, applicable regulations adopted by the FMCSA, and/or any other Laws relating to processing freight loss and damage claims and salvage. In the event goods are compromised or otherwise damaged, BROKER or its CUSTOMER, in its sole reasonable discretion, may determine whether the goods are salvageable, and if salvageable, the value of the salvageable goods.
   d. Except as otherwise provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether the CARRIER has common or contract Operating Authority will be governed by common law applicable to common carriers, federal transportation Laws, and by the Carmack Amendment codified in 49 U.S.C. § 14706, including on loads that are exempt from such Laws such as intrastate loads or loads of exempt commodities. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including, without limitation, by Electronic Communications.
   e. Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER will acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period will be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement.

9. **INDEPENDENT CONTRACTORS**. The relationship between BROKER and CARRIER will, at all times, be that of independent contractors. As independent contractors, the Parties agree to the following terms.
   a. No terms or conditions of this Agreement, or any act or omission of either Party will be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, or employer/employee relationship between the Parties.
   b. CARRIER and any of its approved carriers or agents will employ, pay, supervise, direct, discipline, discharge, and assume full responsibility and control over all persons required for CARRIER's performance of the Services. BROKER has no right to discipline or direct the performance of any driver and/or employee, contractor, subcontractor, or agent of CARRIER. Under no circumstances will CARRIER or any of its approved carriers, agents, or employees be deemed to be or hold themselves out as employees of BROKER or CUSTOMERS.
   c. CARRIER agrees that a CUSTOMER's insertion of BROKER's name as the carrier on a BOL is without authorization and in error and will be for the CUSTOMER's convenience only and will not change BROKER's status or liability as a property broker only, nor CARRIER's status or obligations as a motor carrier.
   d. CARRIER agrees that any driving directions or routing instructions to or from a CUSTOMER's location given by BROKER are for informational purposes only. It is CARRIER's sole responsibility to ensure the directions are appropriate with regard to equipment, route, protection and securement of the cargo, and safe operation of the vehicle(s), and CARRIER assumes and is fully and exclusively responsible and liable for the route CARRIER actually takes while performing Services.
   e. CARRIER assumes all liability and agrees that it is fully and exclusively responsible for any and all contributions, benefits, taxes, and any other payments which might be expected in an employer-employee relationship, which includes, without limitation, the payment of the following items: any and all taxes under Laws (including payroll taxes), taxes for unemployment insurance, pensions, workers' compensation, and social security for each and every person engaged in CARRIER's performance of the Services. BROKER is not liable for any obligations specified above and CARRIER will indemnify, defend, reimburse, and hold BROKER and CUSTOMERS harmless from any claim, liability, interest, fines, or penalties imposed or asserted against BROKER or CUSTOMERS for any such obligations.

f. CARRIER agrees that BROKER may, in BROKER's sole discretion, track any or all loads with or without CARRIER's knowledge by electronic tracking or otherwise. Such tracking may include, but is not limited to, tracking by mobile phone of the driver, electronic logging devices, and gps devices. CARRIER warrants and represents that it has obtained any necessary consents from its drivers for such tracking.

10. **INDEMNIFICATION**. CARRIER agrees to defend, indemnify, reimburse, and hold BROKER and CUSTOMERS harmless from and against any and all claims or liability (including, without limitation, Workers' Compensation claims), arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance, failure to perform, or beach of this Agreement, including, without limitation, claims or liability for cargo loss and damage, theft, delay, damage to property, and bodily injury and/or death. Except for Workers' Compensation claims, CARRIER will not be required to indemnify BROKER or CUSTOMERS for claims or liability that are directly and solely caused by the negligence or willful misconduct of that party.

11. **BROKER'S ACCOUNTS**. CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the Term, making no contact with CUSTOMERS except the minimum level of contact necessary to perform the Services. If this Agreement is terminated for any reason, CARRIER will not solicit freight or provide transportation services to any CUSTOMERS for a period of twelve (12) months after the termination date of this Agreement. If CARRIER violates this Section, then, in addition to any other remedies available under the law (including punitive damages) or in equity, CARRIER will also be liable to BROKER for all costs and expenses incurred to enforce this Section, including, without limitation, court costs and reasonable attorneys' fees. This Section will not apply to CUSTOMERS for whom CARRIER has (without the assistance of, introduction by, or involvement in any way of BROKER) performed transportation services in the twelve (12) months immediately preceding the Effective Date, which must be proved in writing.

12. **CO-BROKERING**. CARRIER is prohibited from brokering, re-brokering, co-brokering, subcontracting, transferring, trip leasing, assigning, or interlining the transportation of loads to any other person or entity conducting business under an operating authority different from CARRIER's Operating Authority without advance written authorization from BROKER. If BROKER becomes aware of such prohibited activity by CARRIER prior to payment of any compensation otherwise due CARRIER, then BROKER may withhold payment to CARRIER and instead pay appropriate compensation to the motor carrier that actually transported the load. Any subcontracting or brokering of any load by CARRIER to any third party will be deemed an assignment of CARRIER's right to be compensated for that load to the third party. Upon BROKER's payment to delivering carrier, CARRIER will not be released from any liability to BROKER under this Agreement.

13. **WAIVER AND DISCHARGE**. The failure of either Party to enforce any provision of this Agreement will not be construed as a waiver of such provision or the waiver of the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part of this Agreement. To the extent that terms and conditions in this Agreement are inconsistent with Part (b), Subtitle IV of Title 49 U.S.C. (ICC Termination Act of 1995)(the "Act"), the Parties expressly waive any or all rights and remedies they may have under the Act.

14. **NOTICES**. All notices required or permitted under this Agreement will be in writing, signed by or on behalf of the Party giving the notice, and sent to the other Party at its main office (listed above or provided through Electronic Communication) via certified U.S. Mail, overnight courier with delivery receipt, or facsimile with machine printed proof of delivery. All notices to BROKER must also be sent to BROKER by email at contracts@tql.com.

15. **GOVERNING LAW / JURISDICTION / VENUE**. This Agreement will be governed by the laws of the State of Ohio, except to the extent that federal transportation Laws preempt those laws, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law. The Parties consent to the jurisdiction of the state court located in Clermont County, Ohio, waive any objection to the jurisdiction of that court, and agree that any dispute between the Parties, including, without limitation, those arising under or related to this Agreement, will be brought in that court, which will have exclusive jurisdiction over such dispute. The prevailing Party in any lawsuit between the Parties will be entitled to all reasonable expenses, attorneys' fees, and costs (including court costs).

16. **ENTIRE AGREEMENT**. This Agreement constitutes the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and no extrinsic evidence may be introduced to reform or change this Agreement in any judicial or equitable proceeding arising out of this Agreement. Any changes to this Agreement must be in a signed writing.

17. **INVALIDITY OF PROVISIONS / SEVERABILITY**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such a manner as to make such provision valid, legal, or enforceable.

18. **ASSIGNMENT AND DELEGATION**. This Agreement inures to the benefit of and is binding upon the successors and assigns of both Parties. Neither Party may assign this Agreement without the consent of the other Party, except as expressly provided in this Agreement. Any assignment in violation of this Agreement is voidable at the sole discretion of the Party that did not violate this Section. BROKER may assign this Agreement, whether in whole or part, without notice to or consent of CARRIER, to any entity which controls, is controlled by, or is under common control with BROKER or which acquires all or substantially all of the assets or ownership interests of BROKER, provided that said assignee assumes, in full, the obligations of BROKER under this Agreement.

19. **FACTORING**. CARRIER will provide BROKER written notice of any assignment, factoring, amendment, or other transfer of its right to receive payment arising under this Agreement, which may affect BROKER's payment obligations ("Pay Assignment"), at least thirty (30) days prior to the effective date of such Pay Assignment. BROKER is not obligated to honor any Pay Assignment unless such notice is proper and timely received. At minimum, each written notice will include the name and address of the factoring company, assignee, or transferee; date signed; date Pay Assignment is to begin; and the terms of the Pay Assignment. Notice is considered delivered upon receipt of written notice by BROKER. BROKER will have the right to ask for, and CARRIER will be obligated to furnish, any further documentation BROKER requires in order to satisfy BROKER as to the authenticity and requirements of the Pay Assignment. BROKER's payment obligations will not be subject to more than one Pay Assignment at any one time. Any and all Pay Assignments are taken subject to all the terms of this Agreement regardless of when or if BROKER receives a notice of Pay Assignment. If CARRIER wants to terminate a Pay Assignment, a written release from the CARRIER and the Pay Assignment's assignee, in a form satisfactory to BROKER's counsel, must be received by BROKER specifying the terms and date of release. If CARRIER fails to comply with any one of the requirements of this Section, then CARRIER releases and waives any and all right, claim, or action against BROKER and CUSTOMERS for any amount due and owing under this Agreement.

20. **ELECTRONIC COMMUNICATIONS**. The following terms apply to any and all Electronic Communication (defined below) with BROKER.
    a. During the Term, the Parties anticipate that they will exchange materials and information in electronic form, including, without limitation, through websites, e-mail, fax, text messaging, mobile applications, and other electronic means (collectively "Electronic Communications"), and each Party consents to receiving Electronic Communications related to the Services. CARRIER agrees to BROKER's privacy policy and terms of use found on its website at www.tql.com.
    b. Under no circumstances will BROKER be liable for, and CARRIER hereby expressly waives and releases BROKER from, any liability for any loss or damage caused by computer viruses, Trojans, worms, or similar programs.
    c. Electronic Communications may contain information that is confidential and subject to legal privilege. Such Electronic Communications are intended solely for the individual or entity to whom it is addressed and to others who have the authority to receive it, and CARRIER may not, under any circumstances, disclose, copy, or distribute the information without BROKER's written consent.
    d. BROKER does not make any representation regarding any links and does not endorse the products or services that may be offered from or through any link. BROKER accepts no responsibility for the content or use of information contained in any link.
    e. Unless otherwise noted, Electronic Communications are subject to intellectual property rights of BROKER. Use of the content in web pages, electronic or written publications, mobile applications, or any other media and/or words, phrases, names, designs, or logos that are BROKER's trademarks are prohibited without the express written permission of BROKER.
    f. BROKER disclaims all implied warranties, including, without limitation, warranties of compatibility, security, and accuracy, and BROKER will not be liable for any special, indirect, consequential, or punitive damages of any kind arising out of the use of Electronic Communications by CARRIER.
    g. By providing an email address to BROKER, CARRIER is expressly opting-in to BROKER's promotional email distribution list. CARRIER can opt-out at any time by contacting BROKER via telephone, email, or mail.
    h. CARRIER understands that all calls to or from BROKER may be recorded, and CARRIER consents to being recorded during any and all calls with BROKER. CARRIER waives and releases BROKER from any liability or claim related to calls with BROKER being recorded and waives any right to obtain a copy of such recording to the extent any such right exists under the law.
    i. CARRIER understands that BROKER, or its designee, may use Electronic Communications to setup CARRIER with various websites, mobile applications, and other account services. CARRIER is solely responsible for the security of any accounts setup with BROKER and any other Electronic Communications, including, without limitation, CARRIER's passwords, user identification, financial information, or account settings. If CARRIER believes that the security of any of its accounts with BROKER have been compromised in any way, CARRIER must contact BROKER immediately.

21. **CONFIDENTIALITY**. In addition to confidential information protected by law, whether statutory or otherwise, the Parties agree that all of their financial information and that of CUSTOMERS, including, without limitation, freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, amounts of freight charges paid, freight volume requirements, as well as related CUSTOMER information, CUSTOMER shipping or other logistic requirements shared or learned between the Parties and CUSTOMERS will be treated as confidential, and will not be disclosed or used for any reason without prior written consent by the Parties. If confidentiality is breached, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties are entitled, in addition to any other remedy available, to an injunction restraining the violating Party from further violation of this Agreement.

22. **GENERAL CARRIER DUTIES**. CARRIER agrees to the following general carrier duties. (These duties are in addition to any other duties required in this Agreement or in Laws)
    a. Drivers will check in with BROKER every day (including Saturday, Sunday, and holidays) between 8:00 a.m. and 9:00 a.m. EST, giving their current location and load temperature.
    b. CARRIER will call BROKER immediately to report any problems related to the Services. BROKER is available 24 hours a day, 7 days a week, 365 days a year.
    c. CARRIER will report any overage, shortage, or damage at loading or delivery to BROKER immediately upon becoming aware of such overage, shortage, or damage, and CARRIER assumes all liability for failing to so notify BROKER.
    d. If any payment for lumper services (loading/unloading) is agreed upon between BROKER and CARRIER, CARRIER must supply a legible unloading receipt with lumper's full name, address, and contact information accompanied by the BROKER's authorization number assigned to this particular load. Unless CARRIER provides this information within 24 hours of delivery, CARRIER will not be reimbursed for lumper costs.
    e. For all pallet exchange loads, the number of pallets in and out must be clearly notated on the original BOL.
    f. All loads tendered to CARRIER require exclusive use of trailer space solely for the freight related to that particular load, unless otherwise agreed in writing with BROKER. CARRIER assumes all liability, including, without limitation, any costs incurred by BROKER, caused by CARRIER loading any unauthorized freight on a load.
    g. Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to CARRIER.
    h. Any product which must be disposed of must have prior consent from BROKER before being disposed of by any party. If a load is disposed of without prior written consent from BROKER, CARRIER is liable for the entire value of the load, plus any other associated damages. CARRIER is required to remit to BROKER any funds received from salvage and/or insurance.
    i. Before loading begins, CARRIER's driver must have a sufficient number of load locks or other suitable cargo securing devices to secure the load.
    j. Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, CARRIER will be fully liable for the greater of either (i) the invoice amount to CUSTOMER or (ii) the cost of the product. In addition, CARRIER will also be liable for any other expenses arising from or related to the unauthorized removal of the seal.
    k. CARRIER will provide a trailer that is in sound mechanical and structural condition, and is clean, dry, free of defects, and suitable in all respects to accept, load, and transport the load.
    l. CARRIER will not, unless expressly authorized to do so by BROKER, contact or communicate directly with CUSTOMER. This includes CARRIER's agents, representatives, heirs, or assigns. This Section will not prohibit communication with dock workers, as long as such communication is limited to the minimum amount of communication necessary to perform the Services for that load.
    m. CARRIER's drivers will not, under any circumstances, use a cellular phone, whether by talking, texting, or otherwise, while operating a vehicle related to the Services.

n. At all times, CARRIER will use proper, working equipment acceptable to CUSTOMER, train its personnel in sanitary transportation practices and document all training, maintain all necessary records, abide by all Laws, and follow all protocols communicated to CARRIER when transporting human and/or animal food.

23. **CARRIER DUTIES FOR REFRIGERATED LOADS**. In order to fulfill CUSTOMERS' delivery and tracking requests, if CARRIER accepts BROKER's tender of a refrigerated load, then CARRIER agrees to the following duties. (These duties are in addition to the General Carrier Duties listed above)
   a. Prior to loading, CARRIER will confirm that the reefer unit is working properly and pre-cool trailer to the temperature specified on BROKER's Rate Confirmation. The temperature on BROKER's Rate Confirmation will be in Fahrenheit unless otherwise specified in writing. CARRIER must strictly adhere to the temperature listed on the Rate Confirmation and will check pulp temperature of the product to ensure that product has been pre-cooled to the proper temperature prior to loading. CARRIER will not accept any product with a pulp temperature that is more than two (2) degrees above or below the specified temperature noted on BROKER's Rate Confirmation. If the temperature on BROKER's Rate Confirmation differs from that on the BOL, CARRIER will call BROKER before signing the BOL or transporting the freight. If CARRIER loads or otherwise accepts freight contrary to the terms on BROKER's Rate Confirmation or applicable BOL, CARRIER is liable for any and all loss or damage arising from or related to such acceptance.
   b. Trailers hauling refrigerated loads are required to have a properly functioning air chute for circulation. It is CARRIER's responsibility to make sure the chute is not damaged, obstructed, blocked, or malfunctioning in any way. It is CARRIER's sole responsibility to make sure sufficient space is provided for air circulation in front, rear, top, bottom, and between the load.
   c. By signing the BOL, CARRIER is confirming that the correct product and correct product count were received at the proper temperature. CARRIER is solely responsible for cargo loss or damage incurred related to discrepancies in product information between the BOL, Rate Confirmation, and the actual product. If a discrepancy as to count, condition, or temperature is encountered, CARRIER will immediately notify BROKER, and no change to loading information will be made until confirmed in writing by BROKER.
   d. CARRIER will continuously maintain the temperature noted on BROKER's Rate Confirmation from pickup at shipper until delivery at receiver. CARRIER will not, at any time, set reefer on start/stop, cycle, or any other non-continuous temperature setting unless otherwise notified in writing by BROKER. CARRIER will contact BROKER immediately in the event of any problems including, without limitation, out-of-temperature condition, equipment malfunction, accident, or delay. It is CARRIER's sole responsibility to ensure all refrigeration equipment is in a properly working condition at all times while in possession, custody, or control of the cargo.

24. **INTERNATIONAL TERMS AND CONDITIONS**. If CARRIER transports any load outside of the U.S., whether in whole or part, then CARRIER agrees to BROKER's Global Supplier Code of Conduct ("Code of Conduct") and Broker's International Terms Addendum ("International Terms"), both of which are incorporated into this Agreement as if fully rewritten in this Section. BROKER may revise the Code of Conduct and the International Terms at any time, and CARRIER agrees to be bound by the version in effect on the later of either the Effective Date or the date of the most recent load tendered to CARRIER by BROKER. The International Terms and the Code of Conduct are available at www.tql.com/International_Terms_Addendum and www.tql.com/Supplier_Code_of_Conduct respectively, or a hardcopy will be provided to CARRIER upon written request to BROKER.

25. **SURVIVAL**. The terms and conditions of this Agreement which contemplate the need for performance after the expiration or termination of this Agreement, which includes, without limitation, provisions regarding indemnification, solicitation of CUSTOMERS, attorneys' fees, cargo liability, claims processing, and compensation for Services performed prior to termination, will survive any such expiration or termination of this Agreement.

26. **RECITAL PARAGRAPHS / HEADINGS**. The statements in the recital paragraphs at the beginning of this Agreement are true and correct and may be relied upon in this Agreement. The Section headings in this Agreement are for convenience only and will not be used to interpret this Agreement.

27. **COUNTERPARTS**. This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts and may be executed by electronic means and exchanged by Electronic Communications. Each executed counterpart will be deemed to be an original and all of which together constitute one and the same agreement.

28. **TRANSLATIONS SUBJECT TO ENGLISH**. Any translation of this Agreement into languages other than English are for convenience only, and if any conflict arises between the English language version and any other translation, the English language version controls.

The Parties, through their duly authorized representatives, agree that this Agreement may be signed by electronic means, and by their electronic endorsement through TQL's designated system or their physical signature below, the parties intend to sign this Agreement and acknowledge that they have read this Agreement in its entirety; understand the terms and conditions of this Agreement; have had the opportunity to consult with legal counsel regarding terms and conditions of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

FMCSA Legal Name: EOS INC
Name of Authorized Carrier Representative: Nick Dettlinger
Title of Authorized Carrier Representative: Operations
Phone number of Authorized Carrier Representative: 501-503-4000
Email of Authorized Carrier Representative: nick@eostrucking.com

Agreement Date: 2/6/2026

☑ "I, Nick Dettlinger, am the Operations for Eos Inc. I am authorized to execute the Transportation Brokerage Agreement (the "Agreement") set out above dated 2/6/2026 1:14:29 PM Pacific Time between TQL and Eos Inc and legally bind Eos Inc to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the Agreement. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I acknowledge I have read this agreement in its entirety; understand the terms and conditions of this agreement; and

knowingly, voluntarily, and willfully enter into this agreement without any duress or coercion of any kind. THE AGREEMENT SHALL BE BINDING ON EOS INC. I UNDERSTAND AND ACKNOWLEDGE THAT EOS INC IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

TQL
TOTAL QUALITY LOGISTICS

**Billing Address:** P.O. Box 9049, Louisville, KY 40209-0049
**Overnight Address:** 1701 Edison Drive, Milford, OH 45150
**Company Phone:** 800-580-3101 or 513-831-2600

# BROKER/CARRIER AGREEMENT
## CANADIAN ADDENDUM

This Addendum to the BROKER/CARRIER AGREEMENT (collectively the "Agreement") is made and intended to be effective (mm/dd/yyyy) 7 26 17, by and between TOTAL QUALITY LOGISTICS, LLC ("BROKER") with FMCSA property broker No. MC-322572B and Stevens Trucking Company, a valid and existing Registered Motor Carrier with D.O.T. Permit/Certificate No. MC 156009 (authorized under all applicable Canadian laws and regulations) ("CARRIER") (BROKER and CARRIER collectively referred to as the "Parties"). "Registered" means operated under authority issued by: the Federal Motor Carrier Safety Administration or its predecessor entities/agencies, within the U.S. Department of Transportation and/or under a National Safety Code Number and Safety Rating issued by the applicable Provincial Authority in a province or territory of Canada.

1. **CARRIER REPRESENTATIONS AND WARRANTIES:** CARRIER warrants that it:
   a) Is a Registered Motor Carrier legally authorized to provide transportation of property under contracts with shippers, receivers and/or brokers of general commodities and is fully authorized to transport freight under all applicable Canadian laws and regulations, including, but not limited to: holding a National Safety Code (NSC) and Safety Fitness Certificate, in each Province it traverses;
   b) Is currently, and shall at all times maintain compliance with any and all federal, state, provincial, and local laws relating to the services contemplated under this Agreement. These services include, but are not limited to, those identified in Section 2 (b) of the BROKER/CARRIER Agreement;
   c) Canadian CARRIERS must have and maintain a Carrier Safety Rating ("CSR") issued by the Ontario Ministry of Transportation that is at all times "Satisfactory – Unaudited" or better, and /or a "Satisfactory" Safety Rating ("SR") issued by the applicable provincial regulatory authority if the carrier is an extra-provincial motor carrier as defined under the Motor Vehicle Transport Act (Canada);
   d) Will notify BROKER immediately if CARRIER's Operating Authority, licensure, safety rating, including but not limited to CSR and/or SR issued by a Provincial Authority in Canada is threatened to be or is revoked, under investigation, suspended or rendered inactive for any reason;
   e) Will notify BROKER immediately if CARRIER is sold, its assets assigned or otherwise transferred, or if there is a change in control/ownership of CARRIER and/or if the insurance required by this Agreement is threatened to be or is terminated, cancelled, suspended or revoked for any reason;
   f) Shall comply with any and all applicable federal and/or provincial laws and regulations pertaining to the transportation of Dangerous Goods under the Dangerous Goods Act for shipments originating in Canada and delivered in Canada or delivered in the United States;
   g) For shipments transported between the United States and Canada, CARRIER shall hold bonded carrier status and be duly licensed and qualified under all necessary customs and border security laws, and be experienced with customs clearance procedures and customs requirements including identifying manifests, commercial invoices and customs documents necessary for shipments moving between the United States and Canada.

2. **TAX RESPONSIBILITIES**:
   a) CARRIER shall be responsible and liable for all of its employees and independent contractors providing services to BROKER. CARRIER shall pay and accept full and exclusive liability for the assessments or contributions imposed on CARRIER by the Unemployment Insurance Act, Canada Pension Act, Income Tax Act, and any provincial workplace safety, insurance, or similar laws or regulations. CARRIER, its employees, and/or independent contractors, or subcontractors shall not be entitled to receive from BROKER, any regular pay, vacation pay, overtime pay, severance pay or any workers compensation, unemployment benefits, or any other benefits of any kind. CARRIER shall furnish to BROKER immediately upon request, proof of compliance with any workers compensation, unemployment or other employee related laws/regulations required under Canadian federal or provincial laws/regulations;
   b) If the payments made by BROKER to CARRIER are subject to a United States withholding income tax, or similar levy, or to Canadian tax of any type, or similar levy, BROKER may withhold from payment to CARRIER the amount of such taxes and may pay the same to the applicable taxing authority. If BROKER fails to withhold at the time payment is made, and an obligation to withhold is later discovered, CARRIER will reimburse BROKER, via offset or otherwise, for the payment made by BROKER to the taxing authority on CARRIER's behalf.

3. **SHIPMENTS ORIGINATING IN THE UNITED STATES FOR DELIVERY IN CANADA UNDER A "THROUGH" BILL OF LADING:** Notwithstanding the terms of 49 CFR §370.9:
   a) CARRIER shall comply with any and all applicable federal/provincial laws and regulations and shall be solely liable for freight loss, freight damage and delay claims as well as personal injury/death and property damage claims;
   b) CARRIER shall pay the full, or mutually acceptable compromised amount, or deny any freight loss and damage claims within 90 days from date of receipt of a claim from BROKER, or be conclusively presumed liable for such claims if no payment, compromise, or denial is received within 90 days, and shall at all times exercise its best efforts to salvage rejected or damaged cargo;
   c) CARRIER's liability for any freight damage, loss, and/or theft (regardless of the type of operating authority it has) shall be determined under the Carmack Amendment (49 U.S.C. §14706 *et seq*);
   d) CARRIER shall be liable for special damages if such damages are reasonably foreseeable or if CARRIER is made aware of the possibility or existence of the possibility of being assessed special damages;
   e) CARRIER shall issue a bill of lading which complies with the Federal Bill of Lading Act (49 USC §80101 *et seq*) for the property it receives for transportation under this Agreement;
   f) CARRIER assumes all risk of loss and shall defend, indemnify and hold BROKER harmless from and against any liability arising out of any breach of the terms of this Agreement, including consequential damages, costs, expenses and reasonable attorney fees.

4. **SHIPMENTS ORIGINATING IN CANADA FOR DELIVERY IN THE UNITED STATES UNDER A "THROUGH" BILL OF LADING:**
   a) CARRIER shall comply with any and all applicable federal/provincial laws and regulations and shall be solely liable for freight loss, freight damage and delay claims as well as personal injury/death and property damage claims;
   b) Unless otherwise agreed in writing, with respect to cargo damage claims, CARRIER shall be liable for the declared value of the freight, as it appears in the bill of lading, or any other shipping document related to the shipment, and not to "released rates," "limited liability" rates. Any attempt to limit damages shall be void. If no shipping documents state a declared value, the statutory limit of $4.41 CDN per kg shall apply;
   c) CARRIER shall issue a uniform standard bill of lading for each load of freight tendered for transportation and the services related to the transportation under this Agreement, and shall be liable to the person entitled to recover under the bill of lading. CARRIER'S liability shall be the same as that of a common carrier as set forth under the Ontario Highway Traffic Act and related regulations (and any amendments thereto), and the comparable federal or provincial laws of the province in which the shipment originates.

5. **INSURANCE:** CARRIER shall, at all times, comply with the insurance requirements set forth in the BROKER/CARRIER Agreement, and to the extent that any applicable Canadian federal or provincial law and/or regulation require additional insurance coverage, CARRIER shall be required to strictly adhere to these laws and regulations.

6. **MISCELLANEOUS:** This Agreement supersedes any and all prior or contemporaneous understandings and agreements between the parties with respect to the subject matter of this Agreement and is, along with the BROKER/CARRIER AGREEMENT which is expressly incorporated, the complete and exclusive agreement between the parties. Unless preempted by federal transportation laws or any treaties between Canada and the United States, this Agreement shall be interpreted and construed in accordance with laws of Ohio regardless of any applicable conflicts of laws rules and venue shall be exclusively in Clermont County, Ohio.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first above written intending to be legally bound.

| | | | |
|---|---|---|---|
| **BROKER:** | **TOTAL QUALITY LOGISTICS, LLC.** | **CARRIER:** | Stevens Trucking CO |
| **Name:** | **Marc Bostwick** | **Name:** | Kenney Stevens |
| **Signature:** | Marc Bostwick | **Signature:** | [signature] |
| **Title:** | **Operational Sales Manager** | **Title:** | President/Owner |

TQL
TOTAL QUALITY LOGISTICS
*exceptional service, proven results*

# FAX

| | |
|---|---|
| **To:** Tina | **From:** Lindsay Milligan |
| **Fax:** 14057452735 | **Pages:** 12 Including Cover Letter |
| **Phone:** 405-745-2363 | **Date:** 1/10/2007 |
| **RE:** Total Quality Logistics Carrier Packet | |

MC156009

Thank you for your interest in TQL. Please fill in all of the blanks on this cover letter and in the attached packet and return by fax to 513-965-7899. If you have any questions please contact Logistics Development Department at 513-831-2600/800-580-3101 Ext. 2510.

| | |
|---|---|
| **Carrier Name:** | Stevens Trucking Co. |
| **MC #:** | 156009 |
| **City/State/Zip:** | OKC OK 73179 |

## **IMPORTANT**

**THIS COVER SHEET MUST BE RETURNED ALONG WITH THE REST OF THE TQL CARRIER PACKET FOR YOUR INFORMATION TO BE PROCESSED CORRECTLY!!!**

www.totalqualitylogistics.com

Rev 09/07/06

1/9/2007 OH CARRIER PACKET 1--

TQL
TOTAL QUALITY LOGISTICS
INCORPORATED
exceptional service, proven results

**Mailing Address:**
**P.O. Box 799, Milford, OH 45150**

**Overnight Address:**
**1701 Edison Dr, Milford, OH 45150**

**Dun & Bradstreet Rating: "4A1"**
**Red Book Rating: "Business Character Award" A****I**
**Blue Book Rating: "Transportation Member" 4000M XXXX B**
**T.I.A. (Transportation Intermediaries Association): "P3(sm) Partner"**
**N.A.S.T.C. (National Association of Small Trucking Companies): "Best Broker Member"**

**CINCINNATI, OHIO OFFICE**
Phone: 513-831-2600 or 800-580-3101

**ELKINS, WEST VIRGINIA OFFICE**
Phone: 304-637-2550 or 800-499-4989

**TQL, INC. CO. INFORMATION**
Federal ID #20- 5152109
MC #322572B
Blue Book #158194
Red Book #285135
DUNS #17-669-0378
# of Employees – over 600

**INSURANCE CARRIER**
C. Edwards/Lovins Insurance Co.
122 Water Street
Milford, OH 45150
Mark Brokamp (513-831-7900)

**BANKING INFORMATION**
Fifth Third Bank
Fifth Third Center
Cincinnati, OH 45206
David Hummel (513-534-5423)

**100K SURETY BOND INFORMATION**
Pacific Financial Association, Inc.
8669 San Alberto Drive #201
Scottsdale, AZ 85258
480-905-1818

**AWARDS**

**"2005 Winner, Cincinnati Better Business Bureau Torch Award"**
Cincinnati Better Business Bureau

**"2005 Inc 500"**
Inc Magazine

**"2005 Fast 55"**
Cincinnati Business Courier

**"2005 Greater Cincinnati 100"**
Deloitte & Touche LLP and The Cincinnati Enquirer

**"2004 Small Business of the Year Awards (51 – 250) Employees"**
Greater Cincinnati Chamber of Commerce

**"2004 Entrepreneur of the Year"**
Ernst & Young

**"2004 Fast 50"**
Cincinnati Business Courier

**"2004 Greater Cincinnati 100"**
Deloitte & Touche LLP and The Cincinnati Enquirer

**"2004 Hon. Mention, Cincinnati Better Business Bureau Torch Award"**
Cincinnati Better Business Bureau

**CARRIER TRADE AND CREDIT REFERENCES**

**Brians Trucking**
26020 Potter Place
Stevenson Ranch, CA 91381
661-255-6933
Contact: Mary Herrera

**Miller Truck Lines**
106 N 8th Street
Stroud, OK 74079
800-324-3584
Contact: Austin Seals

**Haney Trucking, Inc.**
PO BOX 231
Lufkin, TX
800-433-0608
Contact: Randy Dupree

**Silkey Trucking, Inc.**
P.O. BOX 2250
Nixa, MO 65714
888-844-5544
Contact: Jeff Silkey

**SPJ Corporation**
3105 Slatefield Avenue
Bakersfield, CA 93313
661-835-9146
Contact: Saminder P. Singh

**Arctic Express**
4277 Lyman Drive
Hilliard, OH 43026
800-927-9241
Contact: Ron Pebble

**Cincinnati Carriers**
7423 Weaver Road
Germantown, OH 45327
937-477-7136
Contact: Scott Pennal

**PST Transport**
12445 N. 42nd Drive
Phoenix, AZ 85029
602-978-1587
Contact: Dino Perviz


This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 513-248-5347 To: 14057452735 Page: 3/12 Date: 1/10/2007 5:20:12 PM

*Rev 09/07/06*

*1/9/2007 OH CARRIER PACKET 2--*

# TOTAL QUALITY LOGISTICS, INC. CARRIER FORM

**Welcome to Total Quality Logistics, Inc.** We will need the following form filled out in order for us to update your company information and process your payments in a timely manner.

1) Signed Broker-Carrier Agreement
2) Copy of your CARGO and LIABILITY insurance
3) W9 (included in this packet)
4) Copy of your WORKERS COMPENSATION
5) Contract or Carrier Authority
6) This sheet with your information filled out.
7) Factoring company address and phone #
8) A Voided Invoice

CARRIER INFO

Carrier Name: Stevens Trucking Co

Dispatchers: Bill, Tina, Jim

Remit To Address: PO Box 19608 Oklahoma City ok 73179

Physical Address: 6600 SW 29th OKC OK 73144

Phone (Local): 405-745-2363 WATTS: ______ Fax: 405 745 2735

Email Address: ______ Web Site: ______

Would you like us to email you available loads? ___Yes ___No

Claims Contact: Dee Dee Jones

Does your company broker out extra freight? ___Yes X No Number of Tractors: 75

Number of Trailers: Reefers___ Vans 100 Vented Vans___ Flats___ 4' Tarps___ 6' Tarps___

8' Tarps___ Step Deck___ Removable Goose Neck___ Drop Deck___ Other: ___

Is your company Hazmat Certified? X Yes ___No (If yes forward a copy of your Certification and fill out Appendix A of the contract)

How do you track your drivers? GPS ___ Cell Phone X Other: ___ If GPS Can TQL have access on line? Yes __ No _

**Please check the states in which your company looks for loads:**

United States

| ST | ✓ | ST | | ST | | ST | | ST | |
|---|---|---|---|---|---|---|---|---|---|
| AL | ✓ | ID | ✓ | MI | ✓ | NY | ✓ | TN | ✓ |
| AR | ✓ | IL | ✓ | MN | ✓ | NC | ✓ | TX | ✓ |
| AZ | ✓ | IN | ✓ | MS | ✓ | ND | ✓ | UT | ✓ |
| CA | ✓ | IA | ✓ | MO | ✓ | OH | ✓ | VT | ✓ |
| CO | ✓ | KS | ✓ | MT | ✓ | OK | ✓ | VA | ✓ |
| CT | ✓ | KY | ✓ | NE | ✓ | OR | ✓ | WA | ✓ |
| DE | ✓ | LA | ✓ | NV | ✓ | PA | ✓ | WV | ✓ |
| DC | ✓ | ME | ✓ | NH | ✓ | RI | | WI | ✓ |
| FL | ✓ | MD | ✓ | NJ | ✓ | SC | ✓ | WY | ✓ |
| GA | ✓ | MA | ✓ | NM | ✓ | SD | · | CA | ✓ |

**Please check the states your company requires as destinations:**

United States

| ST | | ST | | ST | | ST | | ST | |
|---|---|---|---|---|---|---|---|---|---|
| AL | | ID | | MI | | NY | | TN | |
| AR | | IL | | MN | | NC | | TX | |
| AZ | | IN | | MS | | ND | | UT | |
| CA | | IA | | MO | | OH | | VT | |
| CO | | KS | | MT | | OK | | VA | |
| CT | | KY | | NE | | OR | | WA | |
| DE | | LA | | NV | | PA | | WV | |
| DC | | ME | | NH | | RI | | WI | |
| FL | | MD | | NJ | | SC | | WY | |
| GA | | MA | | NM | | SD | | CA | |

In which states to you haul intra-state loads? Oklahome

TQL is available 24/7/365 at 800-580-3101 to assist drivers and dispatchers with any problems, in return we ask for after hour information for your company.

Monday - Friday 24 until 7 Phone # 405 745 2363 Fax # 405 745 2735 Contact name: Freight Dispatch

Weekend Coverage:

Saturday ___ until ___ Phone # 405-388-8904 Fax # ___ Contact name: ___

Sunday ___ until ___ Phone # ___ Fax # ___ Contact name: ___



This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com
This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

*Rev 09/07/06* *1/9/2007 OH CARRIER PACKET 3...*

## Payment Terms

PAYMENT TERMS

Please indicate which of the following payment terms you would like to be set up with. **Your selection will remain as your permanent payment term until we (TQL) are notified in writing that you would like your term changed.** If this form is not filled out, signed and returned your payment terms will default to 28 DAYS.

**All pay terms are calculated from the day TQL receives the paperwork**

✓ 28 Days – no fees – check mailed within 28 days of TQL receiving the paperwork.

____ 3% 7 Day – 3% service charge will be deducted from the gross truck rate. A check will be issued within 7 days of TQL receiving the paperwork. This will be my regular payment term.

We also offer a 5% Next Day payment option – 5% service charge will be deducted from the gross truck rate, plus a $25.00 processing fee per load. You will receive a Comcheck one business day after TQL receives the paperwork. If we receive your paperwork on Friday, you will receive your Comcheck on Monday (QuickPay will not be guaranteed if there are any problems with the load overages, shortages, late delivery, temperature issues, etc.). **You can select 5% Next Day on a per invoice basis if you have selected either 28 Day or 3% 7 Day. To use this option 5% Next Day must be marked clearly on both your envelope and invoice.**

____ I would like 5% Next Day to be my regular payment term. **To use this option you will still need to mark 5% Next Day clearly on both your envelope and invoice.**

All paperwork submitted must include:
- Invoice with your company name and address with your payment terms clearly indicated.
  (The TQL Rate Confirmation can be used as your invoice as long as you mark your invoice number in the provided space)
- Original B.O.L./P.O.D. signed by the receiver.
- Any unloading or pallet receipts with TQL authorization number printed on them.
- Copy of the TQL Rate Confirmation.

## Comcheck Authorization

COMCHECK AUTHORIZATION

**Comchecks are available only after freight has been loaded. If this form is not completed TQL will not be able to issue comchecks. Yes or No must be selected for each item listed below.**

| | |
|---|---|
| Comchecks can be issued to drivers (maximum allowed is 40%, limit $1,400) | Yes___ No X |
| Comchecks can be issued to dispatchers (maximum allowed is 40%, limit $1,400) | Yes___ No X |
| Comchecks are to be issued ONLY FOR UNLOADING<br>***Unloading will be reimbursed with a valid unloading receipt, see carrier contract*** | Yes___ No X |
| Comchecks are NEVER to be issued to either drivers or dispatchers | Yes X |

*****TQL After Hours and Weekend Comcheck Procedure*****

TQL after hours personnel can only issue a Comcheck upon confirmation from the shipper that the truck has been loaded. In the event that we are unable to reach a shipper, we may request a fax copy of the Bills of Lading before issuing the Comcheck. Furthermore, to ensure that we are giving the Comcheck to the correct carrier, it is imperative that all drivers be able to recite their company's MC number. TQL after hours personnel can not issue an advance for more than 40% of the total rate to the truck up to a $1400.00 maximum advance. This policy will be in effect after 5pm every weekday and throughout each weekend.


This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Rev 09/07/06 1/9/2007 OH CARRIER PACKET 4–

# FORM W-9

W-9

TQL's Form W-9 is used to determine whether or not TQL should file Form 1099-MISC annually for a specific payee. The Internal Revenue Service requires TQL to supply our payees with either the standard federal W-9 form or our substitute W-9 form to hold in the payee's file. Please complete TQL's substitute Form W-9 and return it with your contract carrier approval paperwork. Should you have any questions, please feel free to contact us at 800-580-3101; Ext. 2510.

**Please be sure to supply your "Doing Business As" information, if applicable. Your DBA is important information for proper tax reporting.**

**CORPORATIONS - PLEASE CHECK: INC. ( ) CORP. ( ) LLC ( )**

Corporation Name Kenney Stevens

Doing Business As (*If applicable) Stevens Trucking Co.

State of Incorporation OK Federal Tax ID# 061665484

**INDIVIDUALS, SOLE PROPRIETORS, PARTNERSHIPS**

Company or Individual Name ____

Doing Business As (*If applicable) ____

Federal Tax ID # ____

Social Security # ____

Name: Tina Northrup

Title: IB Dispatcher

Address: 6600 SW 29th

City: OKC State: OK Zip: 73179

**CERTIFICATION**

*Under penalties of perjury, I certify that: (1) the number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me) ; and, (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.*

**Signature** Tina Northrup **Date** 1-10-07



This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

*Rev 09/07/06*

*1/9/2007 OH CARRIER PACKET 5...*

TQL
TOTAL QUALITY LOGISTICS
INCORPORATED
*exceptional service, proven results*

**Mailing Address:**
**P.O. Box 799, Milford, OH 45150-0799**

**Overnight Address:**
**1701 Edison Dr, Milford, OH 45150-2728**

## BROKER/CARRIER AGREEMENT

THIS AGREEMENT ("Agreement"), is made and intended to be effective this 10 day of January, 2007 by and between Total Quality Logistics, Inc., an Ohio corporation and Total Quality Logistics, LLC, an Ohio Limited Liability Company whose main office is located in Milford, Ohio, ("BROKER") and Stevens, whose main office is located at 6600 SW 29th St OKC OK, ("CARRIER"), collectively the "Parties."

## RECITALS

WHEREAS, BROKER is licensed by the Federal Motor Carrier Safety Administration in Docket No. MC-322572 B to engage in operations, in interstate or foreign commerce, as a broker, arranging for transportation of freight (except household goods), and as a broker arranges services for various consignors, consignees, motor carriers and/or other third parties (hereinafter individually or collectively "CUSTOMER(S)");

WHEREAS, CARRIER holds motor carrier operating authority from the Federal Highway Administration in Certificate No. MC-156009 and, or, Permit/Certificate No. DOT-__________ to engage in transportation as a common or contract carrier of property (except household goods, and class A and B explosives) under contracts with shippers and receivers and/or brokers of general commodities, and shall transport said property under its own operating authority and subject to the terms of this Agreement, and makes the representations herein for the purpose of inducing BROKER to enter into this agreement;

WHEREAS, BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER on a non-exclusive basis.

NOW, THEREFORE, for good and valuable consideration, the Parties agree as follows:

## AGREEMENT

1. **TERM.** The term of this Agreement shall be one (1) year, commencing on the date first mentioned above. This Agreement shall automatically renew itself for successive one year periods. Not withstanding the foregoing, either Party may terminate this Agreement on 30 days prior written notice, at any time, to the other Party, with or without cause, or as otherwise provided in this Agreement.

2. **CARRIER'S COVENANTS.** In performing transportation services hereunder, CARRIER agrees that it shall, at all times and at its own expense, provide and maintain:
   (a) driver(s) with enough available hours of service to pick up and complete delivery of the tendered load(s) within time frame(s) requested by BROKER and/or its CUSTOMER(s), without violating the FMCSA hours of service regulations contained at 49 C.F.R. § 395;
   (b) compliance during the term of this Agreement, with all applicable federal, state and local laws relating to the provision of its services including, but not limited to: transportation of Hazardous Materials, (including the licensing and training of drivers), as defined in 49 C.F.R. § 172.800, § 173, and § 397 et seq. to the extent that any shipments hereunder constitute Hazardous Materials; security regulations; owner/operator lease regulations; loading and securement of freight regulations; implementation and maintenance of driver safety regulations including, but not limited to, hiring, controlled substances, and hours of service regulations; sanitation, temperature, and contamination requirements for transporting food, perishable, and other products, qualification and licensing and training of drivers; implementation and maintenance of equipment safety regulations; maintenance and control of the means and method of transportation including, but not limited to, performance of its drivers.
   (c) CARRIER will notify BROKER immediately if its federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if it is sold, or if there is a change in control of ownership, and/or any insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

3. **BROKER'S COVENANTS.** BROKER warrants that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement. BROKER is not restricted from tendering freight to other carriers; CARRIER is not restricted from performing transportation for parties other than BROKER.



This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

4. **COMPENSATION**. CARRIER agrees to transport freight for BROKER, under the terms of its carrier authority, at a rate mutually agreed upon in writing, by fax, or by electronic means, contained in BROKER's Load Confirmation Sheet(s). Additionally, any rates, which may be verbally agreed upon, shall be deemed confirmed in writing where CARRIER has billed the agreed rate and BROKER has paid it. Rates or charges, including but not limited to stop-offs, detention, loading or unloading, fuel surcharges, or other accessorial charges, released rates or values, or tariff rules or circulars, shall only be valid when specifically agreed to in a signed writing by the Parties. CARRIER shall submit invoices, bills of lading and signed loading or delivery receipts for all transportation services furnished under this Agreement to BROKER. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER invoices and that, under no circumstance, will CARRIER seek payment from the shipper or consignee. BROKER and CARRIER shall use their best efforts to ensure the accuracy of all freight charge billings tendered by BROKER to CUSTOMERS for transportation services performed by CARRIER under this Agreement. BROKER shall have the right to audit, from time to time, any and all freight charge billings by CARRIER, and CARRIER shall cooperate fully with the conduct of such audits. Except in case of *Force Majeure*, CARRIER will be responsible for any additional costs incurred upon BROKER when replacement services are required.

5. **DOT SAFETY RATING.** At all times during the term of this Agreement, CARRIER shall maintain a "Satisfactory" DOT safety rating. Any change in CARRIER's safety rating other than "Satisfactory" shall be grounds for BROKER to immediately terminate this Agreement on one day's notice to CARRIER.

6. **INSURANCE.** CARRIER shall obtain and maintain in effect during the term of this Agreement at least the following types and amounts of insurance coverage from reliable insurance companies having a Best rating of A-VII or better. All such insurance shall be written and be required to respond and pay prior to any other available coverage:
   (a) **Cargo Insurance** insuring CARRIER, BROKER and CUSTOMERS against liability for loss of or damage to freight while in the custody, possession or control of CARRIER, with liability limits of not less than $250,000.00 for each truckload;
   (b) **Comprehensive General Liability Insurance** (including blanket contractual liability, broad form property damage liability, and extended bodily injury coverage) insuring CARRIER, BROKER and BROKER's CUSTOMERS against liability for injuries to persons, including injuries resulting in death, and loss or destruction of or physical damage to property, including any other equipment furnished by BROKER's CUSTOMER for or in connection with services under this Agreement, with combined single limits of not less than $1,000,000.00 per occurrence;
   (c) **Workers' Compensation Insurance** coverage, as statutorily required; and
   (d) **Any Other Insurance** required by DOT or any other government agency whose rules and regulations may apply to CARRIER's performance of the terms of this Agreement.

   CARRIER shall furnish BROKER with a certificate of insurance, in a form satisfactory to BROKER, to prove that each of the coverages specified in this paragraph is in effect and is being properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Such certificate of insurance shall reflect that all liability policies name BROKER as certificate holder, and if requested by BROKER, BROKER and BROKER's CUSTOMER as additional insureds. In addition such policies shall provide BROKER with at least 30 days advance notice prior to cancellation, material change or non-renewal.

   CARRIER shall pay all deductible amounts under the foregoing policies. Upon request by BROKER or any CUSTOMER of BROKER, CARRIER shall provide an actual copy of the policies currently in effect along with any exclusions, exemptions, or riders that are not depicted in the governing certificate of insurance.

7. **HAZMAT**. If BROKER requests CARRIER to transport any shipment required to be placarded under the Department of Transportation (DOT) rules as a hazardous material, the additional provisions in Appendix A, including additional insurance requirements, shall apply for each such shipment.

8. **CARGO LIABILITY AND CLAIMS.** CARRIER shall issue a bill of lading in compliance with 49 U.S.C. § 80101 et seq., 49 C.F.R. § 373.101 (and any amendments thereto), for the property it receives for transportation under this Agreement. Unless otherwise agreed in writing, CARRIER shall become fully responsible/liable for the freight when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a bill of lading has been issued, and/or signed, and/or delivered to CARRIER,, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt. Any terms of the bill of lading (including but not limited to payment terms) inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. Failure to issue a bill of lading, or sign a bill of lading acknowledging receipt of the cargo, by CARRIER, shall not affect liability of CARRIER. Under no circumstances shall CARRIER execute any bill of lading or any other document which represents or holds out BROKER as the person responsible for delivery of any freight.

   If a consignee refuses a shipment, or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman shall




This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

not begin until CARRIER has provided 24 hour prior written notification of request for directions, and if no other directions are received, either has placed the shipment in a BROKER approved public warehouse, or in CARRIER's terminal or storage facility under reasonable security.

CARRIER shall comply with 49 C.F.R. § 370.1 et seq. and any amendments and/or any other applicable regulations adopted by the Federal Motor Carrier Safety Administration, U.S. Department of Transportation, or any applicable state regulatory agency, for processing all loss and damage claims and salvage.

All liability standards, time limitations and burdens of proof regardless of whether the CARRIER has common or contract authority shall be governed by the common law applicable to common carriers and by 49 U.S.C. § 14706 (the Carmack Amendment), subject to a maximum liability of $250,000.00 per truckload. BROKER reserves the right to offset any claim(s) with pending invoices.

Notwithstanding the terms of 49 C.F.R. 370.9, CARRIER shall pay, decline or make settlement offer in writing on all cargo loss or damage claims within 30 days of receipt of the claim. Failure or CARRIER to pay, decline or offer settlement within this 30 day period shall be deemed admission by CARRIER of full liability for the amount claimed and a material breach of this Agreement.

9. **INDEPENDENT CONTRACTORS.** The relationship between BROKER and CARRIER shall, at all times, be that of independent contractors. CARRIER and any of its approved carriers or agents shall employ, pay, supervise, direct, discipline, discharge and assume full responsibility for all persons required for the performance of CARRIER's duties under this Agreement. Under no circumstances shall CARRIER or any of its approved carriers, agents or employees deemed to be or hold themselves out as employees of BROKER or any CUSTOMER.

10. **INDEMNIFICATION.** CARRIER agrees to indemnify, hold harmless and defend BROKER and its CUSTOMERS from and against any and all claims for loss, damage or injury (including but not limited to reasonable attorney's fees), from and against any lawsuits, actions, and administrative or legal proceedings brought against BROKER or its CUSTOMERS for or on account of any loss or damage to the tangible property of BROKER, BROKER's CUSTOMERS or other persons, or for or on account of any injury received or sustained by any person, including but not limited to employees of CARRIER or its prior written approved carriers, employees and agents of CUSTOMERS, caused by or arising out of the performance of CARRIER, its employees or approved carriers.

11. **BROKER'S ACCOUNTS.** CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the term of this Agreement. If this Agreement is terminated for any reason whatsoever, CARRIER agrees not to solicit freight or provide transportation services to any of BROKER's CUSTOMERS for a period of 18 months after the termination date of this Agreement. If CARRIER does solicit freight or provide transportation services for any of BROKER's CUSTOMERS in violation of this paragraph, then BROKER shall be entitled to collect 10% of the gross compensation received by CARRIER from any and all such CUSTOMERS on all shipments that CARRIER transports for any such CUSTOMER(S) during the 18 month period following the date of termination.

12. **CO-BROKERING.** CARRIER agrees not to re-broker, assign or interline the shipments hereunder tendered to CARRIER by BROKER without the advance written authorization of BROKER. Violation of this policy shall be grounds for immediate termination of this Agreement. If BROKER becomes aware of such co-brokering activity by CARRIER prior to payment of any compensation otherwise due CARRIER, BROKER shall withhold payment to CARRIER and shall instead pay appropriate compensation to the carrier who actually transported the shipment. BROKER will deem any acceptance of a shipment by CARRIER as a common or contract carrier and subsequent subcontracting of the shipment to any third party as an assignment of the right to be compensated for that shipment to the third party. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement. CARRIER will be liable for consequential damages (including but not limited to reasonable attorney's fees) for violation of this Paragraph.

13. **WAIVER AND DISCHARGE.** The failure of either Party to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision or the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part hereof.

14. **NOTICES.** All notices required or permitted under this Agreement shall be in writing, shall be signed by or on behalf of the Party giving the notice, and shall be sent to the other Party at its main office listed above via certified U.S. Mail, overnight courier with delivery receipt, facsimile with machine printed proof of delivery.

15. **GOVERNING LAW.** Unless preempted by or controlled by Federal Transportation Laws and Regulations this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. CARRIER and BROKER further agree that the


This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

exclusive venue for any lawsuit necessary to resolve a dispute not resolved pursuant to paragraph 16 below shall be in state or federal court in Cincinnati, Hamilton County, Ohio.

16. **DISPUTE RESOLUTION.** If a dispute arises between the Parties under this Agreement, as a condition precedent to any other remedy, the Parties agree to:
    (a) Meet and confer with each other as soon as possible to reach a voluntary resolution of the dispute.
    (b) If such voluntary resolution does not succeed, the Parties agree to submit the dispute to arbitration before a mutually agreed upon arbitrator.
    (c) For disputes whose amount in controversy is $10,000.00 or less, the arbitrator's decision shall be final and binding upon both Parties.
    (d) For disputes whose amount in controversy exceeds $10,000.00 the Parties will seek litigation.

    Each Party shall bear its own costs and fees in connection with any above described dispute resolution effort. If the process described in this paragraph fails to resolve any dispute between the Parties, and litigation results, CARRIER agrees to pay all reasonable expenses, attorney fees and costs (including court costs) that BROKER incurs in any such litigation.

17. **ENTIRE AGREEMENT.** This Agreement and its Appendices constitute the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

18. **INVALIDITY OF PROVISIONS.** If a court of competent jurisdiction declares any provision of this Agreement invalid, such decision shall not affect the validity of any remaining provisions, and all remaining provisions of this Agreement shall remain in full force and effect.

19. **ASSIGNMENT AND DELEGATION.** This Agreement shall inure to the benefit of and be binding upon the successors and assigns of both Parties, provided, however, that no assignment of rights and no delegation of duties under this Agreement shall be effective without the prior written consent of the other Party. Notwithstanding the above, either Party may, at any time, transfer this Agreement together with its rights and duties to any parent corporation or wholly owned subsidiary of its parent corporation, without permission of the other Party.

20. **FACTORING.** Carrier shall provide BROKER written notice of any assignment, factoring, or other transfer of its right to receive payments arising under this Contract at least thirty (30) days prior to such assignment, factoring, or other transfer taking legal effect as to BROKER's payment obligation hereunder (BROKER shall not be obligated to honor any factoring, assignment or any other transfer of CARRIER's right to receive any payments hereunder unless such notice is timely received). Such written notice shall include the name and address of factoring company, assignee/transferee, date, date assignment is to begin, and terms of the assignment, and shall be considered delivered upon receipt of such written notice by BROKER. BROKER shall have the right to ask for and Carrier shall be obligated to furnish any further documentation BROKER requires in order to satisfy itself as to the authenticity of, and payment requirements of the factoring arrangement(s). BROKER's payment obligations hereunder shall not be subject to more than one factoring/assignment agreement at any one time. No multiple assignments, factoring or other such transfers by the CARRIER shall be binding on BROKER. CARRIER shall indemnify BROKER against and hold BROKER harmless from any and all lawsuits, claims, actions, damages (including reasonable attorneys fees, obligation, liabilities, and liens) arising or imposed on BROKER in connection with the factoring/assignment or transfer of any account or right arising thereunder. If CARRIER wants to terminate factoring, a release from the CARRIER and the factoring company in a form satisfactory to BROKER's counsel must be received by BROKER specifying the terms and date of release. CARRIER also releases and waives any right, claim or action against BROKER for any amount due and owing under this Agreement where CARRIER has not complied with the notice requirements of this section.

21. **ELECTRONIC AND FAX COMMUNICATIONS.** During the term of this Agreement, the parties anticipate that they will exchange materials and information in electronic form (collectively "Electronic Materials"), either through the other party's websites, e-mail or other electronic means (collectively "Electronic Connections") and via fax. By providing their fax numbers and signing this Agreement, each party consents to receiving communications via fax regarding all aspects of their relationship. Under no circumstances will BROKER or its affiliates be responsible for, and CARRIER hereby expressly waives and releases BROKER and its affiliates from, any liability for any loss or damage caused by Computer Viruses, the CARRIER's receipt of Electronic Materials from BROKER or its affiliates or Electronic Connections between BROKER and its affiliates and the CARRIER.

22. **CONFIDENTIALITY.** In addition to Confidential information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of their customers, including but not limited to freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, amounts of freight charges paid, freight volume requirements, as well as


This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and their customers, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent. In the event of violation of this Confidentiality paragraph, the Parties and agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy they may have, to an injunction restraining the violating Party from further violation of this Agreement in which case the prevailing Party shall be liable for all costs and expenses incurred, including but not limited to reasonable attorney's fees.

## CARRIER REQUIREMENTS

### GENERAL CARRIER REQUIREMENTS

1. Drivers are required to check call every day (including Saturday, Sunday, and holidays) between 8:00am and 9:00 am Eastern Time giving their current location and temperature if required. Failure to do so can result in a $100.00 fine against the CARRIER's settlement for each infraction.
2. BROKER is available 24 hours a day 7 days a week. Failure to call immediately on any problems can result in a $200.00 fine to CARRIER.
3. Failure to report any overage, shortage, or damage within 24 hours will result in a $100.00 fine to CARRIER.
4. CARRIER is responsible for any damage to product or damage to the products container, and shortages of freight.
5. If any unloading payment is agreed upon, carrier must supply unloading receipt with lumper's full name and social security number along with the BROKER authorization number at the time of original billing. Failure to do so within 24 hours of delivery will result in no reimbursement for unloading.
6. For all pallet exchange loads be sure that the number of pallets in and number of pallets out are marked clearly on the original Bill of Lading.
7. Failure to deliver with fully loaded trailer or incomplete order will result in a reduced pro-rated fee.
8. Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to the CARRIER.
9. Any product which must be disposed must have prior written consent from BROKER before being disposed.
10. Before loading driver must have a sufficient number of load locks to secure the load.
11. Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, the CARRIER becomes 100% liable for the invoice value to customer or cost whichever is greater, of the product and any other expenses.

### CARRIER REQUIREMENTS FOR REFRIGERATED LOADS

(*These requirements are additions to the General Carrier Requirements listed above*)

1. Prior to loading, confirm that the reefer unit is working properly and pre-cool trailer to required temperature.
2. Trailers hauling produce must have an air chute for proper circulation, no exceptions! It is the driver's responsibility to make sure the chute is not damaged, obstructed or blocked in any way.
3. Driver is responsible to make sure space is provided for air circulation in front, rear, top, bottom and between the load.
4. Check pulp temperature of the product to ensure that it has been pre-cooled. Do not accept any fresh product pulping over 2 degrees above the required temperature noted on BROKER rate confirmation. If the temperature on BROKER rate confirmation differs from that on the Bill of Lading, call BROKER before signing the bills of lading at the shipper. If the load is accepted contrary to the terms on BROKER rate confirmation, CARRIER accepts all risk or resulting loss. Make sure the pulp temperature of the product loaded is marked on the original Bill of Lading and that the driver agrees with that temperature.
5. When driver signs the Bill of Lading, he/she is confirming that he/she received the correct product and correct count at the proper temperature. Be sure they agree with the information on the Bill of Lading. Your company is responsible.
6. Maintain continuous temperature noted on our Rate Confirmation in-route, unless otherwise instructed by our office. If you do not, you assume all risk of loss resulting.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first above written intending to be legally bound.

| | | | |
|---|---|---|---|
| **BROKER:** | **TOTAL QUALITY LOGISTICS, INC.**<br>**TOTAL QUALITY LOGISTICS, LLC.** | **CARRIER:** | Stevens Trucking Co |
| **Name:** | **Jim Perkinson** | **Name:** | Tina Northrup |
| **Signature:** | James E Perkinson | **Signature:** | [signature] |
| **Title:** | **Controller** | **Title:** | IB Dispatcher |

CONTRACT PAGE 5



This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

TQL TOTAL QUALITY LOGISTICS
exceptional service, proven results

## Appendix A

### Extra Requirements for Hazardous Materials Shipments

HAZMAT

For any shipment arranged by BROKER to be transported by CARRIER involving transportation of hazardous materials or waste requiring vehicle placarding under 49 C.R.R. Part 172, or any amendment, revision or other applicable regulation, the parties agree the following provisions shall apply and shall be included by this reference, in addition to provisions in the Broker/Carrier Agreement, to which this Appendix is attached:

1. CARRIER also represents and warrants it holds all Federal and/or state permits and registrations necessary to transport the hazardous materials or waste, and CARRIER shall provide BROKER copies of all appropriate documents upon BROKER's request.

2. CARRIER also represents and warrants all CARRIER's drivers transporting hazardous materials or waste (a) are properly trained and qualified under all applicable Federal and state laws, including, as example, 49 C.F.R. § 172.000 and 177.800, and (b) have the proper endorsements on their Commercial Driver's License to transport such shipments.

3. CARRIER shall comply with all applicable laws and regulations relating to the transportation of Hazardous Materials as defined 49 C.F.R. § 172.800, § 173, and § 397, et seq. (including any amendments) to the extent that any shipments hereunder constitute Hazardous Materials; applicable security plan regulations and training required by Homeland Security laws and regulations. CARRIER shall be solely responsible for any violation of the applicable laws and regulations, and shall defend, indemnify, and BROKER and its CUSTOMERS harmless and pay BROKER on demand from any claims, losses, damages or liability incurred, including but not limited to reasonable attorneys fees arising from non-compliance.

4. If CARRIER is requested to transport hazardous materials or waste for which CARRIER must maintain $5 million ($US) liability coverage under 49 C.F.R. § 387.9, CARRIER shall procure and maintain, at its sole expense, public liability and property damage insurance from an insurance company authorized to do business in all states in which goods will move, insuring CARRIER for at least $5 million ($US) per occurrence. Such insurance shall name BROKER as certificate holder and, if requested by BROKER, BROKER and BROKER's CUSTOMER as additional insureds for any and all liabilities for personal injuries (including death) and property damage, including environmental damage due to the release or discharge of a hazardous substance, arising out of or in any way related to CARRIER's transportation.

5. By signing below CARRIER specifically acknowledges that this Appendix A is a part of the Broker/Carrier Agreement to which it is attached and is fully enforceable against the CARRIER according to its terms.

Dated this 10 day of January, 2007

CARRIER: Sterns Trucking

Name: Tina Northrop

Signature: [signature]

Title: IB Dispatcher



This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

TQL
TOTAL QUALITY LOGISTICS
exceptional service, proven results

**Mailing Address:**
**P.O. Box 799, Milford, OH 45150**

**Overnight Address:**
**1701 Edison Dr, Milford, OH 45150**

**PM-25**
**(Rev. 1/95)**

SERVICE DATE
**August 11, 1997**

FEDERAL HIGHWAY ADMINISTRATION

LICENSE

MC 322572 B

TOTAL QUALITY LOGISTICS INC.

CINCINNATI, OH, US

**This license is evidence of the applicant's authority to engage in operations, in interstate or foreign commerce, as a broker, arranging transportation of freight (except household goods) by motor vehicle.**

**This authority will be effective as long as the broker maintains insurance coverage for the protection of the public (49 CFR 387) and the designation of agents upon whom process may be served (49 CFR 366). Applicant shall also render reasonably continuous and adequate service under this authority. Failure to maintain compliance will constitute sufficient grounds for revocation of this authority.**

**Thomas T. Vining**
**Chief, Licensing and Insurance Division**


This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

PM-31
(Rev. 1/95)

**SERVICE DATE**
**December 12, 2000**

DEPARTMENT OF TRANSPORTATION
FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

PERMIT

MC 156009 P

KENNEY STEVENS
D/B/A STEVENS TRUCKING
OKLAHOMA CITY, OK, US

This Permit is evidence of the carrier's authority to engage in transportation as a contract carrier of property (except household goods) by motor vehicle in interstate or foreign commerce.

This authority will be effective as long as the carrier maintains compliance with the requirements pertaining to insurance coverage for the protection of the public (49 CFR 387) and the designation of agents upon whom process may be served (49 CFR 366). Failure to maintain compliance will constitute sufficient grounds for revocation of this authority.

Service must be performed under a continuing agreement with one or more persons.

Terry Shelton, Acting Director
Office Data Analysis & Information Systems

NOTE: Willful and persistent noncompliance with applicable safety fitness regulations as evidenced by a DOT safety fitness rating of "Unsatisfactory" or by other indicators, could result in a proceeding requiring the holder of this certificate or permit to show cause why this authority should not be suspended or revoked.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Form **W-9** (Rev January 2002) Department of the Treasury Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give form to the requester. Do not send to the IRS.**

Print or type. See Specific Instructions on page 2.

Name: Stevens Trucking Co.

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor ☒ Corporation ☐ Partnership ☐ Other ► ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.): P.O. Box 19608

Requester's name and address (optional)

City, state, and ZIP code: Oklahoma City, OK. 73144

List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 2.

Social security number: 

or

Employer identification number: 06-1166548 14

Note: *If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.*

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 2.)

**Sign Here** Signature of U.S. person ► [signature] Date ► 1-6-05

## Purpose of Form

A person who is required to file an information return with the IRS must get your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**Use Form W-9 only if you are a U.S. person** (including a resident alien), to give your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**If you are a foreign person,** use the appropriate Form W-8. See Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities.

**Note:** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 30% of such payments after December 31, 2001 (29% after December 31, 2003). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester, or
2. You do not certify your TIN when required (see the Part II instructions on page 2 for details), or
3. The IRS tells the requester that you furnished an incorrect TIN, or
4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or
5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions on page 2 and the separate Instructions for the Requester of Form W-9.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.



This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

U.S. Department of Transportation
Federal Motor Carrier Safety Administration

400 7th Street SW
Washington, DC 20590

**SERVICE DATE**
**December 27, 2002**

**DECISION**

**MC-156009**
**KENNEY STEVENS**
**D/B/A STEVENS TRUCKING**
**OKLAHOMA CITY, OK**
**REENTITLED**

STEVENS TRUCKING CO.

On December 20, 2002, applicant filed a request to have the Federal Motor Carrier Safety Administration's records changed to reflect a name change.

***It is ordered:***

The Federal Motor Carrier Safety Administration's records are amended to reflect the carrier's name as STEVENS TRUCKING CO..

Within 30 days after this decision is served, the applicant must establish that it is in full compliance with the statute and the insurance regulations by having amended filings on prescribed FMCSA forms (BMC91 or 91X or 82 for bodily injury and property damage liability, BMC 34 or 83 for cargo liability, or a BMC 84 or 85 for property broker security and BOC-3 for designation of agents upon whom process may be served) submitted on its behalf. Copies of Form MCS-90 or other "certificates of insurance" are not acceptable evidence of insurance compliance. Insurance and BOC-3 filings should be sent to Federal Motor Carrier Safety Administration, 400 Virginia Avenue, SW, Suite 600, Washington, DC 20024.

The applicant is notified that failure to comply with the terms of this decision shall result in revocation of its operating rights registration, effective 30 days from the service date of this decision.

To verify that the applicant is in full compliance, call (202)358-7000 or visit our web site at: **http://fmcsa-li.volpe.dot.gov**. Any other questions regarding the action taken should be directed to (202)358-7028/7029.

***Decided:*** December 23, 2002
By the Federal Motor Carrier Safety Administration.

*Terry Shelton*

**Terry Shelton, Director**
**Office of Data Analysis & Information System**

**NCA**

## ID/Operations | Inspections/Crashes | Safety Rating | Insurance

**Carrier Safety Rating:**

**The rating below is current as of: 04/21/2001**

**Review Information:**

| | | | |
|---|---|---|---|
| Rating date: | 06/01/1992 | Date: | 08/05/1997 |
| Rating: | Satisfactory | Type: | Compliance Review |

## ID/Operations | Inspections/Crashes | Safety Rating | Insurance

*Operating Authority and Insurance Information is updated nightly. For the most current information, go to* **FMCSA Licensing & Insurance site.**

**Insurance Information last updated: 04/26/2001**

**Docket Number(s): MC156009**

**Name on Operating Authority Documents: KENNEY STEVENS DBA STEVENS TRUCKING**
**Docket #: MC156009**

**Operating Authority Status:**

| Common Authority | Contract Authority | Broker Authority |
|---|---|---|
| Active | Active | Active |



This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# HAZARDOUS MATERIALS CERTIFICATE OF REGISTRATION FOR REGISTRATION YEAR(S) 2005-2007

**Registrant:** STEVENS TRUCKING CO
Attn: CURTIS T CHILDRESS
PO BOX 19608
OKLAHOMA, OK 73144

This certifies that the registrant is registered with the U.S. Department of Transportation as required by 49 CFR Part 107, Subpart G.

This certificate is issued under the authority of 49 U.S.C. 5108. It is unlawful to alter or falsify this document.

**Reg. No: 061405 014 019NO** ***Issued:*** **06/15/2005** **Expires: 06/30/2007**
**Reissued: 07/08/2005**

**Record Keeping Requirements for the Registration Program**

The following must be maintained at the principal place of business for a period of three years from the date of issuance of this Certificate of Registration:

(1) A copy of the registration statement filed with PHMSA; and
(2) This Certificate of Registration

Each person subject to the registration requirement must furnish that person's Certificate of Registration (or a copy) and all other records and information pertaining to the information contained in the registration statement to an authorized representative or special agent of the U. S. Department of Transportation upon request.

Each motor carrier (private or for-hire) and each vessel operator subject to the registration requirement must keep a copy of the current Certificate of Registration or another document bearing the registration number identified as the "U.S. DOT Hazmat Reg. No." in each truck and truck tractor or vessel (trailers and semi-trailers not included) used to transport hazardous materials subject to the registration requirement. The Certificate of Registration or document bearing the registration number must be made available, upon request, to enforcement personnel.

For information, contact the Hazardous Materials Registration Manager, DHM-60, Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation, 400 Seventh Street, SW, Washington, DC 20590, telephone (202) 366-4109.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

P.O. Box 19608

STEVENS TRUCKING

Okla. City Ok 73144

Fax (405) 745-2735

(405) 745-2363

Stevens Trucking Co
Phone: 405-745-2363
Fax: 405-745-2735

Billing Address:
Stevens Trucking Co
PO Box 19608
Oklahoma City, OK 73144

References:

Dayton Tire
PO Box 24011
Oklahoma City, OK 73124
Randy Duffel – Transportation Manager
Phone: 405-280-3406

Autocraft Industries
PO Box 270180
Oklahoma City, OK 73137
Danny Thompson – Warehouse Supervisor
Phone: 405-577-9980

Eaton Corporation
5001 S.W. 20th Street
Oklahoma City, OK 73128
Tim Huegel – Materials Manager
Phone: 405-682-0873 ext 18

Please call if you have any other questions.
Thank you,
Ron Stone
Freight Manager
Stevens Trucking Co

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

OP ID VJ STEVE-8

DATE (MM/DD/YYYY) 07/21/06

PRODUCER
Brown & Brown of Central OK
P.O. Box 16340
Oklahoma City OK 73113
Phone: 866-678-5862 Fax: 405-607-6353

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

INSURED Vicki #28
Stevens Trucking Co.
Post Office Box 19608
Oklahoma City OK 73144-0608

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: National American Ins. Co. | |
| INSURER B: Travelers Cas & Surety of Amer | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE [X] OCCUR<br>X BI/PD DED $500<br>GEN'L AGGREGATE LIMIT APPLIES PER: X POLICY / PRO-JECT / LOC | 3G10000035 | 07/26/06 | 07/26/07 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>HIRED AUTOS<br>NON-OWNED AUTOS | 3A10070035<br>COMMERICAL AUTO ONLY | 07/26/06 | 07/26/07 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN AUTO ONLY: EA ACC | $ |
| | | | | | | AGG | $ |
| | | EXCESS/UMBRELLA LIABILITY<br>OCCUR / CLAIMS MADE<br>DEDUCTIBLE<br>RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| A | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | 3W21500035 | 07/26/06 | 07/26/07 | X WC STATU-TORY LIMITS / OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| B | | OTHER<br>Motor Truck Cargo<br>Legal Liability | QT6603267B225-02 | 07/26/06 | 07/26/07 | $100,000<br>$1,000 | Limit<br>Deductible |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
INSURANCE PURPOSES ONLY

## CERTIFICATE HOLDER

STEVOKL

Stevens Trucking Co.
P.O. Box 19608
Oklahoma City OK 73144

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE [signature]

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.